UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF WASHINGTON THROUGH THE WASHINGTON DEPARTMENT OF ECOLOGY, SUQUAMISH TRIBE, AND TULALIP TRIBES, <br><br> Plaintiffs, <br><br> v. <br><br> PORT OF EVERETT, <br><br> Defendant. | Civil Action No.: <br><br> 2:19-cv-843 |

## AMENDED **CONSENT DECREE**

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

# I.   BACKGROUND

A.   The Plaintiffs have filed a complaint in this matter against the Port of Everett ("Settling Defendant" or "Port") pursuant to the Model Toxics Control Act ("MTCA"), chapter 70.105D RCW; chapter 90.48 RCW; Section 311 of the Clean Water Act ("CWA"), 33 U.S.C. § 1321; and Section 1002(b)(2)(A) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2702(b)(2)(A) for Natural Resource Damages as a result of releases of hazardous substances and discharges of oil into the Port Gardner Bay Area.  Potential claims of the non-federal Trustees against the United States on behalf of the Settling Federal Agency are deemed filed and some or all of the allegations in such claims are deemed denied.  The Port Gardner Bay Area (as defined below and depicted in Appendix A) includes the lower Snohomish River, Everett Waterfront, East Waterway, and a portion of Possession Sound in and near Everett, Washington. Several industrial facilities – including those owned and/or operated by the Settling Defendant and owned and/or operated by the Settling Federal Agency, identified in Appendix B – have contributed hazardous substances and oil to the Port Gardner Bay Area. This Consent Decree (the "Decree") addresses the claims asserted in the Complaint against the Port and potential claims against the Settling Federal Agency.

B.   The United States Department of Commerce, acting through the National Oceanic and Atmospheric Administration ("NOAA"); the United States Department of the Interior; the Washington Department of Ecology on behalf of the State of Washington ("State"); the Suquamish Tribe; and the Tulalip Tribes, (collectively, "the Trustees" and, individually, a "Trustee"), under the authority of Section 107(f) of the Comprehensive Environmental

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

Page 2 of 75

1    Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(f); Section 1006(b)

2    of OPA, 33 U.S.C. § 2706(b); 40 C.F.R. Part 300, subpart G; and RCW 70.105D.040(2), serve as

3    trustees for Natural Resources for the assessment and recovery of damages for injury to,

4    destruction of, or loss of Natural Resources under their trusteeship.

5         C.        Investigations conducted by the Trustees and others have detected hazardous

6    substances in the sediments, soils and groundwater of the Port Gardner Bay Area, including, but

7    not limited to, polychlorinated dibenzodioxins and furans ("dioxins"), polychlorinated biphenyls

8    ("PCBs"), organochlorine pesticides and related products, polycyclic aromatic hydrocarbons

9    ("PAHs"), metals (including lead, mercury, copper, chromium, and arsenic), volatile and semi-

10   volatile organic compounds (including 4-methylphenol), perchlorate, herbicides, organic

11   solvents, antifouling agents such as tributyltin and other butyltins, and wood waste degradation

12   products (including sulfide and ammonia).

13        D.        Plaintiffs allege that hazardous substances and oil released to the Port Gardner

14   Bay Area from facilities owned and/or operated by Settling Defendant and facilities owned

15   and/or operated by the Settling Federal Agency, identified in Appendix B, have caused injury to,

16   destruction of and loss of Natural Resources under Plaintiffs' trusteeship, including fish,

17   shellfish, wildlife, marine sediments, and resources of cultural significance. Plaintiffs further

18   allege that each of them and the public have suffered the loss of natural resource services

19   (including ecological services as well as direct and passive human use losses) as a consequence

20   of those injuries.

CONSENT DECREE                              UNITED STATES DEPARTMENT OF JUSTICE
                                            Environment and Natural Resources Division
                                            P.O. Box 7611, Washington, D.C. 20044-7611
                                            202-514-5270

1         E.      Although the Trustees initiated but have not completed a full natural resource

2 damage assessment for the Port Gardner Bay Area, the Trustees have developed and analyzed

3 information sufficient to support a settlement that is fair, reasonable and in the public interest.

4         F.      The Trustees issued a Damage Assessment Restoration Plan and Environmental

5 Assessment for the Port Gardner Bay Area in August 2016, which the Trustees adopted as final

6 in October 2016 after a public comment period, selecting the Blue Heron Slough Restoration

7 Project ("Restoration Project" or "Project") as the preferred alternative to restore, replace, and/or

8 acquire the equivalent of injured Natural Resources and services.

9         G.      As contemplated by this Consent Decree, the Port will resolve its liability as set

10 forth in Section XIII by constructing, monitoring and maintaining the Blue Heron Slough

11 Restoration Project as described in Appendix C. The Project will restore and protect in perpetuity

12 approximately 338 acres of habitat in the Snohomish River estuary that is highly beneficial to

13 injured Natural Resources in the Port Gardner Bay Area. As set forth in this Decree and

14 Appendix C, the Port shall purchase 469.39 natural resource damage restoration credits ("NRD

15 DSAYs") equivalent to 34.79 acres of the Project Site upon Final Completion of the Project.

16 The Project will also be a certified conservation bank, maintained in perpetuity by Wildlands of

17 Washington, LLC, as outlined in the *Puget Sound Salmon, Steelhead, and Bull Trout Umbrella*

18 *Conservation Bank Agreement* and *Addendum #1, Blue Heron Slough Conservation Bank*

19 *Agreement* ("Conservation Bank Agreement" or "CBA")*,* approved by NOAA's National Marine

20 Fisheries Service on June 18, 2008.

CONSENT DECREE                         UNITED STATES DEPARTMENT OF JUSTICE
                                                        Environment and Natural Resources Division
                                                          P.O. Box 7611, Washington, D.C. 20044-7611
                                                                    202-514-5270

1        H.      To facilitate the resolution of natural resource damage claims, relying upon the

2    results of remedial investigations, regulatory standards, and scientific literature, and as set forth

3    in the final Damage Assessment Restoration Plan and Environmental Assessment, the Trustees

4    developed an estimate of the amount of injury to Natural Resources that had occurred as a result

5    of releases of hazardous substances and discharges of oil to the Port Gardner Bay Area. The

6    Trustees used a metric called discounted service acre-years ("DSAYs") to quantify the effects of

7    the injuries in terms of the losses of ecological services over affected areas and over time,

8    discounted to the current year. The Trustees used DSAYs to describe both the scale of the

9    injuries, and the amount of habitat restoration they are seeking to compensate for the injuries.

10    The Trustees first calculated the DSAYs lost due to contamination to the Port Gardner Bay Area,

11    then calculated the DSAYs associated with the Port's Restoration Project, determining that

12    purchase of NRD DSAYs by the Port, described in the preceding paragraph, is sufficient to

13    resolve the liability of the Port.

14        I.       Consistent with Sections 7.4 and 8.1.3 of the Trustees' Damage Assessment

15    Restoration Plan and Environmental Assessment, Port Gardner Bay Trustee Council Resolution

16    No. 2019-01, and the March 7, 2019, Memorandum of Agreement ("MOA") between the U.S.

17    Fish and Wildlife Service, acting on behalf of DOI, the Tulalip Tribes, and Settling Defendant,

18    after approval and entry of this Decree by the Court, the Trustees anticipate using the natural

19    resource damages payments received by the Trustees pursuant to the Consent Decree entered in

20    *United States, et al. v. Jeld-Wen, Inc., et al.*, Civil Action No. 2:18-cv-00113 (W.D. Wash.)

21    ("Cashout Consent Decree") to purchase restoration credits in the Blue Heron Slough

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

**Page 5 of 75**

1   Restoration Project equivalent to the 399.74 NRD DSAYs (equivalent to 29.63 acres of the

2   Project Site) allocated to the Potentially Responsible Parties ("PRPs") that entered into the

3   Cashout Consent Decree.  The purchase of these restoration credits will be in addition to Settling

4   Defendant's obligation to purchase 469.39 NRD DSAYs, as described in Paragraphs G and 29.

5          J.        Plaintiffs assert that hazardous substance releases and oil discharges to the Port

6   Gardner Bay Area have become dispersed and commingled to the extent that the effects of

7   releases of one PRP cannot be readily distinguished from another's. Plaintiffs further assert that

8   the circumstances of the contamination make all PRPs who contributed to the contamination

9   jointly and severally liable for all injuries to Natural Resources that have resulted from the

10  contamination.  As a consequence, Plaintiffs assert the right to recover for the loss of all the

11  calculated DSAYs and associated damage assessment costs from any PRP.  Without prejudice to

12  their position and solely for purposes of facilitating settlement with individual PRPs, the

13  Plaintiffs have determined that settling with the Settling Defendant and the Settling Federal

14  Agency for a portion of the Natural Resource damages attributable to all Port Gardner Bay Area

15  sources would result in a fair and equitable resolution of Plaintiffs' claims. The Trustees have

16  estimated the cash damages equivalent of the DSAYs allocated to Settling Defendant (469.39 of

17  the 1,019 total DSAYs assessed by the Trustees for the Port Gardner Bay Area) to total

18  $4,634,287.47. In lieu of payment of damages, the Port will implement the Restoration Project as

19  set forth in this Decree. The State and the Tribes have agreed to settle their claims against the

20  Settling Federal Agency for the equivalent of 80 DSAYs (having a cash damages equivalent of

21  $789,840).

CONSENT DECREE                                          UNITED STATES DEPARTMENT OF JUSTICE
                                                        Environment and Natural Resources Division
                                                        P.O. Box 7611, Washington, D.C. 20044-7611
                                                        202-514-5270

1       K.      The Parties agree, and this Court by entering this Consent Decree finds, that this

2   Decree has been negotiated by the Parties in good faith, that settlement of this matter will avoid

3   prolonged and complicated litigation between the Parties, that this Decree will expedite the

4   restoration and protection of Natural Resources at and near the Port Gardner Bay Area, that the

5   timely implementation of the Restoration Project and payments to be provided under this Decree

6   constitute appropriate actions necessary to protect and restore the Natural Resources allegedly

7   injured by releases or threatened releases of hazardous substances and discharges of oil by the

8   Settling Defendant and the Settling Federal Agency, and that this Decree is fair, reasonable, and

9   in the public interest.

10   NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

11           **II.     JURISDICTION AND VENUE**

12       1.      This Court has jurisdiction over the subject matter of this action pursuant to 28

13   U.S.C. §§ 1331, 1345 and 1367, and 42 U.S.C. §§ 9607 and 9613(b) and 33 U.S.C. § 2717(b).

14   The Court also has personal jurisdiction over the Settling Defendant.  Solely for purposes of this

15   Consent Decree and the underlying Complaint, the Settling Defendant waives all objections and

16   defenses that it may have to jurisdiction of the Court or to venue in this District.  Settling

17   Defendant shall not challenge the terms of this Decree or this Court's jurisdiction to enter and

18   enforce this Decree.

19           **III.     PARTIES BOUND**

20       2.      This Consent Decree is binding upon the United States, the State, the Suquamish

21   Tribe, the Tulalip Tribes, and the Settling Defendant, its successors, and assigns.  Any change in

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

**Page 7 of 75**

1  ownership or corporate or other legal status of Settling Defendant, including, but not limited to,

2  any transfer of assets or real or personal property, shall in no way alter Settling Defendant's

3  responsibilities under this Consent Decree.

4       3.     Settling Defendant shall provide a copy of this Consent Decree to each contractor

5  hired to perform any of the work required by this Consent Decree, and to each person

6  representing Settling Defendant with respect to such work, and shall condition all contracts

7  entered into hereunder upon performance of the work in conformity with the terms of this

8  Consent Decree.  Settling Defendant or its contractors shall provide written notice of the Consent

9  Decree to all subcontractors hired to perform any portion of the work.  Settling Defendant shall

10  nonetheless be responsible for ensuring that its contractors and subcontractors perform the work

11  in accordance with the terms of this Consent Decree.

12  **IV.  DEFINITIONS**

13       4.     Unless otherwise expressly provided in this Consent Decree, terms used in this

14  Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA

15  shall have the meaning assigned to them in CERCLA or such regulations.  Whenever terms listed

16  below are used in this Decree or its appendices, the following definitions shall apply solely for

17  purposes of this Decree:

18       a.     "CERCLA" shall mean the Comprehensive Environmental Response,

19  Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

20       b.     "Commerce" shall mean the United States Department of Commerce and

21  its successor departments, agencies, or instrumentalities.

CONSENT DECREE                      UNITED STATES DEPARTMENT OF JUSTICE
                                          Environment and Natural Resources Division
                                          P.O. Box 7611, Washington, D.C. 20044-7611
                                          202-514-5270

1        c.      "Consent Decree" or "Decree" shall mean this consent decree and all

2  appendices attached hereto (listed in Section XXI) and any final approved plans required

3  hereunder.  In the event of a conflict between this Consent Decree and any Appendix or plan, the

4  Consent Decree shall control.

5        d.      "Conservation Bank Agreement" or "CBA" shall mean the *Puget Sound*

6  *Salmon, Steelhead, and Bull Trout Umbrella Conservation Bank Agreement* and *Addendum #1,*

7  *Blue Heron Slough Conservation Bank Agreement*, approved by NOAA's National Marine

8  Fisheries Service on June 18, 2008.

9        e.      "Day" or "day" shall mean a calendar day.  In computing any period of

10  time under this Consent Decree, where the last day falls on a Saturday, Sunday, or federal

11  holiday, the period shall run until the close of business of the next working day.

12        f.      "Default" shall mean circumstances constituting default as defined in the

13  Performance Bond attached as Appendix F.

14        g.      "DOI" shall mean the United States Department of the Interior and its

15  successor departments, agencies, or instrumentalities.

16        h.      "DSAYs" means discounted service acre-years, the metric established by

17  the Trustees to quantify the scale of Natural Resource Damages liability associated with the Port

18  Gardner Bay Area and the natural resource restoration efforts needed to compensate for injury to,

19  destruction or loss of Natural Resources giving rise to liability.

20        i.      "Effective Date" shall mean the date upon which the approval of this

21  Consent Decree is recorded on the Court's docket.

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1     j.  "Federal Trustees" shall mean DOI and Commerce, acting through

2 NOAA.

3     k.  "Final Completion" shall mean the completion of construction of the

4 Project, as defined in Section 10 of Appendix C.

5     l.  "Initial Maintenance and Monitoring" shall mean the maintenance and

6 monitoring activities during the first ten (10) years after Final Completion, described in Section 7

7 of Appendix C.

8     m.  "Lodging Date" means the date on which this Consent Decree is lodged

9 with the Court.

10     n.  "Long-Term Maintenance and Monitoring" shall mean the maintenance

11 and monitoring activities during the twenty (20) years after completion of Initial Maintenance

12 and Monitoring, described in Section 8 of Appendix C.

13     o.  "Maintenance and Monitoring" shall mean the maintenance and

14 monitoring activities during the first thirty (30) years after Final Completion, and includes both

15 Initial Maintenance and Monitoring and Long-Term Maintenance and Monitoring.

16     p.  "MTCA" shall mean the Washington Model Toxics Control Act, Chapter

17 70.105D RCW.

18     q.  "Natural Resource Damages" shall mean any damages, including the

19 costs of damage assessment, recoverable by the Trustees under Section 107 of CERCLA, 42

20 U.S.C. § 9607; Chapter 70.105D RCW; Section 311 of the Clean Water Act ("CWA"), 33

21 U.S.C. § 1321; Chapter 90.48 RCW; and Section 1002(b)(2) of the Oil Pollution Act of 1990

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1   ("OPA"), 33 U.S.C. § 2702(b)(2), for injury to, destruction of, loss of, loss of use of, or

2   impairment of Natural Resources, including, but not limited to: (i) the costs of assessing such

3   injury, destruction, or loss or impairment of natural resources; (ii) the costs of restoration,

4   rehabilitation, or replacement of injured or lost natural resources or of acquisition of equivalent

5   resources; (iii) the costs of planning such restoration activities; (iv) compensation for injury,

6   destruction, loss, impairment, diminution in value, or loss of use of natural resources; and (v)

7   each of the categories of recoverable damages described in 43 C.F.R. § 11.15, and applicable

8   State or tribal law, resulting from releases of hazardous substances or discharges of oil to the

9   Port Gardner Bay Area, where such release or discharge occurred on or before the Effective Date

10   of this Consent Decree, at the locations identified in Appendix B.  Damages, injury to,

11   destruction of, loss of, loss of use of, or impairment of Natural Resources resulting from releases

12   of hazardous substances or discharges of oil originating from Settling Defendant's operations or

13   activities at properties other than the property identified in Appendix B are not included in

14   Natural Resource Damages, for purposes of this Decree, even if those hazardous substances or

15   discharges of oil reach the Port Gardner Bay Area by flowing over, under, or through any portion

16   of the property identified in this subparagraph.

17           r.    "Natural Resources" shall mean that definition as provided in 42 U.S.C.

18   § 9601(16).

19           s.    "Parties" shall mean the United States, the State of Washington, the

20   Suquamish Tribe, the Tulalip Tribes, and the Settling Defendant.

CONSENT DECREE                   UNITED STATES DEPARTMENT OF JUSTICE
                                           Environment and Natural Resources Division
                                           P.O. Box 7611, Washington, D.C. 20044-7611
                                           202-514-5270

1    t.    "Performance Standards" are the standards for performance of the work

2    for the Project set forth in Appendix C.

3    u.    "Plaintiffs" shall mean the United States, the State of Washington, the

4    Suquamish Tribe, and the Tulalip Tribes.

5    v.    "Port" or "Port of Everett" shall mean the Settling Defendant.

6    w.    "Port Gardner Bay Area" shall mean the area depicted on Appendix A,

7    attached, including the lower Snohomish River, Everett Waterfront, East Waterway, and a

8    portion of Possession Sound in and near Everett, Washington.

9    x.    "Project" or "Restoration Project" shall mean the Blue Heron Slough

10   Restoration Project, including all work and other commitments identified in Appendix C.

11   y.    "Project Abandonment" shall mean a circumstance in which Settling

12   Defendant, directly or through its contractors, (a) has abandoned construction or has abandoned

13   Maintenance and Monitoring of the Project, without Trustee permission or approval, or (b) is

14   seriously and repeatedly deficient in construction or in Maintenance and Monitoring of the

15   Project in accordance with Appendix C.

16   z.    "Project Site" shall mean the areas outlined for the Restoration Project as

17   identified in Appendix C.

18   aa.    "Settling Defendant" shall mean the Port of Everett.

19   bb.    "Settling Federal Agency" shall mean the United States Navy and its

20   successor departments, agencies, or instrumentalities.

21   cc.    "State" shall mean the State of Washington.

CONSENT DECREE                                    UNITED STATES DEPARTMENT OF JUSTICE
                                                  Environment and Natural Resources Division
                                                  P.O. Box 7611, Washington, D.C. 20044-7611
                                                  202-514-5270

1          dd.     "Stewardship" shall mean actions intended to preserve, protect or maintain

2    the Project and the Project Site in perpetuity after the completion of Long-Term Maintenance

3    and Monitoring, as required by the Conservation Bank Agreement, including (a) maintaining,

4    restoring or replacing the ecological function of the Projects; and (b) maintaining, restoring or

5    replacing physical components of the Project.

6          ee.     "Tribes" shall mean the Suquamish Tribe and the Tulalip Tribes.

7          ff.     "Trustees" shall mean Commerce, acting through NOAA; DOI; the

8    Washington State Department of Ecology, on behalf of the State of Washington; the Suquamish

9    Tribe; and the Tulalip Tribes.

10         gg.     "United States" shall mean the United States of America and each

11   department, agency, and instrumentality of the United States, including Commerce, acting

12   through NOAA; DOI; and the Settling Federal Agency.

13         hh.     "Wildlands" shall mean Wildlands of Washington LLC, a business entity

14   that, among other things, designs, constructs, and maintains natural resource restoration and

15   enhancement projects on behalf of persons that are liable for natural resource damages at

16   properties that have suffered a loss of Natural Resources pursuant to CERCLA. The Port is

17   working with Wildlands to plan, restore and manage habitat within the Project Site.

18                    **V.     GENERAL PROVISIONS**

19       5.     The Complaint states claims upon which relief may be granted.

CONSENT DECREE                                    UNITED STATES DEPARTMENT OF JUSTICE
                                                  Environment and Natural Resources Division
                                                  P.O. Box 7611, Washington, D.C. 20044-7611
                                                  202-514-5270

1   6.  This Consent Decree shall not be used as evidence of Settling Defendant's or

2 Settling Federal Agency's alleged liability in any action or proceeding other than an action or

3 proceeding to enforce the terms of this Decree.

4   7.  This Decree is not, and shall not be construed to be, a permit issued pursuant to

5 any law. Where any portion of the activities undertaken pursuant to this Decree requires a

6 federal, state or local permit or approval, Settling Defendant shall submit timely and complete

7 applications and take all other actions necessary to obtain such permits or approvals.  Settling

8 Defendant may not seek relief under the provisions of Section X (Force Majeure) of this Decree

9 for any delay in the performance of the Project resulting from a failure to obtain, or a delay in

10 obtaining, any permit or approval required for the Project.

11   8.  Settling Defendant shall ensure that all work performed under this Decree shall be

12 conducted as set forth in Appendix C to achieve the objective of constructing and maintaining

13 the Project to meet the Performance Standards identified in Appendix C.  If the Trustees

14 determine that Settling Defendant is not complying with the requirements set forth in the Decree,

15 including Appendix C, the Trustees shall provide written notice to Settling Defendant specifying

16 the basis for their determination of noncompliance.  Settling Defendant may correct the

17 noncompliance or invoke the dispute resolution procedures set forth in Section XI.  The Trustees

18 may require Settling Defendant to take actions to alter, suspend or cease ongoing activities, and

19 to alter, postpone or refrain from taking proposed actions, as are necessary to ensure compliance

20 with the terms of this Decree and any plans or proposals adopted hereunder.  If Settling

21 Defendant disputes any such requirements imposed by the Trustees, the Settling Defendant may

CONSENT DECREE         UNITED STATES DEPARTMENT OF JUSTICE
                     Environment and Natural Resources Division
                     P.O. Box 7611, Washington, D.C. 20044-7611
                     202-514-5270

1    invoke the dispute resolution procedures set forth in Section XI.  Notwithstanding the foregoing,

2    if in connection with the noncompliance the Trustees seek to exercise one of the performance

3    guarantees in Section VI.F, the procedures described in Paragraph 26 will control.

4          9.     The Plaintiffs do not, by their consent to the entry of this Decree, warrant or aver

5    in any manner that Settling Defendant's compliance with this Decree will result in compliance

6    with CERCLA or any other law.  Compliance with this Decree does not diminish or affect

7    Settling Defendant's responsibility to comply with any applicable federal, state, tribal or local

8    law or regulation.  The Parties agree that Settling Defendant is responsible for achieving and

9    maintaining complete compliance with all applicable federal, state, tribal and local laws,

10    regulations and permits (including those related to Settling Defendant's operation, maintenance

11    and repair of the I-5 Dike identified in Sections 6.1, 8.2 and 10.1 of Appendix C).

12    **VI.**    **PERFORMANCE OF RESTORATION PROJECT BY SETTLING DEFENDANT**

13          10.    Settling Defendant shall fund and perform all activities required for design,

14    construction, and Maintenance and Monitoring of the Blue Heron Slough Restoration Project, in

15    accordance with the requirements and schedule set forth in Appendix C, and shall make

16    arrangements for Stewardship of the Project in accordance with the Conservation Bank

17    Agreement.  The Parties stipulate that the time period for implementing the Project is a

18    significant factor in the settlement reached in this Decree and that delay in carrying out the

19    activities required in this Decree may diminish the compensatory value attributable to those

20    activities.

CONSENT DECREE                        UNITED STATES DEPARTMENT OF JUSTICE
<br>                                                Environment and Natural Resources Division
<br>                                                P.O. Box 7611, Washington, D.C. 20044-7611
<br>                                                202-514-5270

1      **A.  Design and Construction of the Blue Heron Slough Project**

2           11.     Settling Defendant shall reach Final Completion of the Project by no later than

3     four years after the Effective Date of this Decree.  If Settling Defendant has not reached Final

4     Completion by this date, then Settling Defendant shall either (i) pay to the Trustees the sum of

5     $50,000 as compensation for the additional delay in restoration of Natural Resources, or (ii)

6     perform additional restoration work agreed upon in writing by Settling Defendant and the

7     Trustees.  For each subsequent year beyond four years after the Effective Date of this Decree in

8     which Settling Defendant has not reached Final Completion, and the Trustees have not taken

9     over restoration work by requiring payments in accordance with Paragraphs 26 or 28, Settling

10    Defendant shall either (i) pay to the Trustees the sum of $50,000 as compensation for the

11    additional delay in restoration of Natural Resources, or (ii) perform additional restoration work

12    agreed upon in writing by Settling Defendant and the Trustees.  Settling Defendant's obligations

13    under this paragraph are in addition to any other obligations or applicable penalties under this

14    Decree.  If a condition constituting default under the terms of the Performance Bond (Appendix

15    F) occurs, Settling Defendant may request, and the Trustees may consider and agree to,

16    adjustments to the construction deadline described in this paragraph and the related deadlines set

17    forth in Appendix C.

18           12.     Within ninety (90) days after Final Completion, Settling Defendant shall submit a

19    written Notice of Final Completion to the Trustees.  The Trustees shall review the results of the

20    development of the Project to determine whether the Project has been constructed in accordance

21    with, and as designed to meet the Performance Standards set forth in, Appendix C.  Within

CONSENT DECREE                                    UNITED STATES DEPARTMENT OF JUSTICE
                                                  Environment and Natural Resources Division
                                                  P.O. Box 7611, Washington, D.C. 20044-7611
                                                  202-514-5270

1  ninety (90) days after receiving the Notice of Final Completion, the Trustees shall submit to

2  Settling Defendant either (a) a written notice identifying specific deficiencies the Trustees

3  determine must be satisfied for the Project to be completed in accordance with Appendix C

4  (Notice of Deficiencies); or (b) a written notice of the Trustees' determination that the Project

5  has been so completed (Notice of Approval of Final Completion).  Failure by the Trustees to

6  provide any notice within the specified time shall be deemed approval.  Within one hundred

7  eighty (180) days of receipt of a Notice of Deficiencies, or as otherwise agreed to in writing by

8  the Trustees, Settling Defendant shall correct the identified deficiencies and complete the Project

9  in accordance with Appendix C, and submit to the Trustees an amended Notice of Final

10  Completion for review and response in accordance with this paragraph.  Any delay in completing

11  construction of the Project as a result of the operation of this paragraph shall not in and of itself

12  constitute grounds for relief from the requirement to pay compensation under Paragraph 11 of

13  this Section or stipulated penalties under Section XII (Stipulated Penalties) for compliance

14  delays.

15      **B. Initial Maintenance and Monitoring Requirements**

16      13.     Settling Defendant shall develop and submit to the Trustees for review and

17  approval an Initial Maintenance and Monitoring Plan, by the deadline set forth in Appendix C

18  (Sections 9.3 and 10.1), to maintain and monitor the vegetation and habitat of the Project to meet

19  the Performance Standards set forth in Appendix C for a period of ten (10) years from Final

20  Completion, including any needed Contingency Measures or Adaptive Management Plans as

21  directed at the sole and unreviewable discretion of the Trustees.  Upon completion of the ten-

CONSENT DECREE                              UNITED STATES DEPARTMENT OF JUSTICE
                                            Environment and Natural Resources Division
                                            P.O. Box 7611, Washington, D.C. 20044-7611
                                            202-514-5270

1   year period, Settling Defendant shall provide written Notice of Completion of Initial

2   Maintenance and Monitoring Obligations to the Trustees in accordance with Section XIX

3   (Notices and Submissions).  Within forty-five (45) days after receiving the Notice of Completion

4   of Initial Maintenance and Monitoring Obligations, the Trustees shall submit to Settling

5   Defendant either (a) a written notice identifying specific deficiencies the Trustees determine

6   must be satisfied for the Initial Maintenance and Monitoring obligations to be completed in

7   accordance with Appendix C (Notice of Deficiencies); or (b) a written notice of the Trustees'

8   determination that the Initial Maintenance and Monitoring obligations are completed (Approval

9   of Completion of Initial Maintenance and Monitoring Obligations).  Failure by the Trustees to

10  provide any notice within the specified time shall be deemed approval.  In the event the Trustees

11  identify, in a Notice of Deficiencies, specific deficiencies with Settling Defendant's compliance

12  with its obligations, Settling Defendant shall correct the identified deficiencies and complete the

13  Project in accordance with Appendix C.  Within one hundred eighty (180) days of Settling

14  Defendant's receipt of a Notice of Deficiencies from the Trustees, or as otherwise agreed to in

15  writing by the Trustees, Settling Defendant shall complete all corrective actions and submit to

16  the Trustees an amended Notice of Completion of Initial Maintenance and Monitoring

17  Obligations for review and response in accordance with this paragraph.

18      **C.  Long-Term Maintenance and Monitoring Requirements**

19          14.      Settling Defendant shall develop and submit to the Trustees for review and

20  approval a Long-Term Maintenance and Monitoring Plan, by the deadline set forth in Appendix

21  C (Sections 9.3 and 10.1), for maintaining vegetation and other habitat attributes, for controlling

CONSENT DECREE                                          UNITED STATES DEPARTMENT OF JUSTICE
                                                        Environment and Natural Resources Division
                                                        P.O. Box 7611, Washington, D.C. 20044-7611
                                                        202-514-5270

1    invasive vegetation and debris removal, and for undertaking corrective actions for any

2    perturbation that affects the ecological integrity of the Project, as set forth more fully in

3    Appendix C (Section 8).  For purposes of this Decree, Settling Defendant's responsibility for

4    active maintenance and corrective action of the Project (Long-Term Maintenance and

5    Monitoring) shall extend twenty (20) years from the Notice of Completion of Initial Maintenance

6    and Monitoring Obligations, or sooner if the Trustees agree that a "force majeure" event makes

7    corrective action or further maintenance impossible.  Perturbations include events with a

8    foreseeable probability of occurrence (such as, for example, flood events up to a 100 year flood

9    event) but do not include "force majeure" events.

10    15.    Settling Defendant shall be responsible for continued maintenance and corrective

11    actions for the Project in accordance with Paragraph 14, regardless of ownership of property

12    within the Project Site.  Settling Defendant is solely responsible for securing the cooperation of

13    any property owners, including Wildlands, in order to successfully complete and maintain the

14    Project in accordance with Appendix C.  Any failure by Settling Defendant to successfully

15    complete or maintain the Project in accordance with Appendix C resulting from disputes with

16    any property owners, including but not limited to, Wildlands, shall not constitute a "force

17    majeure" event.

18    16.    If Settling Defendant transfers ownership of any property within the Project Site

19    prior to the expiration of Settling Defendant's obligations in Paragraph 14, such transfer shall not

20    affect or lessen Settling Defendant's obligations under that paragraph, or any other provision of

21    this Decree, and as a condition of any such transfer, the entity to which any property is

CONSENT DECREE                                    UNITED STATES DEPARTMENT OF JUSTICE
                                                  Environment and Natural Resources Division
                                                  P.O. Box 7611, Washington, D.C. 20044-7611
                                                  202-514-5270

1    transferred shall be required to provide Settling Defendant with all access necessary to fulfill

2    Settling Defendant's responsibilities under Paragraph 14. Within sixty (60) days of any proposed

3    transfer of property within the Project Site, Settling Defendant shall provide the Trustees with

4    written notice of the proposed transfer, identifying the entity that will own the property,

5    certifying that Settling Defendant provided a copy of this Decree to such entity and providing a

6    copy of the proposed access agreement for review and approval by the Trustees.

7    **D.  Stewardship Requirements**

8    17.    The Parties' intention is that the ecological functions provided by the Project be

9    maintained in perpetuity. In order to ensure permanent preservation of the Project Site, and

10    ensure all ecological functions provided by the Project be maintained in perpetuity, Settling

11    Defendant shall grant and record a conservation easement for the Project Site, including for its

12    property, and obtain necessary agreements to grant and record such a conservation easement for

13    property owned by Wildlands.  The conservation easements shall be in the form set forth in

14    Appendix D, and shall be executed within thirty (30) days of the Effective Date of this Decree.

15    Settling Defendant shall take all other appropriate actions necessary to ensure that the Project

16    Site will not be used in a manner inconsistent with the requirements of this Decree.

17    18.    Prior to the completion of Long-Term Maintenance and Monitoring, Settling

18    Defendant shall make arrangements for Stewardship of the Project, consistent with the

19    requirements of the Conservation Bank Agreement.

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1       **E.  General Project Requirements**

2            19.      Settling Defendant shall not take any action that is inconsistent with this Decree

3    and that would adversely affect the Project, including those prohibited actions set forth in the

4    Conservation Easement (Appendix D) and the Conservation Bank Agreement.

5            20.      Settling Defendant shall undertake all activities required to address cultural

6    resource issues associated with the Project, including, as applicable, consultation with tribes and

7    the Washington State Department of Archaeology and Historic Preservation, conducting a

8    background and project review by an archaeologist who meets the Department of Interior's

9    professional qualification standards at 36 C.F.R. Part 61, conducting cultural resource surveys or

10   monitoring activities, and meeting the requirements in Sections 5.1.5 and 6.3 of Appendix C.

11      **F.  Performance Guarantees**

12           21.      <u>Purpose of Performance Guarantees</u>.  Settling Defendant shall provide certain

13   Performance Guarantees, described in this Section VI.F, in order to ensure that there are

14   sufficient funds to properly construct the Project and conduct Maintenance and Monitoring,

15   notwithstanding any noncompliance with the terms of this Consent Decree by Settling Defendant

16   or Wildlands.  The Performance Guarantees are intended to provide sufficient funds to Settling

17   Defendant to complete, maintain, and monitor the Project in the event of noncompliance by

18   Wildlands; and to provide sufficient funds to the Trustees to complete, maintain, and monitor the

19   Project in the event of noncompliance by both Settling Defendant and Wildlands, or

20   noncompliance by Wildlands that Settling Defendant fails to remedy.

CONSENT DECREE                          UNITED STATES DEPARTMENT OF JUSTICE
                                        Environment and Natural Resources Division
                                        P.O. Box 7611, Washington, D.C. 20044-7611
                                        202-514-5270

1        22.   <u>Project Escrow Account</u>.  In accordance with the Project Escrow Agreement

2  attached as Appendix G, Settling Defendant shall establish a Project Escrow Account in

3  accordance with the timeframes set forth in Appendix G. The Project Escrow Agreement may

4  not be modified or terminated without the express written approval of the Trustees.

5        a.    The Project Escrow Account shall have two subaccounts:

6          i.    A subaccount to hold the transferred funds described in Paragraph I above

7  (funds paid by settlors in the Cashout Consent Decree) and Paragraph 32 below (funds paid on

8  behalf of the Settling Federal Agency), and any proceeds received by Settling Defendant from

9  the Performance Bond described in Paragraph 24 below (the "Transfer Subaccount"); and

10          ii.    A subaccount to hold other funds provided by Settling Defendant to

11  Wildlands to complete construction of the Project (the "Direct Subaccount"), to be funded as

12  described in Appendix E.

13        b.    Settling Defendant shall only use the funds in the Project Escrow Account

14  for the Project, and any remaining funds shall only be released after the Trustees provide a

15  Notice of Approval of Final Completion as described in Paragraph 12.

16        c.    At least fifteen (15) days before making any payment from the Project

17  Escrow Account, Settling Defendant shall provide notice and an accounting to the Trustees of

18  the proposed expenditures from the Project Escrow Account, including a copy of the invoice(s)

19  to be paid and statement of the work performed.

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1          d.      In the event that the Trustees issue a Notice of Exercise of Performance

2   Guarantee pursuant to Paragraph 26.d, the Trustees shall be entitled to all funds in the Transfer

3   Subaccount necessary to complete construction of the Project, as determined by the Trustees.

4          23.     Maintenance and Monitoring Escrow Account.   In accordance with the

5   Maintenance and Monitoring Escrow Agreement attached as Appendix G, Settling Defendant

6   shall establish a Maintenance and Monitoring Escrow Account in the amount of $625,836 within

7   sixty (60) days of the Effective Date of this Decree.  The Maintenance and Monitoring Escrow

8   Agreement may not be modified or terminated without the express written approval of the

9   Trustees.  Settling Defendant shall only use the funds in the Maintenance and Monitoring

10  Escrow Account for Maintenance and Monitoring of the Project.  Any funds remaining in the

11  Maintenance and Monitoring Escrow Account at the conclusion of the Maintenance and

12  Monitoring period shall be applied towards Stewardship of the Project.

13         24.     Performance Bond. In order to ensure completion of construction of the Project,

14  Settling Defendant shall secure a surety bond (Performance Bond) in the initial amount of

15  $5,076,748.21 and in the form attached as Appendix F, guaranteeing payment and/or

16  construction of the Project by Wildlands for the benefit of the Port and Trustees.  Such

17  Performance Bond shall be issued by a surety company among those listed as acceptable sureties

18  on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury, and

19  approved by the Trustees.

20         a.      Settling Defendant shall obtain the Performance Bond within ninety (90)

21  days of the Effective Date of this Decree, and submit an executed copy to the Trustees.  Settling

CONSENT DECREE                              UNITED STATES DEPARTMENT OF JUSTICE
                                            Environment and Natural Resources Division
                                            P.O. Box 7611, Washington, D.C. 20044-7611
                                            202-514-5270

1   Defendant shall ensure that the Performance Bond is maintained as legally binding and fully

2   effective.

3                   b.      Calling the Performance Bond.

4                           i.      Settling Defendant or the Trustees may call the Performance Bond at any

5   time after a Notice of Project Abandonment or Default is provided to the surety pursuant to

6   Paragraph 26.a, provided that the Parties comply with the timing provisions of Paragraph 26.b

7   and 26.c.

8                           ii.     If Settling Defendant calls the Performance Bond and the surety elects to

9   complete the Project, Settling Defendant shall provide surety's written notice of such election to

10  the Trustees with ten (10) days of receipt, and shall meet and confer with Trustees regularly

11  regarding the progress of remaining Project construction under surety.  Any failure by the surety

12  to properly complete construction of the Project shall not relieve Settling Defendant of its

13  obligations pursuant to this Decree.

14                          iii.    If the Settling Defendant calls the Performance Bond and the surety elects

15  to tender to Settling Defendant sufficient funds to complete the Project, Settling Defendant shall

16  deposit such funds into the Transfer Subaccount and use such funds to complete the Project.

17  Any failure by the surety to tender sufficient funds to Settling Defendant shall not relieve

18  Settling Defendant of its obligations pursuant to this Decree.  At least fifteen (15) days before

19  making any payment from the Performance Bond, Settling Defendant shall provide notice and an

20  accounting to the Trustees of the proposed expenditures from the Performance Bond, including a

21  copy of the invoice(s) to be paid and statement of the work performed.

CONSENT DECREE                                    UNITED STATES DEPARTMENT OF JUSTICE
                                                  Environment and Natural Resources Division
                                                  P.O. Box 7611, Washington, D.C. 20044-7611
                                                  202-514-5270

1           c.      Settling Defendant may submit to the Trustees, on any anniversary of the

2  Effective Date of this Decree or at any other time agreed to by the Parties, a request to reduce the

3  amount, or change the form or terms, of the Performance Bond.  Any such request must include

4  an estimate of the cost of the remaining construction work, an explanation of the bases for the

5  cost calculation, and a description of the proposed changes.  The Trustees will notify Settling

6  Defendant in writing of their decision to approve or disapprove a requested change pursuant to

7  this subparagraph.  Settling Defendant may reduce the amount of or change the form or terms of

8  the Performance Bond only in accordance with: (a) the Trustees' approval; or (b) if there is a

9  dispute, the agreement or final judicial decision resolving such dispute under Section XI (Dispute

10  Resolution).  Within thirty (30) days after receipt of the Trustees' approval of, or the agreement

11  or decision resolving a dispute relating to, the requested modifications pursuant to this

12  subparagraph, Settling Defendant shall submit to the Trustees documentation of the reduced,

13  revised, or alternative Performance Bond.

14           d.      If the issuer of the Performance Bond notifies Settling Defendant that it

15  intends to resign and/or cancel the Performance Bond, and the Settling Defendant fails to provide

16  an alternative financial assurance mechanism in an amount and form that is reasonably

17  acceptable to the Plaintiffs, Settling Defendant must pay in full the funds guaranteed under the

18  Performance Bond to the Transfer Subaccount at least thirty (30) days prior to the cancellation

19  date.

20      25.    Order of Performance Guarantees.  The Parties intend that the funds in the

21  Transfer Subaccount described in Paragraph 22 above will be the first source of funding to

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1    complete construction of the Project.  Therefore, the funds secured by the Performance Bond

2    described in Paragraph 24 above will be available to Settling Defendant only after the balance in

3    the Transfer Subaccount has been exhausted.  Funds in the Maintenance and Monitoring Escrow

4    Account described in Paragraph 23 above will be available to the Parties only after Final

5    Completion of the Project.

6         26.    Exercise of Performance Guarantees by the Trustees.  The Performance

7    Guarantees described above provide funding to complete construction, or Maintenance and

8    Monitoring, in the event a Default occurs or in the event of a Project Abandonment. The Parties

9    have agreed that, before the Trustees may exercise the Performance Guarantees described above,

10   Settling Defendant shall have a limited opportunity to pursue dispute processes with the Trustees

11   and/or with Wildlands regarding any such Project Abandonment or Default.  This paragraph

12   describes the processes and timelines for identifying and notifying the Parties of identified

13   Project Abandonment or Default; for disputes about identified Project Abandonment or Default;

14   and for exercise of the Performance Guarantees by the Trustees.

15         a.    Identification of Project Abandonment or Default.  If Settling Defendant

16   identifies or learns of Project Abandonment or Default, Settling Defendant shall issue a Notice of

17   Project Abandonment or Default to the Trustees within fifteen (15) days, and explain what steps

18   are being taken to address the Project Abandonment or Default.  If the Trustees independently

19   determine that Project Abandonment or Default has occurred, the Trustees will issue a Notice of

20   Project Abandonment or Default to Settling Defendant, specifying the deficiencies and grounds

21   upon which such notice was issued.  Settling Defendant shall have fifteen (15) days from

CONSENT DECREE                              UNITED STATES DEPARTMENT OF JUSTICE
                                            Environment and Natural Resources Division
                                            P.O. Box 7611, Washington, D.C. 20044-7611
                                            202-514-5270

1    issuance or receipt (as applicable) of such notice to remedy, to the Trustees' satisfaction, the

2    issues set forth in the Notice of Project Abandonment or Default.

3               b.    <u>Dispute Processes for Project Abandonment or Default</u>.  If Settling

4    Defendant has not remedied to the Trustees' satisfaction the issues set forth in the Notice of

5    Project Abandonment or Default within fifteen (15) days, the Trustees will issue a Notice of

6    Intent to Exercise Performance Guarantee ("Notice of Intent").  Within fifteen (15) days from

7    receipt of such Notice of Intent, Settling Defendant shall either (i) remedy the identified issues,

8    (ii) invoke dispute resolution procedures with the Trustees pursuant to Section XI (Dispute

9    Resolution); or (iii) invoke the procedures for notice, cure and arbitration ("Cure and Arbitration

10    Process") with Wildlands pursuant to the terms of the agreement between Settling Defendants

11    and Wildlands.

12               i.    If, within fifteen (15) days of receipt of a Notice of Intent, Settling

13    Defendant does not either remedy the identified issues, invoke dispute resolution procedures

14    with the Trustees pursuant to Section XI (Dispute Resolution), or invoke the Cure and

15    Arbitration Process with Wildlands, then the Trustees may exercise the Performance Guarantees

16    as the Trustees deem necessary to complete or maintain the Project.

17               ii.    If Settling Defendant timely initiates dispute resolution procedures with

18    the Trustees pursuant to Section XI (Dispute Resolution), or timely initiates the Cure and

19    Arbitration Process with Wildlands, the Trustees will not exercise the Performance Guarantees

20    until at least one hundred eighty (180) days have elapsed from issuance of the Notice of Intent

21    (the "Abeyance Period"), and will exercise the Performance Guarantees only in the event that the

CONSENT DECREE                          UNITED STATES DEPARTMENT OF JUSTICE
                                                  Environment and Natural Resources Division
                                                   P.O. Box 7611, Washington, D.C. 20044-7611
                                                        202-514-5270

1    issues described in the Notice of Project Abandonment or Default have not been remedied to the

2    Trustees' satisfaction during the Abeyance Period.

3                    iii.    If, after the Abeyance Period described above has elapsed, the Project

4    Abandonment or Default has not been corrected, the Trustees may exercise the Performance

5    Guarantees as the Trustees deem necessary to complete or maintain the Project, but only in the

6    order described in Paragraph 25.  If a dispute process between Settling Defendant and Wildlands

7    is ongoing at that time, Settling Defendant may request, and the Trustees may, but shall not be

8    required to, agree to an additional extension of time before exercising the Performance

9    Guarantees.  If a dispute process between Settling Defendant and the Trustees is ongoing at that

10   time, the Trustees may in their sole discretion exercise the Performance Guarantees until the

11   earlier of (1) the date that Settling Defendant remedies, to the Trustees' satisfaction, the

12   circumstances giving rise to the dispute, or (2) the date that a final decision is rendered by the

13   court in favor of Settling Defendant.  Following either event, the Trustees shall cease obligating

14   any further funds pursuant to this Section VI.F but shall not be required to repay any funds

15   already obligated or spent by the Trustees.

16                    c.    Exception for Project Takeovers.  If, as a result of Project Abandonment

17   or Default, the Trustees exercise the Performance Guarantees pursuant to the provisions of

18   subparagraphs 26.a and 26.b and actually take over construction of the Project by drawing on the

19   funds in the Transfer Subaccount and/or calling the Performance Bond, then the Trustees shall

20   not be required to follow the process described in subparagraphs 26.a and 26.b prior to

21   exercising any remaining Performance Guarantees.

CONSENT DECREE                              UNITED STATES DEPARTMENT OF JUSTICE
                                            Environment and Natural Resources Division
                                            P.O. Box 7611, Washington, D.C. 20044-7611
                                            202-514-5270

1    d. <u>Exercise of Performance Guarantees</u>. The Trustees shall exercise the

2 Performance Guarantees by sending a Notice of Exercise of Performance Guarantee to the

3 Escrow Agent or Surety, as applicable, as further described in Appendices E, F, and G.  Any

4 funds obtained by the Trustees' exercise of the Performance Guarantees shall be, as directed by

5 the Trustees: (i) paid to the Trustees in order to facilitate the completion of the work by the

6 Trustees or by another person; or (ii) deposited into an interest-bearing account, established at a

7 duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the

8 completion of the work by another person.

9    27. <u>Release, Cancellation, or Discontinuation of Performance Guarantees.</u>  Settling

10 Defendant shall not release, cancel, or discontinue any Performance Guarantee required under

11 this Section except as provided pursuant to this paragraph and as set forth in Appendices E, F

12 and G.  Settling Defendant may release, cancel, or discontinue any Performance Guarantee

13 provided under this Section only: (a) for the Performance Guarantees required by Paragraphs 22

14 and 24, if the Trustees issue a Notice of Approval of Final Completion under Paragraph 12; (b)

15 in accordance with the Trustees' written notice of approval of such release, cancellation, or

16 discontinuation; or (c) if there is a dispute between the Trustees and Settling Defendant regarding

17 the release, cancellation or discontinuance of any Performance Guarantee, in accordance with

18 any agreement or final judicial decision resolving such dispute under Section XI (Dispute

19 Resolution) and permitting such release, cancellation, or discontinuation.

20    28. <u>Shortfall Payments</u>.  If the Trustees take over construction of the Project, and the

21 funds available in the Transfer Subaccount and any funds received directly by the Trustees from

CONSENT DECREE          UNITED STATES DEPARTMENT OF JUSTICE
                 Environment and Natural Resources Division
                 P.O. Box 7611, Washington, D.C. 20044-7611
                 202-514-5270

1    the Performance Bond are insufficient to complete construction of the Project, Settling

2    Defendant shall, in addition to the funds in the Transfer Subaccount, pay to the Trustees all

3    remaining costs necessary to complete construction of the Project, as determined by the Trustees,

4    up to a total amount of $4,634,287.47 ("shortfall payments").  Whenever a shortfall payment is

5    required to fund remaining work, the Trustees will provide Settling Defendant with an estimate

6    of the cost of remaining work along with a demand for payment of the estimated costs.  Payment

7    shall be made within thirty (30) days of the demand for such payment(s) from the Trustees.

8    Within 180 days of completion of any work funded by shortfall payments, the Trustees will

9    provide Settling Defendant with documentation of the costs incurred.  Shortfall payments shall

10   be paid in accordance with Paragraph 26.d.  For the purpose of Section XII (Stipulated

11   Penalties), Settling Defendant's full payment of the costs necessary to complete restoration work,

12   as determined by the Trustees, in accordance with this subparagraph shall constitute compliance

13   by the Settling Defendant with the deadline set forth in Paragraph 11.

14        **G. Restriction on Sale of Ecological or Other Conservation Credits**

15        29.      Settling Defendant may use the Project for purposes of a bank to sell or transfer to

16   other parties ecological or conservation credits to potentially resolve liabilities under federal and

17   state environmental laws; however, to resolve its liability pursuant to this Decree, Settling

18   Defendant shall, upon Final Completion of the Project, purchase 469.39 NRD DSAYs in the

19   Project, equivalent to 34.79 acres of the Project Site, which acreage shall not be used as the basis

20   for credits transferred or offered for sale to other parties.  Except as set forth in this Section VI.G

21   (Restriction on Sale of Ecological or Other Conservation Credits), Settling Defendant's

CONSENT DECREE                                  UNITED STATES DEPARTMENT OF JUSTICE
                                                Environment and Natural Resources Division
                                                P.O. Box 7611, Washington, D.C. 20044-7611
                                                202-514-5270

1   establishment and operation of any such bank or transfer or sale of credits to other parties is not

2   subject to this Decree.

3       30.     Settling Defendant shall take the following steps to ensure that Settling Defendant

4   does not transfer or sell credits based upon the excluded portion of the Project Site identified in

5   Paragraph 29:

6           a.      Within 30 days of the sale of any credits (whether NRD,

7   CBA/conservation, or wetlands credits), Settling Defendant shall submit credit sales

8   documentation to Trustees.  Where applicable, this documentation shall be the same

9   documentation Settling Defendant submits to NOAA under the Conservation Bank Agreement.

10          b.      Settling Defendant shall maintain a register of any credit sales and

11  transfers (whether NRD, CBA/conservation, or wetlands credits) that reflects the acreage

12  associated with each sale or transfer, and shall provide an updated version of the register to the

13  Trustees with each annual Maintenance and Monitoring Report, or upon the request of the

14  Trustees.

15  **H. Selection of Contractors**

16      31.     Settling Defendant has selected, and the Trustees have approved, Wildlands as its

17  contractor to design, construct, monitor and maintain the Restoration Project. The selection of

18  any other contractor hereafter retained by Settling Defendant to perform any of the work required

19  under this Decree shall be subject to Trustee approval.  Settling Defendant shall notify the

20  Trustees in writing of the name, title and qualifications of any contractor Settling Defendant

21  proposes to retain, and of any proposed changes in the selection of a contractor.  The Trustees

CONSENT DECREE                                  UNITED STATES DEPARTMENT OF JUSTICE
                                                Environment and Natural Resources Division
                                                P.O. Box 7611, Washington, D.C. 20044-7611
                                                202-514-5270

1   will notify Settling Defendant in writing of the approval or disapproval of a proposed contractor.

2   The Trustees' assent to the proposed selection or change of a contractor may be presumed unless

3   the Trustees notify Settling Defendant in writing of their objection to the proposed selection or

4   change within thirty (30) days of Settling Defendant' written selection notice.

5   **VII.    PAYMENT OF NATURAL RESOURCE DAMAGES BY SETTLING FEDERAL**
6   **AGENCY AND USE BY SETTLING DEFENDANT**

7   32.    As soon as reasonably practicable after the Effective Date, the United States, on

8   behalf of the Settling Federal Agency, will pay to the Transfer Subaccount described in

9   Paragraph 22.a.i above a total of $789,840 for Natural Resource Damages.  Payment shall be

10  made by Automated Clearing House (ACH) Electronic Funds Transfer in accordance with

11  instructions provided by Settling Defendant.

12  33.    Interest.  In the event that the payment required by Paragraph 32 is not made

13  within 120 days after the Effective Date, the United States, on behalf of the Settling Federal

14  Agency, shall pay interest on the unpaid balance, at the rate specified for interest on investments

15  of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded

16  annually on October 1 of each year in accordance with 42 U.S.C. § 9607(a). The applicable rate

17  of interest is the rate in effect at the time the interest accrues. The rate of interest is subject to

18  change on October 1 of each year.  Such interest shall commence on the 121st day after the

19  Effective Date and accrue through the date of the payment.

20  34.    Settling Defendant will notify the Trustees and the U.S. Department of Justice, in

21  accordance with Section XIX (Notices), within 3 days of receiving the payment described in

CONSENT DECREE                              UNITED STATES DEPARTMENT OF JUSTICE
                                           Environment and Natural Resources Division
                                           P.O. Box 7611, Washington, D.C. 20044-7611
                                           202-514-5270

1   Paragraph 32.  Written notice to each Trustee by electronic mail, using the Trustee's e-mail

2   address(es) listed in Section XIX (Notices), satisfies the notice requirement of this paragraph.

3   Settling Defendant shall only use the payment described in Paragraph 32 for the Project.  Within

4   30 days of receiving the payment described in Paragraph 32, Settling Defendant shall purchase

5   80 NRD DSAYs in the Project, equivalent to 5.93 acres of the Project Site, which acreage shall

6   not be used as the basis for credits transferred or offered for sale to other parties.

7                **VIII.   PAYMENTS OF ASSESSMENT COSTS**

8     **A. Payments by Settling Defendant for Assessment Costs**

9        35.    Within thirty (30) days of the Effective Date of this Decree, Settling Defendant

10  shall pay the amounts for past assessment costs as described below:

11            a.    <u>Payments for Past Assessment Costs Incurred by the United States</u>.

12             i.    Within 30 days after the Effective Date, Settling Defendant shall pay

13  $468,157.19 to the United States for unpaid assessment costs incurred by the United States

14  through September 30, 2018.  Payment shall be made by FedWire Electronic Funds Transfer

15  ("EFT") to the U.S. Department of Justice account, in accordance with instructions provided to

16  Settling Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's

17  Office for the Western District of Washington after the Effective Date.  The payment instructions

18  provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number,

19  which Defendant shall use to identify all payments required to be made in accordance with this

20  Consent Decree.  The FLU will provide the payment instructions to:

21

CONSENT DECREE                              UNITED STATES DEPARTMENT OF JUSTICE
                                                   Environment and Natural Resources Division
                                                   P.O. Box 7611, Washington, D.C. 20044-7611
                                                          202-514-5270

1  John Carter
2  Chief Financial Officer
3  (425) 388-0616
4  johnc@portofeverett.com
5  1205 Craftsman Way
6  Suite 200
7  Everett, Washington 98201
8
9  Bob Marion
10 Controller
11 (425) 388-0616
12 robertm@portofeverett.com
13 1205 Craftsman Way
14 Suite 200
15 Everett, Washington 98201

16 on behalf of Settling Defendant.  Settling Defendant may change the individuals to receive

17 payment instructions on its behalf by providing written notice of such change to the United

18 States in accordance with Section XIX (Notices).

19        ii.    Of the total amount to be paid by Settling Defendant pursuant to

20 Subparagraph 35.a.i:

21        1.  $291,019.73 shall be deposited in the DOI Natural Resource

22 Damage Assessment and Restoration Fund ("NRDAR Fund"), to be applied toward natural

23 resource damage assessment costs incurred by DOI.

24        2.  $177,137.46 shall be deposited in the NOAA Damage Assessment

25 Remediation and Restoration Fund ("DARRF"), to be applied toward natural resource damage

26 assessment costs incurred by NOAA.

27        b.   Payment for Past Assessment Costs Incurred by the State.  Within 30 days

28 after the Effective Date, Settling Defendant shall pay $75,000.00 to the State of Washington for

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

**Page 34 of 75**

1    unpaid assessment costs incurred by the State through September 30, 2018.  Payment shall be

2    made by check or electronic fund transfer to the Washington State Department of Ecology,

3    referencing account 1T491.  If payment is made by mail, Settling Defendant shall send checks

4    to:

5            Cashiering Unit
6            Department of Ecology
7            P.O. Box 47611
8            Olympia, WA  98504-7611
9
10           c.      Payment of Past Assessment Costs Incurred by the Suquamish

11   Tribe.  Within 30 days after the Effective Date, Settling Defendant shall pay $69,486.83 to the

12   Suquamish Tribe for unpaid assessment costs incurred by the Tribe through September 30, 2018.

13   Payment shall be made by check to the Suquamish Tribe bearing the notation "Port Gardner Bay

14   NRDA."  Settling Defendant shall send checks to:

15           Finance Director
16           The Suquamish Tribe
17           Office of Tribal Attorney
18           P.O. Box 498
19           18690 Suquamish Way
20           Suquamish, WA 98392
21
22           d.      Payment of Past Assessment Costs Incurred by the Tulalip Tribes.  Within

23   30 days after the Effective Date, Settling Defendant shall pay $90,851.69 to the Tulalip Tribes

24   for unpaid assessment costs incurred by the Tribes through September 30, 2018.  Payment shall

25   be made by check to the Tulalip Tribes bearing the notation "Port Gardner Bay NRDA."

26   Settling Defendant shall send checks to:

27           Mr. Timothy A. Brewer

CONSENT DECREE                                    UNITED STATES DEPARTMENT OF JUSTICE
                                                  Environment and Natural Resources Division
                                                  P.O. Box 7611, Washington, D.C. 20044-7611
                                                  202-514-5270

1              Office of the Reservation Attorney
2              The Tulalip Tribes
3              6406 Marine Drive
4              Tulalip, WA 98271
5
6      36.   <u>Payment of Interim Costs</u>.  The Trustees shall provide Settling Defendant with a

7  bill requiring payment of costs incurred by the Trustees after September 30, 2018, through the

8  Effective Date of the Consent Decree, up to $36,500. Within 30 days of receiving the bill

9  requiring payment of costs from the Trustees, Settling Defendant shall pay the costs in

10  accordance with the procedures set forth in Paragraphs 35.a-d and 46.

11      37.   <u>Prepayment of Future Costs</u>.  Within 30 days after the Effective Date, Settling

12  Defendant shall pay $23,000 for assessment, restoration planning, and restoration

13  implementation costs to be incurred by the Trustees after the Effective Date of this Decree.

14  Payment shall be made to the U.S. Department of Justice in accordance with Paragraph 35.a.i

15  and 46. These funds shall then be deposited in a Port Gardner Bay NRD Account within the DOI

16  NRDAR Fund on behalf of the Trustees.  All funds deposited in the Port Gardner Bay NRD

17  Account shall, in accordance with law, be managed by DOI for use by the Natural Resource

18  Trustees in connection with restoration of Natural Resources in the Port Gardner Bay Area.  DOI

19  shall not make any charge against the Port Gardner Bay NRD Account for any management

20  services provided.  DOI shall hold all funds in the Port Gardner Bay NRD Account subject to the

21  provisions of this Decree.  The Trustees commit to the expenditure of the funds set forth in this

22  Section VIII for the design, implementation, permitting (as necessary), monitoring, and oversight

CONSENT DECREE                            UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

**Page 36 of 75**

1    of restoration projects and for the costs of complying with the requirements of the law to conduct

2    the restoration planning and implementation process.

3    **B. Payments by Settling Federal Agency for Assessment Costs**

4    38.    <u>Payment to DOI</u>.  As soon as reasonably practicable after the Effective Date, the

5    United States, on behalf of the Settling Federal Agency, shall pay $58,220.98 to DOI's NRDAR

6    Fund, in reimbursement of assessment costs incurred by DOI through September 30, 2018.

7    39.    <u>Payment to NOAA</u>.  As soon as reasonably practicable after the Effective Date,

8    the United States, on behalf of the Settling Federal Agency, shall pay $31,602.69 to NOAA's

9    DARRF, in reimbursement of assessment costs incurred by NOAA through September 30, 2018.

10    40.    <u>Payment to the State</u>.  As soon as reasonably practicable after the Effective Date,

11    the United States, on behalf of the Settling Federal Agency, shall pay to the State $20,659.50, for

12    unpaid assessment costs incurred by the State through September 30, 2018, by Automated

13    Clearing House (ACH) Electronic Funds Transfer in accordance with instructions provided by

14    the State.

15    41.    <u>Payment to the Suquamish Tribe</u>.  As soon as reasonably practicable after the

16    Effective Date, the United States, on behalf of the Settling Federal Agency, shall pay to the

17    Suquamish Tribe $10,356.00, for unpaid assessment costs incurred by the Suquamish Tribe

18    through September 30, 2018, by Automated Clearing House (ACH) Electronic Funds Transfer in

19    accordance with instructions provided by the Suquamish Tribe.

20    42.    <u>Payment to the Tulalip Tribes</u>.  As soon as reasonably practicable after the

21    Effective Date, the United States, on behalf of the Settling Federal Agency, shall pay to the

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1    Tulalip Tribes $15,091.94, for unpaid assessment costs incurred by the Tulalip Tribes through

2    September 30, 2018, by Automated Clearing House (ACH) Electronic Funds Transfer in

3    accordance with instructions provided by the Tulalip Tribes.

4         43.    <u>Interest</u>.  In the event that any payment required by Paragraphs 38-42 is not made

5    within 120 days after the Effective Date, the United States, on behalf of the Settling Federal

6    Agency, shall pay interest on the unpaid balance, at the rate specified in Paragraph 33, with such

7    interest commencing on the 121st day after the Effective Date and accruing through the date of

8    the payment.

9         44.    <u>Payment of Interim Costs</u>.  The Trustees shall provide the Settling Federal

10    Agency with a bill requiring payment of assessment costs incurred by the Trustees after

11    September 30, 2018, through the Effective Date of the Consent Decree, up to $74,000.  As soon

12    as reasonably practicable after receiving the bill requiring payment of costs from the Trustees,

13    the United States, on behalf of the Settling Federal Agency, shall pay the costs in accordance

14    with the procedures set forth in Paragraphs 38-42.  In the event that any payment required by this

15    paragraph is not made within 120 days after receiving the bill from the Trustees, the United

16    States, on behalf of the Settling Federal Agency, shall pay interest on the unpaid balance, at the

17    rate specified in Paragraph 33, with such interest commencing on the 121st day after receipt of

18    the bills and accruing through the date of the payment.

19         45.    The Parties to this Decree recognize and acknowledge that the payment

20    obligations of the Settling Federal Agency under this Decree can only be paid from appropriated

21    funds legally available for such purpose. Nothing in this Decree shall be interpreted or construed

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1  as a commitment or requirement that the Settling Federal Agency obligate or pay funds in

2  contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or any other applicable provision of

3  law.

4  **C. Notice of Payments**

5      46.    At the time of each payment pursuant to Paragraphs 35-37, 38-42, and 44, the

6  Party making the payment will send notice to the recipient of the payment that payment has been

7  made.  Written notice to a Party by electronic mail, using the Party's e-mail address(es) listed in

8  Section XIX (Notices), satisfies the notice requirement of this paragraph. Such notice will

9  reference Port Gardner Bay NRDA, DOJ case number 90-11-3-10859/1 and the civil action

10  number.

11                 **IX.    INDEMNIFICATION AND INSURANCE**

12      47.    <u>Settling Defendant's Indemnification of the Plaintiffs.</u>

13          a.    The Plaintiffs do not assume any liability by entering into this Consent

14  Decree.  Settling Defendant shall indemnify, save, and hold harmless each of the Plaintiffs

15  and/or their officials, agents, employees, contractors, subcontractors, or representatives for or

16  from any and all claims or causes of action arising from, or on account of, negligent or other

17  wrongful acts or omissions of Settling Defendant, its officers, directors, employees, agents,

18  contractors, subcontractors, and any persons acting on Settling Defendant's behalf or under its

19  control, including Wildlands, in carrying out activities pursuant to this Decree.  Further, Settling

20  Defendant agrees to pay the Plaintiffs all costs they incur including, but not limited to, attorneys'

21  fees and other expenses of litigation and settlement arising from, or on account of, claims made

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1    against the Plaintiffs based on negligent or other wrongful acts or omissions of Settling

2    Defendant, its officers, directors, employees, agents, contractors, subcontractors, and any persons

3    acting on its behalf or under its control, in carrying out activities pursuant to this Decree.  Except

4    as specifically identified in Appendix F, none of the Plaintiffs shall be held out as a party to any

5    contract entered into by or on behalf of Settling Defendant in carrying out activities pursuant to

6    this Decree.  Neither Settling Defendant nor any contractor or representative of Settling

7    Defendant shall be considered an agent of any Plaintiff.  Settling Defendant shall require any

8    contractor retained by Settling Defendant who performs work for Settling Defendant in carrying

9    out activities pursuant to this Decree to affirmatively acknowledge that it is not acting as an

10   agent of any Plaintiff.

11            b.      Plaintiffs shall give Settling Defendant notice of any claim for which one

12   or more Plaintiffs plans to seek indemnification pursuant to this paragraph, and shall consult with

13   Settling Defendant prior to settling such claim.

14            48.     Settling Defendant covenants not to sue and agrees not to assert any claims or

15   causes of action against the Plaintiffs for damages or reimbursement or for set-off of any

16   payments made or to be made to the Plaintiffs, arising from or on account of any contract,

17   agreement, or arrangement between Settling Defendant and any person for performance of

18   activities pursuant to this Decree, including, but not limited to, claims on account of construction

19   delays.  In addition, Settling Defendant shall indemnify, save and hold harmless the Plaintiffs

20   with respect to any and all claims for damages or reimbursement arising from or on account of

21   any contract, agreement, or arrangement between Settling Defendant and any person for

CONSENT DECREE                                UNITED STATES DEPARTMENT OF JUSTICE
                                              Environment and Natural Resources Division
                                              P.O. Box 7611, Washington, D.C. 20044-7611
                                              202-514-5270

1  performance of activities pursuant to this Decree, including, but not limited to, claims on account

2  of construction delays.

3       49.  <u>Insurance</u>.  No later than fifteen (15) days before commencing any work involved

4  in implementing this Decree, Settling Defendant shall secure and maintain comprehensive

5  general liability and automobile liability insurance with limits of five million dollars, combined

6  single limit.  The Trustees shall be named additional insureds on any such policies with respect

7  to all liability arising out of the activities performed by or on behalf of Settling Defendant

8  pursuant to this Decree.  In addition, for the duration of this Decree, Settling Defendant shall

9  satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and

10  regulations regarding the provision of worker's compensation insurance for all persons

11  performing any work involved in implementing this Decree.  No later than fifteen (15) days

12  before commencing any work involved in implementing this Decree, Settling Defendant shall

13  provide to the Trustees certificates of such insurance and copies of such insurance policies.

14  Settling Defendant shall resubmit such certificates and copies of policies each year on the

15  anniversary of the Effective Date.  If Settling Defendant demonstrates by evidence satisfactory to

16  the Trustees that any contractor or subcontractor maintains insurance equivalent to that described

17  above, or insurance covering the same risks but in a lesser amount, then, with respect to that

18  contractor or subcontractor, Settling Defendant need provide only that portion of the insurance

19  described above that is not maintained by the contractor or subcontractor.

CONSENT DECREE                                   UNITED STATES DEPARTMENT OF JUSTICE
                                                 Environment and Natural Resources Division
                                                 P.O. Box 7611, Washington, D.C. 20044-7611
                                                 202-514-5270

1              **X.     FORCE MAJEURE**

2        50.     "Force majeure," for purposes of this Consent Decree, is defined as any event

3   arising from causes beyond the control of Settling Defendant or of any entity controlled by

4   Settling Defendant, or of the Settling Defendant's contractors and subcontractors, that delays or

5   prevents the performance of any obligation under this Decree despite Settling Defendant's best

6   efforts to fulfill the obligation.  The requirement that Settling Defendant exercise "best efforts to

7   fulfill the obligation" includes using best efforts to anticipate any potential force majeure and

8   best efforts to address the effects of any potential force majeure (a) as it is occurring and (b)

9   following the potential force majeure such that the delay and any adverse effects of the delay are

10  minimized to the greatest extent possible.  The requirement that Settling Defendant exercise

11  "best efforts to fulfill the obligation" also includes, where necessary, the filing of legal actions to

12  compel contract performance in accordance with the design and schedule approved by the

13  Trustees herein.  "Force majeure" does not include financial inability to complete any obligation

14  under this Decree.

15       51.     If any event occurs or has occurred that may delay the performance of any

16  obligation under this Decree for which Settling Defendant intends or may intend to assert a claim

17  of force majeure, Settling Defendant shall notify, in writing or by electronic transmission, the

18  Plaintiffs within seven (7) days of when Settling Defendant first knew that the event might cause

19  a delay.  Within 14 days thereafter, Settling Defendant shall provide in writing to the Plaintiffs

20  an explanation and description of the reasons for the delay; the anticipated duration of the delay;

21  all actions taken or to be taken to prevent or minimize the delay; a schedule of implementation of

CONSENT DECREE                           UNITED STATES DEPARTMENT OF JUSTICE
                                         Environment and Natural Resources Division
                                         P.O. Box 7611, Washington, D.C. 20044-7611
                                         202-514-5270

1   any measures to be taken to prevent or mitigate the delay or the effect of the delay; and the

2   Settling Defendant's rationale for attributing such delay to a force majeure.  Settling Defendant

3   shall include with any notice all available documentation supporting its claim that the delay was

4   attributable to a force majeure.  Settling Defendant shall be deemed to know of any circumstance

5   of which Settling Defendant, any entity controlled by Settling Defendant, or Settling Defendant's

6   contractors or subcontractors knew or should have known.  Failure to comply with the above

7   requirements regarding an event shall preclude Settling Defendant from asserting any claim of

8   force majeure regarding that event, provided, however, that if the Plaintiffs, despite the late or

9   incomplete notice, are able to assess to their satisfaction whether the event is a force majeure

10   under this Section and whether Settling Defendant has exercised its best efforts under this

11   Section, the Plaintiffs may, in their unreviewable discretion, excuse in writing Settling

12   Defendant's failure to submit timely or complete notices under this paragraph.

13       52.    If the Plaintiffs agree that the delay or anticipated delay is attributable to a force

14   majeure, the time for performance of the obligations under this Consent Decree that are affected

15   by the force majeure will be extended by the Plaintiffs for such time as is necessary to complete

16   these obligations.  An extension of the time for performance of the obligations affected by the

17   force majeure shall not, of itself, extend the time for performance of any other obligation.  If the

18   Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a force

19   majeure, the Plaintiffs will notify Settling Defendant in writing of their decision.  If the Plaintiffs

20   agree that the delay is attributable to a force majeure, the Plaintiffs will notify Settling Defendant

CONSENT DECREE                                UNITED STATES DEPARTMENT OF JUSTICE
                                              Environment and Natural Resources Division
                                              P.O. Box 7611, Washington, D.C. 20044-7611
                                              202-514-5270

1   in writing of the length of the extension, if any, for performance of the obligations affected by

2   the force majeure.

3          53.      If Settling Defendant elects to invoke the dispute resolution procedures set forth

4   in Section XI (Dispute Resolution) regarding the Plaintiffs' decision, it shall do so no later than

5   15 days after receipt of Plaintiffs' notice.  In any such proceeding, Settling Defendant shall have

6   the burden of demonstrating by a preponderance of the evidence that the delay or anticipated

7   delay has been or will be caused by a force majeure, that the duration of the delay or the

8   extension sought was or will be warranted under the circumstances, that best efforts were

9   exercised to avoid and mitigate the effects of the delay, and that Settling Defendant complied

10  with the requirements of Paragraphs 50 and 51.  If Settling Defendant carries this burden, the

11  delay at issue shall be deemed not to be a violation by Settling Defendant of the affected

12  obligation of this Decree identified to Plaintiffs and the Court.

13                          **XI.     DISPUTE RESOLUTION**

14         54.      Unless otherwise expressly provided for in this Consent Decree, the dispute

15  resolution procedures of this Section shall be the exclusive mechanism to resolve disputes

16  regarding this Decree.  However, the procedures set forth in this Section shall not apply to

17  actions by the United States to enforce obligations of the Settling Defendant that have not been

18  disputed in accordance with this Section.

19         55.      <u>Informal Dispute Resolution.</u>  A dispute shall be considered to have arisen when

20  the Plaintiffs send the Settling Defendant a written Notice of Dispute, or the Settling Defendant

21  sends the Plaintiffs a written Notice of Dispute.  Any dispute regarding this Decree shall in the

CONSENT DECREE                                    UNITED STATES DEPARTMENT OF JUSTICE
                                                 Environment and Natural Resources Division
                                                 P.O. Box 7611, Washington, D.C. 20044-7611
                                                 202-514-5270

1    first instance be the subject of informal negotiations between the Plaintiffs and Settling

2    Defendant.  The period for informal negotiations shall not exceed twenty-one (21) days from the

3    date the Notice of Dispute is sent, unless it is modified by written agreement of the parties to the

4    dispute.

5         56.    Formal Dispute Resolution.

6         a.     In the event that the parties cannot resolve a dispute by informal

7    negotiations under the preceding paragraph, then the position advanced by the Plaintiffs shall be

8    considered binding unless, within twenty-one (21) days after the conclusion of the informal

9    negotiation period, Settling Defendant invokes the formal dispute resolution procedures of this

10    Section by serving on the Plaintiffs a written Statement of Position on the matter in dispute,

11    including, but not limited to, any factual data, analysis, or opinion supporting that position and

12    any supporting documentation relied upon by Settling Defendant.

13         b.     Within twenty-one (21) days after receipt of Settling Defendant's

14    Statement of Position, the Plaintiffs will serve on the Settling Defendant their Statement of

15    Position, including, but not limited to, any factual data, analysis, or opinion supporting that

16    position and any supporting documentation relied upon by the Plaintiffs.  Within twenty-one (21)

17    days after receipt of Plaintiffs' Statement of Position, Settling Defendant may submit a Reply.

18         c.     An administrative record of the dispute shall be maintained by the

19    Plaintiffs and shall contain all statements of position, including supporting documentation,

20    submitted pursuant to this Section.  Where appropriate, the Plaintiffs may allow submission of

21    supplemental statements of position by the parties to the dispute.

CONSENT DECREE                     UNITED STATES DEPARTMENT OF JUSTICE
                                        Environment and Natural Resources Division
                                        P.O. Box 7611, Washington, D.C. 20044-7611
                                        202-514-5270

1          d.       The Plaintiffs will issue a final decision resolving the dispute based on the

2   administrative record described in subparagraph (c) above.  This decision shall be binding upon

3   the Settling Defendant, subject only to the right to seek judicial review pursuant to

4   subparagraphs (e) and (f) below.

5          e.       Any final decision made by the Plaintiffs pursuant to subparagraph (d)

6   shall be reviewable by this Court, provided that a motion for judicial review of the decision is

7   filed by the Settling Defendant with the Court and served on all Parties within ten (10) days after

8   receipt of the Plaintiffs' decision.  The motion shall include a description of the matter in dispute,

9   the efforts made by the parties to resolve it, the final decision of the Plaintiffs, the relief

10  requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly

11  implementation of this Decree.  The Plaintiffs may file a response to Settling Defendant's

12  motion.

13         f.       In proceedings on any dispute governed by this paragraph, the Settling

14  Defendant shall have the burden of demonstrating that the decision of the Plaintiffs is arbitrary

15  and capricious or otherwise not in accordance with law.  Judicial review of the final decision of

16  the Plaintiffs shall be on the administrative record compiled pursuant to subparagraph (c).

17         g.       The invocation of formal dispute resolution procedures under this Section

18  does not extend, postpone, or affect in any way any obligation of Settling Defendant under this

19  Decree that is not directly in dispute, unless the Plaintiffs agree otherwise or as determined by

20  the Court.  Stipulated penalties with respect to the disputed matter shall continue to accrue, but

21  payment shall be stayed pending resolution of the dispute, as provided in Paragraph 64.

CONSENT DECREE                                    UNITED STATES DEPARTMENT OF JUSTICE
                                                  Environment and Natural Resources Division
                                                  P.O. Box 7611, Washington, D.C. 20044-7611
                                                  202-514-5270

1   Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of

2   noncompliance with any applicable provision of this Decree.  In the event that Settling

3   Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid

4   as provided in Section XII (Stipulated Penalties).

5                                   **XII.    STIPULATED PENALTIES**

6          57.    Settling Defendant shall be liable to the Plaintiffs for stipulated penalties in the

7   amounts set forth in Paragraphs 58 and 59 for failure to comply with the requirements of this

8   Consent Decree specified below, unless excused under Section X (Force Majeure).

9          58.    <u>Late Payments</u>.  Settling Defendant shall pay a stipulated penalty of $1,500 per

10  day that each payment pursuant to Section VIII (Payments of Assessment Costs) is not made by

11  the required due date.

12         59.    <u>Failure to Meet Deadlines or Satisfy Requirements of the Decree</u>.  In the event

13  that Settling Defendant fails to meet a deadline or satisfy other requirements in this Decree

14  (subject to any modifications agreed to under Section XXII) set forth in Paragraphs 11, 22-24, 28

15  and 29 and in Section 10 of Appendix C, and any delay is not excused through operation of the

16  provisions of Section X (Force Majeure), then Settling Defendant shall pay stipulated penalties

17  per violation per day for any noncompliance as follows:

18         <u>Period of Noncompliance</u>              <u>Penalty per Violation per Day</u>

19         1st through 14th day                        $500

20         15th through 30th day                       $750

21         31st day and beyond                     $1,000

CONSENT DECREE                                  UNITED STATES DEPARTMENT OF JUSTICE
                                                Environment and Natural Resources Division
                                                P.O. Box 7611, Washington, D.C. 20044-7611
                                                202-514-5270

1     Nothing in this Decree prevents the simultaneous accrual of separate penalties for separate

2  violations of this Decree.

3     60.    In the event that the Trustees assume performance of a portion or all of the

4  Restoration Project pursuant to Section VI, Defendant shall be liable for a stipulated penalty in

5  the amount of $100,000.  Stipulated penalties under this paragraph are in addition to the

6  remedies available under Paragraph 26 (Exercise of Performance Guarantees).

7     61.    All penalties shall begin to accrue on the day after the complete performance is

8  due or the day a violation occurs, and shall continue to accrue through the final day of the

9  correction of the noncompliance or completion of activity, or until the Trustees send a Notice of

10  Exercise of Performance Guarantee under Paragraph 26.d.  However, stipulated penalties shall

11  not accrue: (a) with respect to a final decision by the Plaintiffs under Paragraph 56.d of Section

12  XI (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that

13  the Settling Defendant's reply to the Plaintiffs' Statement of Position is received until the date

14  that the Plaintiffs issue a final decision regarding such dispute; or (b) with respect to judicial

15  review by this Court of any dispute under Section XI (Dispute Resolution), during the period, if

16  any, beginning on the 31st day after the Court's receipt of the final submission regarding the

17  dispute until the date that the Court issues a final decision regarding such dispute.  Nothing in

18  this Decree shall prevent the simultaneous accrual of separate penalties for separate violations of

19  this Decree.

20     62.    Following the determination by the Plaintiffs, individually or jointly, that Settling

21  Defendant has failed to comply with a requirement of this Decree, the Plaintiffs may give

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1     Settling Defendant written notification of the same and describe the noncompliance.  The

2     Trustees may send Settling Defendant a written demand for payment of the penalties.  However,

3     penalties shall accrue as provided in the preceding paragraph regardless of whether the Trustees

4     have notified Settling Defendant of a violation.

5         63.     All penalties accruing under this Section shall be due and payable to the Plaintiffs

6     within 30 days after Settling Defendant's receipt from the Plaintiff(s) of a demand for payment

7     of the penalties, unless Settling Defendant invokes the Dispute Resolution procedures under

8     Section XI (Dispute Resolution) within the 30-day period.  All payments for stipulated penalties

9     to the United States under this paragraph will be deposited by EFT to the United States Treasury

10     in accordance with Paragraph 35.a.i.  Payments for stipulated penalties to the State of

11     Washington, the Suquamish Tribe or the Tulalip Tribes shall be paid in accordance with the

12     procedures set forth in Paragraph 35.b-35.d.  At the time of each payment, Settling Defendant

13     will send notice that payment has been made to the Trustees and the U.S. Department of Justice

14     in accordance with Section XIX (Notices).  This notice will reference Port Gardner Bay Area

15     NRD, DOJ Case Number 90-11-3-10859/1, and the civil action number.

16         64.     Penalties shall continue to accrue as provided in Paragraph 61 during any dispute

17     resolution period, but need not be paid until the following:

18             a.     If the dispute is resolved by agreement of the parties or by a decision of

19     the Plaintiffs that is not appealed to this Court, accrued penalties determined to be owed shall be

20     paid to the Plaintiffs within 15 days after the agreement or the receipt of the Plaintiffs' decision

21     or order;

CONSENT DECREE                                UNITED STATES DEPARTMENT OF JUSTICE
                                               Environment and Natural Resources Division
                                             P.O. Box 7611, Washington, D.C. 20044-7611
                                             202-514-5270

1               b.       If the dispute is appealed to this Court and the Plaintiffs prevail in whole

2  or in part, the Settling Defendant shall pay all accrued penalties determined by the Court to be

3  owed to the Plaintiffs within 60 days after receipt of the Court's decision or order, except as

4  provided in subparagraph (c) below;

5               c.       If the District Court's decision is appealed by any Party, Settling

6  Defendant shall pay all accrued penalties determined by the District Court to be owed to the

7  Plaintiffs into an interest-bearing escrow account, established at a duly chartered bank or trust

8  company that is insured by the FDIC, within 60 days after receipt of the Court's decision or

9  order.  Penalties shall be paid into this account as they continue to accrue, at least every 60 days.

10  Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the

11  balance of the account to the Plaintiffs or to Settling Defendant to the extent that it prevails.

12       65.      If Settling Defendant fails to pay stipulated penalties when due, Settling

13  Defendant shall pay interest, at the rate specified in 28 U.S.C. § 1961 as of the Lodging Date, on

14  the unpaid stipulated penalties as follows:  (a) if Settling Defendant has timely invoked dispute

15  resolution such that the obligation to pay stipulated penalties has been stayed pending the

16  outcome of dispute resolution, interest shall accrue from the date stipulated penalties are due

17  pursuant to Paragraph 61 until the date of payment; and (b) if Settling Defendant fails to timely

18  invoke dispute resolution, interest shall accrue from the date of demand under Paragraph 63 until

19  the date of payment.  If Settling Defendant fails to pay stipulated penalties and interest due,

20  Plaintiffs may institute proceedings to collect the penalties and interest.

CONSENT DECREE                             UNITED STATES DEPARTMENT OF JUSTICE
                                              Environment and Natural Resources Division
                                              P.O. Box 7611, Washington, D.C. 20044-7611
                                              202-514-5270

1      66.     The payment of penalties and interest, if any, shall not alter in any way Settling

2   Defendant's obligations to make any other payments as required by this Decree or to perform

3   any other requirement of this Decree.

4      67.     Nothing in this Decree shall be construed as prohibiting, altering, or in any way

5   limiting the ability of the Plaintiffs to seek any other remedies or sanctions available by virtue of

6   Settling Defendant's violation of this Decree.

7      68.     Notwithstanding any other provision of this Section, the Plaintiffs may, in their

8   unreviewable discretion, waive any portion of compensation under Paragraph 11 or stipulated

9   penalties that accrued pursuant to this Decree.

10              **XIII.   COVENANTS BY THE PLAINTIFFS**

11      69.     <u>Covenant for Settling Defendant by Plaintiffs</u>.  Except as provided by Section

12   XIV (Reservations of Rights by Plaintiffs), the Plaintiffs covenant not to sue or to take

13   administrative action against Settling Defendant pursuant to Section 107(a) of CERCLA, 42

14   U.S.C. § 9607(a); Chapter 70.105D RCW; Section 311(f) of the CWA, 33 U.S.C. § 1321(f);

15   Chapter 90.48 RCW; Section 1002(a) of OPA, 33 U.S.C. § 2702(a); or federal statutory or state

16   statutory or common law, to recover Natural Resource Damages.  This covenant not to sue shall

17   take effect upon receipt of Settling Defendant's complete payment of costs pursuant to Section

18   VIII.A (Payments by Settling Defendant for Assessment Costs).  This covenant not to sue shall

19   continue in effect conditioned upon the satisfactory performance by Settling Defendant of its

20   obligations under this Consent Decree.  This covenant not to sue extends only to the Settling

21   Defendant and does not extend to any other person.

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

**Page 51 of 75**

1          70.    Covenants for Settling Federal Agency.

2                 a.      Except as provided by Section XIV (Reservations of Rights by Plaintiffs),

3    the Federal Trustees covenant not to take administrative action against the Settling Federal

4    Agency pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a); Section 311(f) of the

5    CWA, 33 U.S.C. § 1321(f); Section 1002(a) of OPA, 33 U.S.C. § 2702(a); or federal statutory or

6    state statutory or common law, to recover Natural Resource Damages.  This covenant shall take

7    effect upon receipt of the payments required by Section VII and Paragraphs 38, 39, and 44 of

8    Section VIII.B.  The Federal Trustees' covenant is conditioned upon the satisfactory

9    performance by the Settling Federal Agency of its obligations under this Decree.  The Federal

10   Trustees' covenant extends only to the Settling Federal Agency and does not extend to any other

11   person.

12                b.      Except as provided by Section XIV (Reservations of Rights by Plaintiffs),

13   the State and the Tribes covenant not to sue or to take administrative action against the United

14   States, including the Settling Federal Agency, pursuant to Section 107(a) of CERCLA, 42 U.S.C.

15   § 9607(a); Chapter 70.105D RCW; Section 311(f) of the CWA, 33 U.S.C. § 1321(f); Chapter

16   90.48 RCW; Section 1002(a) of OPA, 33 U.S.C. § 2702(a); or federal statutory or state statutory

17   or common law, to recover Natural Resource Damages.  This covenant shall take effect upon

18   receipt of the payments required by Section VII and Paragraphs 40-42 and 44 of Section VIII.B.

19   The State and Tribes' covenant is conditioned upon the satisfactory performance by the Settling

20   Federal Agency of its obligations under this Decree.  The State and Tribes' covenant extends

21   only to the United States and does not extend to any other person.

CONSENT DECREE                                    UNITED STATES DEPARTMENT OF JUSTICE
                                                  Environment and Natural Resources Division
                                                  P.O. Box 7611, Washington, D.C. 20044-7611
                                                  202-514-5270

## XIV.   RESERVATIONS OF RIGHTS BY PLAINTIFFS

1

2    71.    <u>General Reservations of Rights</u>.  The Plaintiffs reserve, and this Consent Decree

3  is without prejudice to, all rights against Settling Defendant, and the Federal Trustees, the State,

4  and the Tribes reserve, and this Consent Decree is without prejudice to, all rights against the

5  Settling Federal Agency, with respect to all matters not expressly included within the Plaintiffs'

6  covenants in Section XIII.  Notwithstanding any other provision of this Consent Decree, the

7  Plaintiffs reserve all rights against the Settling Defendant, and the Federal Trustees, the State,

8  and the Tribes reserve all rights against the Settling Federal Agency, with respect to:

9       a.    liability for failure by Settling Defendant or Settling Federal Agency to

10  meet a requirement of this Decree;

11       b.    criminal liability;

12       c.    liability for any other costs, including without limitation, costs of response

13  incurred or to be incurred by the United States, the State, or the Tribes under any federal or State

14  statute or tribal law that are not within the definition of Natural Resource Damages;

15       d.    liability for damages to Natural Resources (including assessment costs) as

16  defined in 42 U.S.C. §§ 9601(6) and (16) that are not expressly included within the Plaintiffs'

17  covenants in Section XIII;

18       e.    liability for damages to Natural Resources (including assessment costs) as

19  defined in 42 U.S.C. §§ 9601(6) and (16) within the Port Gardner Bay Area resulting from

20  Settling Defendant's or Settling Federal Agency's transportation, treatment, storage, or disposal,

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1    or arrangement for transportation, treatment, storage, or disposal of hazardous substances after

2    the Lodging Date of this Decree;

3          f.      liability for injunctive relief or administrative order enforcement under

4    any federal or State statute; and

5          g.      liability under Section 107(a)(4)(D) of CERCLA, 42 U.S.C. §

6    9607(a)(4)(D), for costs of any health assessment or health effects study carried out under 42

7    U.S.C. § 9604(i) in or regarding the Port Gardner Bay Area.

8          72.    Special Reservations Regarding Natural Resource Damages.  Notwithstanding

9    any other provision of this Consent Decree, the Plaintiffs reserve the right to institute

10   proceedings against Settling Defendant in this action or in a new action seeking recovery of

11   Natural Resource Damages, based on (1) conditions, factors or information with respect to the

12   Port Gardner Bay Area, not known to the Trustees at the Lodging Date, that result in releases of

13   hazardous substances that contribute to injury to, destruction of, or loss of Natural Resources, or

14   (2) information received after the Lodging Date which indicates that there is injury to,

15   destruction of, or loss of Natural Resources of a type or future persistence that was unknown, or

16   of a magnitude significantly greater than was known to the Trustees at the Lodging Date.

17         73.    Special Reservations by the Federal Trustees Regarding Natural Resource

18   Damages.  Notwithstanding any other provision of this Consent Decree, the Federal Trustees

19   reserve the right to take administrative action against the Settling Federal Agency for the

20   recovery of Natural Resource Damages, based on (1) conditions, factors or information with

21   respect to the Port Gardner Bay Area, not known to the Trustees at the Lodging Date, that result

CONSENT DECREE                              UNITED STATES DEPARTMENT OF JUSTICE
                                            Environment and Natural Resources Division
                                            P.O. Box 7611, Washington, D.C. 20044-7611
                                            202-514-5270

1  in releases of hazardous substances that contribute to injury to, destruction of, or loss of Natural

2  Resources, or (2) information received after the Lodging Date which indicates that there is injury

3  to, destruction of, or loss of Natural Resources of a type or future persistence that was unknown,

4  or of a magnitude significantly greater than was known to the Trustees at the Lodging Date.

5          74.     Special Reservations by the State and Tribes Regarding Natural Resource

6  Damages.  Notwithstanding any other provision of this Consent Decree, the State and the Tribes

7  reserve the right to institute proceedings against the Settling Federal Agency in this action or a

8  new action for the recovery of Natural Resource Damages, based on (1) conditions, factors or

9  information with respect to the Port Gardner Bay Area, not known to the Trustees at the Lodging

10  Date, that result in releases of hazardous substances that contribute to injury to, destruction of, or

11  loss of Natural Resources, or (2) information received after the Lodging Date which indicates

12  that there is injury to, destruction of, or loss of Natural Resources of a type or future persistence

13  that was unknown, or of a magnitude significantly greater than was known to the Trustees at the

14  Lodging Date.

15  **XV.    COVENANTS BY SETTLING DEFENDANT AND SETTLING FEDERAL**
16  **AGENCY**

17          75.     Covenants by Settling Defendant.  Settling Defendant covenants not to sue and

18  agrees not to assert any claims or causes of action against the United States (including the

19  Settling Federal Agency), the State, the Suquamish Tribe, or the Tulalip Tribes, or their

20  contractors or employees, with respect to Natural Resource Damages or this Consent Decree,

21  including, but not limited to:

CONSENT DECREE                                UNITED STATES DEPARTMENT OF JUSTICE
                                              Environment and Natural Resources Division
                                              P.O. Box 7611, Washington, D.C. 20044-7611
                                              202-514-5270

1         a.     any claims arising out of activities related to the Restoration Project,

2 including, without limitation, claims based on the Trustees' approval of the Restoration Project,

3 oversight and monitoring of the Restoration Project, and/or approval of plans for such activities;

4         b.     any direct or indirect claim for reimbursement of any payment for Natural

5 Resource Damages from the Hazardous Substance Superfund based on CERCLA Sections 107,

6 111, 112, 113 (42 U.S.C. §§ 9607, 9611, 9612, 9613), or any other provision of law;

7         c.     any claim against the Plaintiffs pursuant to Sections 107 and 113 of

8 CERCLA, 42 U.S.C. §§ 9607 and 9613, or Section 311 of the CWA, 33 U.S.C. § 1321, relating

9 to Natural Resource Damages; or

10         d.     any federal statutory or state statutory or common law claim relating to

11 Natural Resource Damages.

12 These covenants not to sue shall not apply in the event that the Plaintiffs take administrative

13 action, issue administrative findings and orders, or bring a cause of action against Settling

14 Defendant for Natural Resource Damages pursuant to the reservations set forth in Paragraphs 71

15 and 72, above, but only to the same extent and for the same matters, transactions, or occurrences

16 as are raised in the claims asserted by the Plaintiffs pursuant to such reservations.

17       76.     Covenant by the Settling Federal Agency.

18         a.     The Settling Federal Agency hereby agrees not to assert against Federal

19 Trustees any direct or indirect claim for reimbursement of any payment for Natural Resource

20 Damages based on Sections 107 or 113 of CERCLA, 42 U.S.C. §§ 9607 or 9613, Section 311 of

21 the CWA, 33 U.S.C. § 1321, or federal statutory or state statutory or common law, including

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1   payments made under Sections VII and VIII.B  These covenants shall not apply in the event that

2   Federal Trustees take administrative action against the Settling Federal Agency pursuant to the

3   reservations set forth in Section XIV, above, but only to the same extent and for the same

4   matters, transactions, or occurrences as are raised in the claims asserted by the Federal Trustees

5   pursuant to such reservations.

6           b.      The Settling Federal Agency hereby covenants not to sue the State or the

7   Tribes under Sections 107 or 113 of CERCLA, 42 U.S.C. §§ 9607 or 9613, Section 311(f)(4) and

8   (5) of the CWA, 33 U.S.C. § 1321(f)(4) and (5), or federal statutory or state statutory or common

9   law, with respect to Natural Resource Damages, including payments made under Sections VII

10  and VIII.B.  These covenants shall not apply in the event the State and/or the Tribes bring a

11  claim and/or administrative action against the Settling Federal Agency pursuant to the

12  reservations set forth in Section XIV, above, but only to the same extent and for the same

13  matters, transactions, or occurrences as are raised in the claims asserted by the State and/or the

14  Tribes pursuant to such reservations.

15          **XVI.   EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION**

16          77.     Nothing in this Consent Decree shall be construed to create any rights in, or grant

17  any cause of action to, any person not a Party to this Decree.  Except as provided in Section XV,

18  each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to

19  Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action

20  that each Party may have with respect to any matter, transaction, or occurrence relating in any

21  way to the Port Gardner Bay Area against any person not a Party hereto.  Nothing in this Decree

CONSENT DECREE                          UNITED STATES DEPARTMENT OF JUSTICE
                                        Environment and Natural Resources Division
                                        P.O. Box 7611, Washington, D.C. 20044-7611
                                        202-514-5270

1   diminishes the right of the Plaintiffs, pursuant to Section 113(f)(2) and (3) of CERCLA, 42

2   U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional relief (including

3   response action, response costs, and natural resource damages, including costs of damage

4   assessment) and to enter into settlements that give rise to contribution protection pursuant to

5   Section 113(f)(2) of CERCLA.

6       78.   The Parties agree, and by entering this Decree this Court finds, that this Decree

7   constitutes a judicially-approved settlement pursuant to which Settling Defendant and the United

8   States on behalf of the Settling Federal Agency have, as of the Effective Date, resolved liability

9   to the Plaintiffs within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2),

10  and are entitled, as of the Effective Date, to protection from contribution actions or claims as

11  provided by Section 113(f)(2) of CERCLA and RCW 70.105D.040(4)(d), or as may be otherwise

12  provided by law, for matters addressed in this Consent Decree.  For these purposes, the "matters

13  addressed" in this Consent Decree are Natural Resource Damages, as defined herein; provided,

14  however, that if the Plaintiffs exercise rights against Settling Defendant or if the Federal

15  Trustees, the State, and/or the Tribes assert rights against the Settling Federal Agency under the

16  reservations in Section XIV, other than Paragraphs 71.a (claims for failure to meet a requirement

17  of this Decree) and 71.b (criminal liability), the contribution protection afforded by this Decree

18  will no longer include those matters that are within the scope of the exercised reservation.

19      79.   The Parties further agree, and by entering this Decree this Court finds, that the

20  complaint filed by the Plaintiffs in this action is a civil action within the meaning of Section

21  113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Decree constitutes a judicially-

CONSENT DECREE                          UNITED STATES DEPARTMENT OF JUSTICE
                                        Environment and Natural Resources Division
                                        P.O. Box 7611, Washington, D.C. 20044-7611
                                        202-514-5270

1  approved settlement pursuant to which the Settling Defendant and the Settling Federal Agency

2  have, as of the Effective Date, resolved liability to the Plaintiffs for Natural Resource Damages

3  within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

4      80.     Settling Defendant shall, with respect to any suit or claim brought by it for

5  contribution for Natural Resource Damages, notify the Plaintiffs in writing no later than 60 days

6  prior to the initiation of such suit or claim.  Settling Defendant shall also notify in writing the

7  Plaintiffs within 10 days of any settlement of its claims (regardless of whether the claim is filed

8  or unfiled) for contribution for Natural Resource Damages.

9      81.     Settling Defendant shall, with respect to any suit or claim brought against it for

10  matters related to this Decree, notify in writing the Plaintiffs within 10 days after service of the

11  complaint on Settling Defendant.  In addition, Settling Defendant shall notify the Plaintiffs

12  within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days

13  after receipt of any order from a court setting a case for trial.

14      82.     <u>Waiver of Claim-Splitting Defenses</u>.

15          a.     In any subsequent administrative or judicial proceeding initiated by the

16  Plaintiffs for injunctive relief, recovery of response costs or Natural Resource Damages, or other

17  appropriate relief relating to the Port Gardner Bay Area, Settling Defendant shall not assert, and

18  may not maintain, any defense or claim based upon the principles of waiver, res judicata,

19  collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention

20  that the claims raised by the Plaintiffs in the subsequent proceedings were or should have been

CONSENT DECREE                                    UNITED STATES DEPARTMENT OF JUSTICE
                                                  Environment and Natural Resources Division
                                                  P.O. Box 7611, Washington, D.C. 20044-7611
                                                  202-514-5270

1   brought in the instant case; provided, however, that nothing in this paragraph affects the

2   enforceability of the covenants not to sue set forth in Section XIII (Covenants by the Plaintiffs).

3          b.     In any subsequent administrative or judicial proceeding initiated by the

4   State and/or the Tribes for injunctive relief, or Natural Resource Damages or other relief related

5   to the Port Gardner Bay Area, the Settling Federal Agency shall not assert, and may not

6   maintain, any defense or claim based upon the principles of waiver, res judicata, collateral

7   estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the

8   claims raised by the State and/or the Tribes in the subsequent proceedings were or should have

9   been brought in the instant case; provided, however, that nothing in this paragraph affects the

10  enforceability of the covenants not to sue set forth in Section XIII (Covenants by the Plaintiffs).

11  ## XVII.  ACCESS TO PROJECT SITE AND INFORMATION

12         83.    The Plaintiffs and their representatives, including attorneys, contractors, and

13  consultants, shall have the right of entry to the Project Site and any property under the control of

14  the Port to which entry is required for oversight or implementation of this Decree, at all

15  reasonable times, to:

16         a.     monitor the progress of activities required under this Decree;

17         b.     assess compliance with this Decree;

18         c.     verify any data or information submitted to the Plaintiffs in accordance

19  with the terms of this Decree;

CONSENT DECREE                                  UNITED STATES DEPARTMENT OF JUSTICE
                                                Environment and Natural Resources Division
                                                P.O. Box 7611, Washington, D.C. 20044-7611
                                                202-514-5270

1             d.       inspect and copy records, operation logs, contracts, or other documents

2 maintained or generated by Settling Defendant or its contractor to perform work undertaken

3 pursuant to this Decree;

4             e.       obtain samples (including conducting fish sampling as needed to include

5 data in salmon recovery efforts) and, upon request, splits of any samples taken by Settling

6 Defendant or its representatives, contractors, or consultants, including Wildlands;

7             f.       obtain documentary evidence, including photographs, video recordings,

8 sound recordings, and similar data.  Plaintiffs may direct that Settling Defendant use a camera,

9 sound recording device, or other type of equipment to record the work done on the Restoration

10 Project or to record injury to Natural Resources and provide copies of any such recordings to the

11 Trustees;

12             g.       conduct such tests and investigations as deemed necessary to monitor

13 compliance with this Consent Decree; and

14             h.       undertake any maintenance action or additional work as the Trustees

15 determine appropriate.  Such maintenance actions or additional work shall only be taken with the

16 approval of Settling Defendant, which approval may be withheld only upon a showing that the

17 proposed action would be inconsistent with the purposes of the Restoration Project as described

18 in Appendix C, with other provisions of the Decree or other applicable law, or would impose

19 costs or additional liability upon Settling Defendant.

CONSENT DECREE                           UNITED STATES DEPARTMENT OF JUSTICE
                                                        Environment and Natural Resources Division
                                                          P.O. Box 7611, Washington, D.C. 20044-7611
                                                                   202-514-5270

## XVIII. RETENTION OF RECORDS

84.     Until ten years after Settling Defendant's receipt of the Trustees' notification pursuant to Paragraph 13 (Approval of Completion of Initial Maintenance and Monitoring Obligations), Settling Defendant shall preserve and retain all non-identical copies of all records, reports, documents, and other information, including records, reports, documents, and other information in electronic form (hereinafter referred to as "Records") now in its possession or control.  Settling Defendant must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records now in their possession or control or that come into their possession or control that relate in any manner to the performance of the Restoration Project, provided, however, that Settling Defendant (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Restoration Project and not contained in the aforementioned Records required to be retained.  Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

85.     The United States acknowledges that the Settling Federal Agency is subject to all applicable federal record retention laws, regulations, and policies.

86.     At the conclusion of this record retention period, Settling Defendant shall notify the Plaintiffs at least 90 days prior to the destruction of any such Records, and, upon request by the Plaintiffs, Settling Defendant shall deliver any such records to the Trustees.  Settling Defendant may assert that all or part of a Record requested by the Trustees is privileged or protected under federal law.  If Settling Defendant asserts a claim of privilege or protection, it

CONSENT DECREE                                          UNITED STATES DEPARTMENT OF JUSTICE
                                                        Environment and Natural Resources Division
                                                        P.O. Box 7611, Washington, D.C. 20044-7611
                                                        202-514-5270

1    shall provide the following information regarding such Record:  its title; its date; the name, title,

2    affiliation (e.g., company or firm), and address of the author, of each addressee, and of each

3    recipient; a description of the Record's contents; and the privilege or protection asserted.  If a

4    claim of privilege or protection applies only to a portion of a Record, Settling Defendant shall

5    provide the Record to the Trustees in redacted form to mask the privileged or protected portion

6    only.  Settling Defendant shall retain all Records that it claims to be privileged or protected until

7    the Trustees have had a reasonable opportunity to dispute the privilege or protection claim and

8    any such dispute has been resolved in the Settling Defendant's favor.  Settling Defendant may

9    make no claim of privilege or protection regarding:  (1) any data regarding the Port Gardner Bay

10   Area, including, but not limited to, all sampling, analytical, monitoring, scientific, chemical, or

11   engineering data, or the portion of any other Record that relates to the Restoration Project or

12   conditions at or around Port Gardner Bay Area; or (2) any Record or portion of any Record that

13   Settling Defendant is required to create or generate pursuant to this Consent Decree.

14        87.    Settling Defendant certifies that, to the best of its knowledge and belief, after

15   thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any

16   Records (other than identical copies) relating to its potential liability regarding the Port Gardner

17   Bay Area since notification of potential liability by any Trustee.

18                    **XIX.   NOTICES AND SUBMISSIONS**

19        88.    All approvals, consents, deliverables, modifications, notices, notifications,

20   proposals, reports, and requests specified in this Consent Decree must be in writing unless

21   otherwise specified.  Whenever, under this Decree, notice is required to be given, or a report or

CONSENT DECREE                              UNITED STATES DEPARTMENT OF JUSTICE
                                            Environment and Natural Resources Division
                                            P.O. Box 7611, Washington, D.C. 20044-7611
                                            202-514-5270

1   other document is required to be sent, by one Party to another, it must be directed to the

2   person(s) specified below at the address(es) specified below.  Any Party may change the person

3   and/or address applicable to it by providing notice of such change to all Parties.  All notices

4   under this Section are effective upon receipt, unless otherwise specified.  Except as otherwise

5   provided, written notice to a Party by regular mail in accordance with this Section satisfies any

6   notice requirement of the Decree regarding such Party.

7   **As to the United States and as to the U.S. Department of Justice:**
8
9   EES Case Management Unit
10   U.S. Department of Justice
11   Environment and Natural Resources Division
12   P.O. Box 7611
13   Washington, D.C. 20044-7611
14   eescdcopy.enrd@usdoj.gov
15   Re: DJ # 90-11-3-10859/1
16
17   Kent E. Hanson
18   U.S. Department of Justice
19   Environment and Natural Resources Division
20   Environmental Defense Section
21   P.O. Box 7611
22   Washington, D.C. 20044-7611
23   kent.hanson@usdoj.gov
24   Re: DJ # 90-11-8-20035
25
26   **As to the United States Department of Interior:**
27
28   Alexandra James
29   Office of the Regional Solicitor
30   U.S. Department of the Interior
31   805 SW Broadway, Suite 600
32   Portland, OR 97205
33   alexandra.james@sol.doi.gov
34
35   Jeff Krausmann

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1   Fish and Wildlife Biologist/NRDA Specialist
2   U.S. Fish and Wildlife Service
3   Washington Fish and Wildlife Office
4   510 Desmond Drive, SE, Suite 102
5   Lacey, Washington  98503-1263
6   jeff_krausmann@fws.gov
7
8   **As to the National Oceanic and Atmospheric Administration:**
9
10  Christopher J. Plaisted
11  National Oceanic and Atmospheric Administration
12  Office of General Counsel, Natural Resources Section
13  U.S. Department of Commerce
14  501 W. Ocean Blvd, Suite 4470
15  Long Beach, CA 90802
16  christopher.plaisted@noaa.gov
17
18  Jason Lehto
19  National Oceanic and Atmospheric Administration
20  NMFS Restoration Center
21  U.S. Department of Commerce
22  7600 Sand Point Way NE
23  Seattle, WA 98115
24  jason.a.lehto@noaa.gov
25
26  **As to the State of Washington:**
27
28  Donna Podger
29  Toxics Cleanup Program
30  State of Washington
31  P.O. Box 47600
32  Olympia, WA 98504-7600
33  dpod461@ecy.wa.gov
34
35  John A. Level
36  Attorney General's Office
37  P.O. Box 40117
38  Olympia, WA 98504-0117
39  johnl3@atg.wa.gov
40
41  **As to the Suquamish Tribe:**

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

```
 1
 2    Richard Brooks
 3    Environmental Program Manager
 4    P.O. Box 498
 5    18690 Suquamish Way
 6    Suquamish, WA 98392
 7    rbrooks@suquamish.nsn.us
 8
 9    Melody Allen
10    Office of Tribal Attorney
11    P.O. Box 498
12    18690 Suquamish Way
13    Suquamish, WA 98392
14    mallen@suquamish.nsn.us
15
16    As to the Tulalip Tribes:
17
18    Kurt Nelson
19    Environmental Manager
20    Tulalip Tribes
21    6406 Marine Drive
22    Tulalip, WA 98271
23    knelson@tulaliptribes-nsn.gov
24
25    Timothy Brewer
26    Tulalip Tribes Office of the Reservation Attorney
27    6406 Marine Drive
28    Tulalip, WA 98271
29    tbrewer@tulaliptribes-nsn.gov
30
31    As to the Port of Everett:
32
33    Erik Gerking
34    Director of Environmental Programs
35    Port of Everett
36    1205 Craftsman Way, Suite 200
37    Everett, WA  98201
38    erikg@portofeverett.com
39
40    Paul Brachvogel
41    Chief of Legal Affairs
```

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1  Port of Everett
2  1205 Craftsman Way, Suite 200
3  Everett, WA  98201
4  paulb@portofeverett.com
5

6                    **XX.    RETENTION OF JURISDICTION**

7          89.      This Court retains jurisdiction over both the subject matter of this Consent Decree

8   and Settling Defendant for the duration of the performance of the terms and provisions of this

9   Consent Decree for the purpose of enabling any of the Parties to apply to the Court at any time

10  for such further order, direction, and relief as may be necessary or appropriate for the

11  construction or modification of this Decree, or to effectuate or enforce compliance with its terms,

12  or to resolve disputes in accordance with Section XI (Dispute Resolution).

13                          **XXI.    APPENDICES**

14         90.      The following appendices are attached to and incorporated into this Consent

15  Decree:

16         "Appendix A" is the map depicting the Port Gardner Bay Area.

17         "Appendix B" is the list of properties within the Port Gardner Bay Area currently and

18         formerly owned and/or operated by Settling Defendant or owned and/or operated by the

19         Settling Federal Agency that are included within the definition of Natural Resource

20         Damages for purposes of this Decree.

21         "Appendix C" is the Statement of the Work for the Blue Heron Slough Restoration

22         Project.

23         "Appendix D" is the Conservation Easement for the Project Site.

CONSENT DECREE                              UNITED STATES DEPARTMENT OF JUSTICE
                                            Environment and Natural Resources Division
                                            P.O. Box 7611, Washington, D.C. 20044-7611
                                            202-514-5270

1     "Appendix E" is the Project Escrow Agreement.

2     "Appendix F" is the Performance Bond for Construction of the Project.

3     "Appendix G" is the Maintenance and Monitoring Escrow Agreement.

4     **XXII.  MODIFICATION**

5     91.    Material modifications to this Consent Decree, including the Appendices, shall be

6  in writing, signed by the Parties, and shall be effective upon approval by the Court.  Non-

7  material modifications to this Decree, including the Appendices, shall be in writing and shall be

8  effective when signed by duly authorized representatives of the Parties.  Nothing in this Consent

9  Decree shall be deemed to alter the Court's power to enforce, supervise, or approve

10  modifications to this Decree.

11     92.    If Settling Defendant experiences significant adverse changes to its financial

12  circumstances or unanticipated delays in obtaining expected funding for the Restoration Project,

13  Settling Defendant may request, and the Trustees may consider and agree to, a modification of

14  the schedules and deadlines set forth in this Decree, including those set forth in Appendix C, as

15  necessary.

16     **XXIII. ENFORCEMENT**

17     93.    The requirements of this Consent Decree, including but not limited to

18  deadlines, schedules and Project designs, are independently enforceable.  Any delay or failure of

19  the Trustees to enforce any requirement will not preclude or prejudice the subsequent

20  enforcement of the same or another requirement.

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE<br>Environment and Natural Resources Division<br>P.O. Box 7611, Washington, D.C. 20044-7611<br>202-514-5270

## XXIV. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

94.     This Consent Decree shall be lodged with the Court for at least 30 days for public notice and comment.  The Plaintiffs reserve the right to withdraw or withhold their consent if comments regarding the Decree disclose facts or considerations that indicate that the Decree is inappropriate, improper, or inadequate.  Settling Defendant consents to the entry of this Decree without further notice.

95.     If for any reason the Court should decline to approve this Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXV.  SIGNATORIES/SERVICE

96.     The Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice and each undersigned representative of the State of Washington, the Suquamish Tribe, the Tulalip Tribes, and Settling Defendant certifies that he or she is fully authorized to enter into the terms and conditions of this Decree and to execute and legally bind such Party that he or she represents to this document.

97.     Settling Defendant agrees not to oppose entry of this Consent Decree by this Court or to challenge any provisions of this Decree unless any Plaintiff has notified Settling Defendant in writing that it no longer supports entry of the Decree.

98.     Settling Defendant shall identify on the attached signature page the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this Decree.

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1   Settling Defendant agrees to accept service in that manner and to waive the formal service

2   requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local

3   rules of this Court, including, but not limited to, service of summons.  Settling Defendant needs

4   not file answers to the complaint unless or until the Court expressly declines to enter this Decree.

5                              **XXVI. FINAL JUDGMENT**

6          99.     This Consent Decree and its appendices constitute the final, complete, and

7   exclusive agreement and understanding among the Parties regarding the settlement embodied in

8   this Decree.  The Parties acknowledge that there are no representations, agreements, or

9   understandings relating to the settlement other than those expressly contained in this Decree.

10         100.    Upon entry of this Consent Decree by the Court, this Decree shall constitute a

11  final judgment between and among the Parties.  The Court finds that there is no just reason for

12  delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

13

14  SO ORDERED THIS 3 DAY OF September, 2019.

15
16
17
18
19  United States District Judge
20


CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1   Signature Page for Consent Decree Regarding the Port Gardner Bay Area.
2
3
4   **FOR THE UNITED STATES OF AMERICA:**
5
6
7
8
9
10  Date _5│17│19_                       
11                            Jeffrey Bossert Clark
12                            United States Department of Justice
13                            Assistant Attorney General
14                            Environment and Natural Resources Division
15                            Washington, D.C. 20530
16
17
18
19
20  Date _6│3│19_                          
21                            Danica Anderson Glaser
22                            Trial Attorney
23                            United States Department of Justice
24                            Environment and Natural Resources Division
25                            Environmental Enforcement Section
26                            P.O. Box 7611, Ben Franklin Station
27                            Washington, D.C. 20044-7611
28
29  Date _____                        
30                            Kent E. Hanson
31                            Senior Attorney
32                            United States Department of Justice
33                            Environment and Natural Resources Division
34                            Environmental Defense Section
35                            P.O. Box 7611
36                            Washington, D.C. 20044-7611
37
38
39

CONSENT DECREE                                   UNITED STATES DEPARTMENT OF JUSTICE
                                                     Environment and Natural Resources Division
                                                     P.O. Box 7611, Washington, D.C. 20044-7611
                                                         202-514-5270

1  Signature Page for Consent Decree Regarding the Port Gardner Bay Area.
2
3
4  **FOR THE UNITED STATES OF AMERICA:**
5
6
7
8
9
10  Date _____
11                            Jeffrey Bossert Clark
12                            United States Department of Justice
13                            Assistant Attorney General
14                            Environment and Natural Resources Division
15                            Washington, D.C. 20530
16
17
18
19
20  Date _____
21                            Danica Anderson Glaser
22                            Trial Attorney
23                            United States Department of Justice
24                            Environment and Natural Resources Division
25                            Environmental Enforcement Section
26                            P.O. Box 7611, Ben Franklin Station
27                            Washington, D.C. 20044-7611
28
29  Date 5/20/2019
30                            Kent E. Hanson
31                            Senior Attorney
32                            United States Department of Justice
33                            Environment and Natural Resources Division
34                            Environmental Defense Section
35                            P.O. Box 7611
36                            Washington, D.C. 20044-7611
37
38
39


CONSENT DECREE                    UNITED STATES DEPARTMENT OF JUSTICE
                                   Environment and Natural Resources Division
                                   P.O. Box 7611, Washington, D.C. 20044-7611
                                                        202-514-5270

1  Signature Page for Consent Decree Regarding the Port Gardner Bay Area.

2

3

4  **FOR THE STATE OF WASHINGTON:**

5

6

7

8

9

10  Date 5/22/19

11  Maia Bellon

12  Director

13  Washington State Department of Ecology

14

15

16

17  Date 5/22/19

18  John A. Level

19  Assistant Attorney General

20  State of Washington

21

22

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1    Signature Page for Consent Decree Regarding the Port Gardner Bay Area.

2

3

4    **FOR THE SUQUAMISH TRIBE:**

5

6

7

8

9

10   Date 5/14/19

11

12

CONSENT DECREE

UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044-7611
202-514-5270

1    Signature Page for Consent Decree Regarding the Port Gardner Bay Area.
2
3
4    **FOR THE TULALIP TRIBES:**
5
6
7
8    Date _____
9                          Teri Gobin,
10                         Chairwoman
11                         The Tulalip Tribes
12                         6406 Marine Drive
13                         Tulalip, WA  98271
14
15
16
17   Date _____
18                         Tim Brewer,
19                         Reservation Attorney
20                         Tulalip Tribes Office of the Reservation Attorney
21                         6406 Marine Drive
22                         Tulalip, WA  98271
23
24
25
26
27   Date _____
28                         Saza Osawa,
29                         Reservation Attorney
30                         Tulalip Tribes Office of the Reservation Attorney
31                         6406 Marine Drive
32                         Tulalip, WA  98271
33
34
35
36
37
38
39
40
41

CONSENT DECREE                          UNITED STATES DEPARTMENT OF JUSTICE
                                        Environment and Natural Resources Division
                                        P.O. Box 7611, Washington, D.C. 20044-7611
                                        202-514-5270

1     Signature Page for Consent Decree Regarding the Port Gardner Bay Area.

2

3

4

5     **FOR THE PORT OF EVERETT:**

6

7

8

9

10

11     Date _MAY 14, 2019_     _Les Reardon_

12

13

14

15

16

17

18

19

20     Agent Authorized to Accept Service   Name: _____

21     On Behalf of Above-Signed Party:   Title: _____

22                                                        Company: _____

23                                                        Address: _____

24                                                                         _____

25                                                        Phone: _____

26                                                        Email: _____

27

CONSENT DECREE                                 UNITED STATES DEPARTMENT OF JUSTICE
                                                          Environment and Natural Resources Division
                                                       P.O. Box 7611, Washington, D.C. 20044-7611
                                                                  202-514-5270

# Appendix A

# Assessment Area



# Appendix B



Scale 1" = 2000'

SHEET INDEX:
1. OVERVIEW MAP
2. MUKILTEO WATERFRONT AREA PARCELS
3. SOUTHERN EVERETT WATERFRONT AREA PARCELS
4. EVERETT MARINA WATERFRONT AREA PARCELS
5. NORTHERN EVERETT WATERFRONT AREA PARCELS
6. SNOHOMISH RIVER WATERFRONT AREA PARCELS
7. STEAMBOAT SLOUGH AND UNION SLOUGH AREA PARCELS
8. NAVAL STATION EVERETT AREA PARCELS NO. 166 THROUGH 175
9. LEGAL DESCRIPTIONS FOR PARCELS NO. 1, 3, & 5 THROUGH 77
10. LEGAL DESCRIPTIONS FOR PARCELS NO. 78 THROUGH 165 AND NOTES
11. LEGAL DESCRIPTIONS FOR PARCELS NO. 166 THROUGH 175





METRON
and ASSOCIATES INC.
LAND SURVEYS, MAPS, AND LAND USE PLANNING

PORT OF EVERETT
SNOHOMISH COUNTY, WASHINGTON

PORT OF EVERETT
ASSESSOR PARCEL MAP

PARCEL MAP
SHEET INDEX



Scale 1" = 300'

NOTE: PARCELS SHOWN ON THIS SHEET:
76, 77, 78, 113, 114, 115, 116, 117, 118, 119, 120,
121, 122, 123, 124, 125, 132, 133, 151, 152, 165

PARCEL MAP
MUKILTEO WATERFRONT AREA PARCELS

PORT OF EVERETT
ASSESSOR PARCEL MAP

PORT OF EVERETT
SNOHOMISH COUNTY, WASHINGTON

METRON
and ASSOCIATES INC.
LAND SURVEYS, MAPS, AND LAND USE PLANNING



NOTE: PARCELS SHOWN ON THIS SHEET:
1, 27, 30,32, 39, 40, 41, 42, 43, 44, 47, 48, 49, 51,
52, 53, 54, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70,
71, 72, 73, 74, 75, 79, 80, 81, 82, 83, 112, 153, 154,
155, 156

**METRON**
and ASSOCIATES INC.
LAND SURVEYS, MAPS, AND LAND USE PLANNING

PORT OF EVERETT
ASSESSOR PARCEL MAP

PARCEL MAP
EVERETT WATERFRONT AREA PARCELS

Scale 1" = 300'





METRON
and ASSOCIATES INC.
LAND SURVEYS, MAPS, AND LAND USE PLANNING
207 N. OLYMPIC AVENUE, SUITE 205
ARLINGTON, WASHINGTON 98223
(360) 435-5777  FAX (360) 435-5777

PORT OF EVERETT
ASSESSOR PARCEL MAP

PARCEL MAP
EVERETT WATERFRONT AREA PARCELS

NOTE: PARCELS SHOWN ON THIS SHEET:
7, 9, 10, 13, 17, 18, 20, 21, 28, 34, 35, 36, 37,
45, 46, 56, 57, 58, 82, 83, 84, 85, 86, 97, 98,
88, 89, 90, 91, 92, 93, 94, 95, 96, 107, 109, 110,
100, 102, 103, 104, 105, 108, 109, 110,
126, 128, 129, 130, 143, 144, 145, 146, 147, 148, 149,
150, 152



SHEET 6 NORTH



Scale 1" = 300'



SHEET 6 SOUTH

NOTE: PARCELS SHOWN ON THIS SHEET:
11, 19, 84, 134, 135, 136, 137, 138, 139, 140, 141,
163, 164

PARCEL MAP
SNOHOMISH RIVER WATERFRONT AREA PARCELS

PORT OF EVERETT
ASSESSOR PARCEL MAP

PORT OF EVERETT
SNOHOMISH COUNTY, WASHINGTON

METRON
and ASSOCIATES INC.
LAND SURVEYS, MAPS, AND LAND USE PLANNING



Scale 1" = 300'

NOTE: PARCELS SHOWN ON THIS SHEET:
2, 4, 5, 6, 8, 12, 14, 15, 16







Scale 1" = 300'

PORT OF EVERETT
ASSESSOR PARCEL MAP

PORT OF EVERETT
SNOHOMISH COUNTY, WASHINGTON

METRON
and ASSOCIATES INC.
LAND SURVEYS, MAPS, AND LAND USE PLANNING

PARCEL MAP
NAVAL STATION EVERETT AREA PARCELS

8 of 11

NOTE: PARCELS SHOWN ON THIS SHEET:
166 THROUGH 175

NOTE:
PARCELS 2 AND 4 INTENTIONALLY DELETED

**METRON**
and ASSOCIATES INC.
LAND SURVEYS, MAPS, AND LAND USE PLANNING

PORT OF EVERETT
ASSESSOR PARCEL MAP
SNOHOMISH COUNTY, WASHINGTON

LEGAL DESCRIPTIONS
PARCELS 1, 3, & 5 THROUGH 78

## NOTES:

1. PARCELS NO. 154, 155, 156, AND 159 ARE LISTED TWICE AS-80, 82, 81, AND 151, RESPECTIVELY. THE SECOND LISTING (80, 82, 81, AND 151) IS MISSING TWO LEADING ZEROS.

2. PARCELS NO. 19, 48, 80, 81, 82, 110, AND 151 WERE PROVIDED WITH NO LEGAL DESCRIPTION IN THAT COLUMN.

3. OTHER PARCELS WITH MULTIPLE LISTINGS ARE DUE TO ADDITIONAL IMPROVEMENTS FOR BUILDINGS AND, OR, OTHER IMPROVEMENTS.

4. PARCELS NO. 134, 136, 137, 138, AND 139 AS SHOWN BY THE ASSESSOR ARE OWNED BY THE PORT OF EVERETT, WITH THE TAXPAYER BEING XIM IT OF LLC.

5. PARCELS NO. 157 AND 158 ARE NOT SHOWN ON THE MAP BY REASON OF OWNERSHIP AS SHOWN BY THE ASSESSOR IS NOT VESTED IN THE PORT OF EVERETT.

6. PARCELS NO. 161 AND 162 ARE NOT SHOWN ON THE MAP AS OWNERSHIP, AND LOCATION, AS SHOWN BY THE ASSESSOR IS NOT VESTED IN THE PORT OF EVERETT.

7. PARCEL NO. 163 AS SHOWN BY THE ASSESSOR IS OWNED BY SNOHOMISH COUNTY, WITH THE TAXPAYER BEING SNOHOMISH COUNTY PROPERTY MANAGEMENT.

8. PARCEL NO. 164 AS SHOWN BY THE ASSESSOR IS OWNED BY, AND TAXPAYER BEING, MARSHALL, & KATHERINE CYMBALUK FAMILY LLC.

9. PARCEL NO. 85 IS SHOWN BY THE ASSESSOR AS AN INVALID TAX ACCOUNT NO., AND EXPLORATORY RESEARCH REVEALS THE PROSPECT THAT THIS PARCEL MAY HAVE BEEN EXTINGUISHED BY MULTIPLE EXPANSIONS OF MARINE VIEW DRIVE.

10. PARCEL NO. 167 AS SHOWN BY THE ASSESSOR IS OWNED BY, AND TAXPAYER BEING THE PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY.

---

# METRON
and ASSOCIATES INC.
LAND SURVEYS, MAPS, AND LAND USE PLANNING

Copyright Metron 2017 © Metron and Associates, Inc.

PROJECT:
PORT OF EVERETT
ASSESSOR PARCEL MAP
SNOHOMISH COUNTY, WASHINGTON

SHEET NAME:
LEGAL DESCRIPTIONS
PARCELS 78 THROUGH 165
NOTES

13 OF 11

METRON
and ASSOCIATES INC.
LAND SURVEYS, MAPS, AND LAND USE PLANNING

PORT OF EVERETT
SNOHOMISH COUNTY, WASHINGTON

LEGAL DESCRIPTIONS
PARCELS 166 THROUGH 175

REV. 09 VIEW 12/14/18

# Appendix C

# Table of Contents

**Tables**                                                                                                                   ii

**Figures**                                                                                                                  ii

**Acronym Table**                                                                                                            ii

**1   Introduction**                                                                                                          1

**2   Project Description**                                                                                                   4

**3   Ecological Benefits**                                                                                                   8

**4   Permitting**                                                                                                           11

**5   Design**                                                                                                               13
   5.1   SITE BACKGROUND AND EXISTING CONDITIONS                                                              13
      5.1.2   Hydrological information                                                         14
      5.1.3   Geotechnical and soil quality information                                        15
      5.1.4   Environmental information                                                        15
      5.1.5   Cultural resource information                                                    16
   5.2   HABITAT RESTORATION DESIGN GOALS AND OBJECTIVES                                                       17

**6   Construction and Habitat Creation**                                                                                    19
   6.1   CONSTRUCTION TIMING AND PHASING                                                                       19
   6.2   IMPLEMENTATION OF PROPOSED RESTORATION ACTIONS                                                        20
      6.2.1   Phase 1                                                                          20
      6.2.2   Phase 2                                                                          20
      6.2.3   Phase 3                                                                          21
   6.3   CONSTRUCTION MANAGEMENT AND CORRECTIVE ACTIONS DURING
       CONSTRUCTION                                                                        22

**7   Performance Standards and Monitoring**                                                                                 23
   7.1   PERFORMANCE STANDARDS                                                                                 23
   7.1.1   NATIVE VEGETATION                                                                                   23
   7.1.2   HYDRAULIC/HYDROLOGIC CONNECTION                                                                     25
   7.1.3   INTERTIDAL AREAL COVERAGE                                                                           25
   7.1.4   INVASIVE PLANT SPECIES MANAGEMENT                                                                   26
   7.1.5   LARGE WOODY DEBRIS                                                                                  26
   7.1.6   PERMANENT PROTECTION                                                                               27
   7.2   MONITORING                                                                                            27
   7.2.1   MONITORING DURING THE INITIAL MAINTENANCE AND MONITORING PERIOD                                    28

**8   Long-term Maintenance and Monitoring**                                                                                 32

**9   Plans and Documentation**                                                                                             35

9.1    DESIGN DOCUMENTATION                                              35
9.2    CONSTRUCTION COMPLETION REPORT (AS-BUILT SUBMITTAL)               35
9.3    MONITORING AND MAINTENANCE REPORTS                                36

**10 Schedule and Trustee Milestones                                    38**

**11 References                                                         41**

## Tables

Table 1.    Habitat types to be restored and/or enhanced within the Blue Heron Slough
            Project                                                      4

Table 2.    Status of permits and authorizations for the Blue Heron Slough Project    11

Table 3.    Monitoring and Performance Standards for the Blue Heron Slough NRDA
            Project                                          End of document

Table 4.    Long-term Maintenance and Monitoring Period Monitoring for the Blue Heron
            Slough NRDA Project                              End of document

## Figures

Figure 1.    Project vicinity map                                       2
Figure 2.    Blue Heron Slough restoration design                       7

## Acronym Table

| Bank | Blue Heron Slough Conservation Bank (see also "Project") |
|------|--------------------------------------------------------|
| BMP | Best Management Practices |
| CBA | conservation bank agreement |
| CESCL | certified erosion and sediment control lead |
| DMMO | Dredged Material Management Office |
| DMMP | Dredged Material Management Program |
| DNR | Department of Natural Resources |
| DSAY | Discounted Service Acre-Year |
| Ecology | Washington State Department of Ecology |
| EMU | Ecological Management Unit |

| | |
|---|---|
| **EPA** | Environmental Protection Agency |
| **ESA** | Endangered Species Act |
| **I-5** | Interstate 5 |
| **LDA** | land disturbing activity |
| **MLLW** | mean lower low water |
| **NMFS** | National Marine Fisheries Service |
| **NOAA** | National Oceanic and Atmospheric Administration |
| **NRDA** | Natural Resource Damages Assessment |
| **Overall Property** | The combined property owned by the Port and Wildlands totaling approximately 356 acres |
| **Port** | Port of Everett |
| **Port Gardner Bay Restoration Plan** | Port Gardner Bay Draft Damage Assessment Restoration Plan and Environmental Assessment |
| **Project** | Blue Heron Slough Restoration Project (see also "Bank") |
| **PRP** | Potentially Responsible Party |
| **Resource Agencies** | Agencies involved in the certification of the site as a conservation bank or mitigation bank |
| **SEWIP** | Snohomish Estuary Wetland Integration Plan |
| **SHPO** | State Historic Preservation Officer |
| **SWPPP** | stormwater pollution prevention plan |
| **Trustees** | Port Gardner Bay Trustee Council |
| **USACE** | US Army Corps of Engineers |
| **WDFW** | Washington State Department of Fish and Wildlife |
| **WRIA** | Water Resource Inventory Area |

# 1    Introduction

This Statement of Work has been prepared as Appendix C to the Consent Decree between the Port of Everett (the Port) and the United States, the State of Washington, the Tulalip Tribes, and the Suquamish Tribe (collectively the Trustees) and describes the Blue Heron Slough Restoration Project (hereafter referred to as the Project). The Consent Decree requires, *inter alia*, that the Port construct, operate, and maintain the Project, a portion of which will be set aside under the Consent Decree to settle the Trustees' claims against the Port for natural resource damages in the Port Gardner Bay Area. See Decree, ¶ 29. In a separate process occurring in 2008, the Blue Heron Slough Project, designed by the Port, along with Wildlands, was certified by the National Oceanic and Atmospheric Administration (NOAA) as a salmon conservation bank. Except as expressly set forth in the Decree, the Decree does not address operation of the bank or the Port's sale or transfer of credits to other parties. Restoration actions at the Project site will restore tidal and riverine hydrology and physical processes, resulting in long-term watershed benefits.

The Project site is located on North Spencer Island in the lower Snohomish River Estuary, between the cities of Everett and Marysville, in unincorporated Snohomish County (Figure 1). It is situated adjacent to the east of Interstate 5 (I-5) between Union Slough and Steamboat Slough near the sloughs' confluence with Possession Sound. The Project will restore intertidal, wetland, and upland habitats to an approximately 353-acre site in the Snohomish Estuary to benefit salmon and other natural resources. Construction will take place in three phases, spanning at least two construction seasons, and is expected to be complete within four years of the Effective Date of the Decree.

As a separate effort from this settlement, the Port, with Wildlands, worked closely with the National Marine Fisheries Service (NMFS), a division of NOAA, to have the Blue Heron Slough Project design certified as a conservation bank for salmon and steelhead. In 2008, the Blue Heron Slough conservation bank was approved by NOAA as a conservation bank generating conservation credits that can be used to compensate for impacts to salmonid species listed as threatened under the Endangered Species Act (ESA). As part of the process for certifying the Project as a conservation bank, a conservation bank agreement (CBA) was developed in 2007 (Wildlands of Washington 2007).



**Figure 1.  Project vicinity map**

In 2016, the Trustees completed the *Port Gardner Bay Final Damage Assessment Restoration Plan and Environmental Assessment* (hereafter referred to as "Port Gardner Bay Restoration Plan"), identifying the Blue Heron Slough Project as the preferred alternative for compensating for injuries to natural resources in the Port Gardner Bay Area (Port Gardner Natural Resource Trustees 2016). The Trustees identified the Project as being an example of integrated habitat restoration, and noted that it "is in a preferred location, restores preferred habitats, will be developed in a sustainable way, and has a high likelihood of project completion and success" (Port Gardner Natural Resource Trustees 2016). The Trustees have reviewed and approved the Final Design and Construction Plan for the Blue Heron Slough Project,[1] and the Monitoring and Maintenance program described herein. The Port has worked with the Trustees to ensure the Project design meets the requirements of the Consent Decree and the Performance Standards set forth herein.

Pursuant to the Consent Decree, a portion of the Project credits (Natural Resource Damage Assessment credits) will be set aside and shall not be used as the basis for conservation credits transferred or sold to other parties. Decree § VII.F. The remaining credits will be available for sale as either conservation credits under the Blue Heron Slough CBA, wetland mitigation bank credits (certification pending), or to offset natural resource damages from other potentially responsible parties (PRPs) for the Port Gardner Bay or other ecosystem markets.

This document includes information from the CBA (Wildlands of WA 2007), the 2014 Revision of Addendum No. 1 to the Puget Sound Umbrella CBA (Wildlands 2014), the Blue Heron Slough Conservation and Mitigation Bank Prospectus submitted to the US Army Corps of Engineers (USACE) in February 2017 (Wildlands and the Port of Everett, 2017), and the Port Gardner Bay Restoration Plan (Port Gardner Natural Resource Trustees 2016).

---

[1] "Final Design and Construction Plan" refers to the Blue Heron Slough Tidal Marsh Construction Plans, prepared by The Watershed Company, PFN: 16-120700 LDA & 18-120426 FZ, dated Sept. 7, 2013 and approved for construction by Snohomish County Planning & Development Services on Nov. 25, 2013, including all revisions approved by Snohomish County through September 1, 2018.

## 2      Project Description

Once constructed, this 353-acre Project will restore a mosaic of intertidal estuarine and upland habitats, reconnecting this acreage to other habitat in the Snohomish River watershed and Puget Sound, and preserving open space adjacent to the City of Everett's Urban Growth Area. While the habitats restored by the Project (Table 1) will provide benefits to a multitude of native wildlife species and other natural resources, the Project was specifically designed to benefit Chinook salmon (*Oncorhyncus tshawytscha*), steelhead (*O. mykiss*), and bull trout (*Salvelinus confluentus*). Estuaries provide unique and critical habitat for Chinook and other salmonids for rearing, migration, and transitioning between fresh- and saltwater (smoltification). Bull trout overwinter and forage in the estuary as well. As detailed in Table 1 and shown on Figure 2, approximately 14.5 acres of the western edge of the site will contain a buffer and replacement dike protecting I-5 (additional information about perimeter dikes to be removed and the replacement dike is provided in Section 6).

**Table 1.    Habitat types within the Blue Heron Slough Project**

| Habitat Type | Acreage | Elevation Range[a] |
|---|---|---|
| Upland forest | 6.5 | Above 13.0 |
| High intertidal – scrub shrub | 2.5 | 11.0 – 13.0 |
| High Intertidal – upper marsh | 63.4 | 7.5 – 11.0 |
| High Intertidal – lower marsh | 121.3 | 6.0 – 7.5 |
| High Intertidal – mudflat | 101.0 | 4.0 – 6.0 |
| Low Intertidal – above MLLW | 26.2 | 0.0 – 4.0 |
| Low Intertidal – below MLLW | 9.2 | -4.0 – 0.0 |
| Shallow Subtidal | 2.0 | Below -4.0 |
| Preserved/Enhanced Existing Habitats | 6.5 | -5.0 – 13.0 |
| Buffer (including dike) | 14.5 | -3.0 – 19.0 |
| **Total Acreage** | **353.1** | |

[a]      Elevation datum used is MLLW.
MLLW – mean lower low water

Historically, the Blue Heron Slough site supported tidally-influenced marsh, non-tidal scrub shrub, and forested habitat types typical of the lower Snohomish Estuary (Haas and Collins 2001). In the early 1900s the site was diked and drained for agricultural use. Construction of the Blue Heron Slough Project will restore tidal and riverine hydrology and physical processes, and restore a mosaic of estuarine mudflats, tidal marshes, scrub

shrub, and upland habitats. Permanent protection of these habitats through a conservation easement will provide long-term watershed benefits. The Snohomish River Estuary is regionally important for the recovery of wild Puget Sound Chinook salmon. It is home to one of the largest remaining populations in Puget Sound. These threatened fish return yearly to pristine habitat in the upper watershed on the western slopes of the Cascade Mountains, tributaries that could support large spawning populations that are in part limited by habitat in the estuary.

Construction of the Project started in 2008, shortly after NOAA certified it as a conservation bank. During the summer of 2008, a small amount of material was imported for habitat mounds and a portion of the interior channels was excavated, but construction was put on hold because of a lack of market demand due to the economic downturn. In 2014, a portion of the interior channels was excavated near I-5, but again the construction was halted due to a lack of market demand for conservation bank credits. In 2015, dike construction began. Dike construction continued in 2017. Although only a portion of the project credits will be set aside for the Decree, the Decree ensures the implementation of the entire 353-acre Restoration Project, which will begin providing ecological benefits as soon as it is constructed. The number of acres available for Natural Resource Damage Assessment (NRDA) restoration credit is 338.6 acres.  The 14.5 acre dike buffer area is not included for restoration credit.

Restoration actions that will be implemented as part of construction of the Project include:

- Demolishing and removing existing buildings and refuse
- Constructing a replacement dike adjacent to I-5
- Constructing a channel network
- Constructing a secondary channel network
- Installing large woody debris (LWD) in the new interior channels
- Grading interior areas for the prescribed marsh-mudflat configuration
- Creating higher-elevation marsh areas along the new channel network
- Controlling weedy and non-native invasive vegetation on remnant perimeter dikes
- Planting upland forest and scrub shrub areas (including remnant perimeter dikes) with native woody and herbaceous vegetation
- Breaching the historical dike in four locations
- Removing an existing tide gate

Figure 2 shows the design for the Project site, approved by the Trustees as part of the Final Design and Construction Plan. Additional information about the restoration activities to be performed under this Decree is provided in Section 6.



| Site Features | | Acreage |
|---|---|---|
| Property Boundary | | 355.8 acres |
| Proposed Conservation Easement Boundary | | 353.1 acres |
| Existing trees to remain as snags | | 20.3 acres |
| Proposed Dike | | 10.3 acres |

| Habitat Type | Elevation MLLW datum | Acreage |
|---|---|---|
| Upland Forest | above 13.0 | 6.5 acres |
| High Intertidal - scrub shrub | 11.0 to 13.0 | 2.5 acres |
| High Intertidal - upper marsh | 7.5 to 11.0 | 63.4 acres |
| High Intertidal - lower marsh | 6.0 to 7.5 | 121.3 acres |
| High Intertidal - mudflat | 4.0 to 6.0 | 101.0 acres |
| Low Intertidal - above MLLW | 0.0 to 4.0 | 26.2 acres |
| Low Intertidal - below MLLW | -4.0 to 0.0 | 9.2 acres |
| Shallow Subtidal | below -4.0 | 2.0 acres |
| Enhanced Existing Habitats | -5.0 to 13.0 | 6.5 acres |
| Buffer (including dike) | -3.0 to 19.0 | 14.5 acres |
| | | 353.1 acres |

**Figure 2.  Blue Heron Slough restoration design**

# 3    Ecological Benefits

The Snohomish River basin, in which the Blue Heron Slough Project is located, is the second-largest watershed draining to Puget Sound and one of the primary producers of anadromous salmonids in the Puget Sound region. However, loss of historical tidal marshes, habitat fragmentation, and reduced edge habitat complexity along major slough channels in the basin have depressed salmon populations (Snohomish Basin Salmon Recovery Forum 2005). The Blue Heron Slough Project offers an important restoration opportunity because of its size and location in the highly productive but heavily impacted transition zone of the Snohomish River Estuary (A. Haas 2001).

Estuarine wetlands are an extremely important component of aquatic and terrestrial ecosystems, providing critical habitat for fish, birds, and other wildlife. Large quantities of sediments, nutrients, and organic matter are exchanged between terrestrial, freshwater, and marine communities within estuary systems. The availability of resources in estuaries benefits a wide variety of plants and animals. Fish, shellfish, birds and plants are the most conspicuous inhabitants of estuarine habitats; however, a large variety of other, less-visible life forms also inhabit estuarine wetlands, including diatoms, algae, and invertebrates that form the base of the food web. Studies in the Northwest have demonstrated that estuarine marshes are more productive than any other plant community (City of Everett et al., 1997). They have high fish and wildlife density and species richness, and provide important breeding and seasonal habitat and movement corridors to fish and wildlife. Tidal wetland habitats also provide ecosystem services related to water quality and carbon sequestration. Estuaries are a priority habitat (Puget Sound Nearshore habitats) as defined by the Washington State Department of Fish and Wildlife (WDFW 2008), and estuarine wetland habitats are considered so valuable that under the Washington State Wetland Rating System they are automatically designated as Category I or II wetlands (Hruby, 2004).

While estuaries have high ecological value, they are limited in their availability and vulnerable to alteration. All of the estuaries in Washington State have been modified to some degree, bearing the brunt of development pressures through filling, drainage, port development, and disposal of urban and industrial wastes. The hydrology of the Snohomish Estuary has been altered dramatically by historical construction of levees, which have disconnected the Snohomish River and its tributaries from tidelands and marshes, resulting in loss of tidal channels and marsh habitat. Approximately 12,000 acres of wetlands and mudflats within the Snohomish Estuary have been diked and drained; this has resulted in an estimated 74% to 85% loss of the original estuarine and freshwater tidal wetland area within the estuary (Pentec 1992 in City of Everett et al. 1997, and Shapiro and Associates 1979 in City of Everett et al. 1997, respectively). In addition, 9% of the estuarine sub-basin is now covered in impervious surfaces and almost two-thirds (44 miles) of the channel edge along the main stem and distributary sloughs of the Snohomish River basin has been diked or armored (Snohomish Basin Salmon Recovery Forum, 2005). Tide gates also restrict fish access to tributary creeks, alter sediment deposition patterns, and degrade water quality.

Estuaries are particularly critical habitat for Chinook (*Oncorhynchus tshawytscha*) and other salmonids, which use them for rearing, migration, and transitioning between fresh- and saltwater habitats (smoltification). Bull trout overwinter and forage in estuaries as well. Native estuarine-dependent species, including wild salmon and bull trout, are listed as threatened under the federal endangered species act. In the Snohomish River basin, Chinook salmon populations are at less than 10% of historic levels (Snohomish Basin Salmon Recovery Forum 2005). Major factors in population declines include: (1) degraded floodplain and in-river channel structure, (2) degraded estuarine conditions and loss of estuarine and river off-channel and side-channel habitats, (3) riparian area degradation and loss of in-river large woody debris, (4) excessive fine-grained sediment in spawning gravel, (5) degraded water quality and temperature, (6) degraded nearshore conditions, (7) impaired passage for migrating fish, and (8) altered flow regimes (Snohomish Basin Salmon Recovery Forum 2005).

In their *Port Gardner Bay Restoration Plan*, the Trustees identified integrated habitat complexes including mudflats, marshes, and riparian buffers as their primary focus for restoration, because such habitat complexes provide the most direct benefits to the natural resources (e.g., salmonids, flatfish, invertebrates and birds) likely to have been injured by hazardous substance releases into Port Gardner Bay (Port Gardner Natural Resource Trustees 2016). Mudflats and marshes are ecologically valuable due to their limited availability within the Port Gardner Bay environment and their importance for providing rearing and refuge areas, spawning and nursery habitat, and food sources to a variety of species within the Snohomish Estuary (Port Gardner Natural Resource Trustees 2016). The Trustees also identified restoration projects located within Port Gardner Bay and portions of the lower/brackish Snohomish Estuary as having the highest ecological value for injured natural resources. The Blue Heron Slough Project will provide the type of habitat complex most valued by the Trustees' Port Gardner Bay Restoration Plan, and is located within the lower Snohomish Estuary.

The Puget Sound Partnership has identified recovery of salmonid populations in the Snohomish River basin as essential to recovering salmonids across Puget Sound (Puget Sound Partnership, 2007). Chinook smolt production estimates show that the estuary commonly acts as a bottleneck, particularly in years when survival to smolt stage is high (Haas and Collins, 2001). Habitat restoration in the estuary, which would improve habitat complexity and connectivity, is needed to address the current rearing habitat bottleneck. Modeling has identified the estuary as one of the most important places to focus restoration actions for salmonids; therefore, restoring tidal marsh and improving edge habitat complexity should also provide significant improvements in the abundance, productivity, and diversity of salmonids and other species (Snohomish Basin Salmon Recovery Forum, 2005).

Implementation of the Project will increase off-channel fish rearing and refuge habitat in the estuary, enhance habitat for other aquatic and terrestrial wildlife, improve habitat connectivity, enhance native riparian vegetation, increase productivity, increase habitat components in the aquatic environment, and increase biological diversity in the plant,

benthic, and wildlife communities. It is also expected to provide general water quality improvements in the estuary by filtering sediments and pollutants, and regulating nutrients, and dissolved oxygen. Restoration and preservation of the Project site in perpetuity will protect against the further loss or degradation of natural resources from agricultural practices or development.

# 4      Permitting

The Port will have all appropriate and applicable permits and authorizations in place prior to construction of the Project. As shown in Table 2, most of permits and authorizations from federal, state, and local agencies have already been obtained and are current. With the exception of a few outstanding permits/authorizations that need to be obtained closer to the start of specific elements of the construction, the Project is "shovel ready." Table 2 below shows each required permit or authorization, the responsible agency, and the status.

**Table 2.    Status of permits and authorizations for the Blue Heron Slough Project**

| Permit/Authorization | Date Issued | Expiration | Notes |
|---|---|---|---|
| Snohomish County Shoreline Exemption | 2-15-2008 | no expiration | |
| Snohomish County LDA Permit | 12-29-2016 | valid until 12-29-2019 | |
| Snohomish County Flood Hazard Permit | 8-28-2018 | valid until 2-28-2020 | |
| USACE Nationwide Permit 27 | 8-12-2008 | valid until 3-18- 2022 | This includes Section 7 consultation with NOAA and Section 106 compliance. Reauthorization from the USACE was received January 9, 2018. |
| Ecology Construction Stormwater Permit | 6-16-2008 | valid until 12-31-2020 | |
| Ecology 401 Water Quality Permit | 11-7-2008 | valid until 3-18-2022 | Permit expiration date is the same as the reauthorized USACE permit. |
| Ecology Coastal Zone Management | 11-7-2008 | no expiration | |
| WDFW Hydraulic Project Approval | 12-9-2013 | valid until 12-8-2018 | |
| DNR Access Agreement | need | | This agreement is not needed until breach. Agreement should be completed 3 months prior to breach. |
| Snohomish County Demolition Permit | need | | Application has been prepared, but need confirmed schedule for demo. Apply 3 months before demo. |
| Snohomish County Haul Route Agreement | need | contractor to obtain prior to construction | |
| Assessment by the DMMO/DMMP | may need | | Placement of approximately 5,900 cubic yards of dredged sediment from the slough to on-site upland areas is the preferred plan. If infeasible or material is not suitable for onsite use, it will be removed and disposed of at an appropriate disposal facility per DMMO requirements, if required. Initiate conversations with DMMO approximately a year and a half prior to breach. If the material removed |

**Table 2.    Status of permits and authorizations for the Blue Heron Slough Project**

| Permit/Authorization | Date Issued | Expiration | Notes |
|---|---|---|---|
| | | | from the sloughs is not suitable for placement on the site, it will not result in measurable changes to proposed habitats or elevations on the project. |

DMMO – Dredged Material Management Office              LDA – land disturbing activity
DMMP – Dredged Material Management Program          NOAA – National Oceanic and Atmospheric Administration
DNR – Department of Natural Resources                       USACE – US Army Corps of Engineers
Ecology – Washington State Department of Ecology       WDFW – Washington State Department of Fish and Wildlife

# 5    Design

Construction drawings for the habitat restoration project were prepared in 2009 for the salmon conservation bank purpose. In 2014, the construction drawings were updated to incorporate slight design refinements and the work already completed. The Port, with Wildlands, worked closely with NOAA to design the project to provide maximum benefits to salmonids and other native species and natural resources. Additional site background information, a description of current site conditions, and the goals and objectives of the habitat design for the Project are described in the following subsections. The Trustees approve the Final Design and Construction Plans for the Project including the engineering drawings and the habitat map, with all requirements as described in this Statement of Work (SOW).

## 5.1    SITE BACKGROUND AND EXISTING CONDITIONS

The Project site is located on North Spencer Island in the lower Snohomish River Estuary, between the cities of Everett and Marysville, in unincorporated Snohomish County (Figure 1). The Project is located between two main distributary channels of the Snohomish River—Steamboat and Union Sloughs, and is approximately three miles upstream of the confluence of these sloughs and Possession Sound. It is bordered by I-5 to the west, Steamboat Slough to the north and Union Slough to the south (Figure 1). The majority of the property was purchased by the Port in 1994. Wildlands owns approximately 12 acres in the northern portion of the site. The combined Overall Property owned by the Port and Wildlands totals approximately 356 acres. Three acres of the Overall Property are encumbered by utility easements and, as a result, have been excluded from the Project area. The Project area is approximately 353 acres and includes 14.5 acres that will be used for a dike and buffer area adjacent to I-5.

Historically, the site supported tidally-influenced marsh, non-tidal scrub-shrub, and forested habitat types typical of the lower Snohomish Estuary. From the early 1900s, when the site was diked and drained for agricultural use, until 2012 at least a portion of the site was farmed in some capacity.

The property is surrounded by private perimeter dike which ranges in elevation from 13.4 to 17.5 mean lower low water (MLLW). This existing dike does not provide 100-year flood protection. During the summer of 2008, a small amount of material was imported for habitat mounds and a portion of the interior channels was excavated. In 2014, a portion of the interior channels was excavated near I-5. In 2015, dike construction began and continued in 2017. The majority of the site is currently fallow and dominated by reed canarygrass (*Phalaris arundinacea*) with occurrences of common Canada thistle (*Cirsium arvense*), common velvetgrass (*Holcus lanatus*), and annual ryegrass (*Lolium multiflorum*). Existing structures on the site include a two-story residence in which a tenant lives, and a barn, outbuildings, and children's theme area that are unused and deteriorating. All of these structures will be removed from the site prior to restoration.

The site is surrounded by sloughs, restored tidal estuary, and I-5. Land uses further to the north, east, and south include a mix of city, county, and tribal open space; wetland preserves; and undeveloped park land. Land west of I-5 on Spencer Island is zoned heavy industrial and listed in the City of Everett Shoreline Management Plan as Mixed Use Industrial (north of the Port's restored Union Slough Restoration Site) and Urban Conservancy (the restored site). Farther north across Ebey Island and Ebey Slough is the City of Marysville Sewage Treatment Plant and associated tidal marsh restoration site, and the Qwuloolt Estuary Restoration site; farther south across Union Slough and a large agricultural tract is the City of Everett Sewage Treatment Plant. The Smith Island/Union Slough Restoration Project and the Spencer Island Restoration Enhancement Project are also located to the south of the Project site. Farther east in the floodplain the land is rural and used mainly for farming.

### 5.1.2  Hydrological information

The Project site is located in the lower Snohomish River Estuary in Water Resource Inventory Area (WRIA) 7, which drains into Possession Sound, Whidbey Basin, and Puget Sound. With a drainage area of nearly 1,800 square miles, WRIA 7 covers a range of rural, suburban, and highly urbanized areas and extends from the Cascade Crest to Puget Sound. The Snoqualmie and Skykomish Rivers are the major surface water resources in this watershed that converge to form the Snohomish River about 20 miles upstream of Puget Sound. The U.S. Environmental Protection Agency (EPA) classifies over 75% of the riparian area within WRIA 7 as forested, and less than 20% as urban or agricultural. However, much of the riparian habitat in WRIA 7 has been adversely impacted by flood control, road building, land development, agriculture, forest practices, and municipal water supply (Snohomish River Basin Salmonid Recovery Technical Committee 2002).

The Project site is located on North Spencer Island, in the Everett sub-watershed, in the Snohomish River Estuary sub-watershed, northeast of the main Snohomish River channel. The site is within the 100-year floodplain of the Snohomish River. The topography, inside the perimeter dikes, is almost uniformly flat with elevations ranging from approximately 4 to 8 feet above MLLW.

The site lies in Ecological Management Unit (EMU) 2 of the Snohomish Estuary Wetland Integration Plan (SEWIP) Salmon Overlay (City of Everett and Pentec 2001); EMU 2 corresponds to the "Emergent/Forested Transition" zone of Haas and Collins (2001), an area that formerly contained a complex of sloughs, channels and mudflats fringed by emergent, brackish marsh, scrub-shrub, and forested higher ground. The area is considered to be of high value as a saltwater transition zone and rearing area for juvenile salmonids (City of Everett and Pentec 2001). This EMU was nearly 100 percent diked for agricultural purposes in the first half of the 20th century, but, as noted above, several areas have been restored to tidal influences either by natural actions (north Ebey Island) or through active restoration (Union Slough Restoration Site, City of Marysville Restoration Site, Qwuloolt Estuary Restoration site).

### 5.1.3   Geotechnical and soil quality information

The soils at the Project site are comprised entirely of Puget silty clay loam (Natural Resources Conservation Service 2006). This is a very deep, poorly drained soil with moderately slow permeability that formed in recent alluvium on floodplains and low river terraces. Slopes are typically zero to three percent. Puget soil is listed on the Snohomish County Area Hydric Soils list, meeting the hydric soil criteria for saturation and ponding. Since most of the site has been drained for farming activities by diking, ditching, tide gates and drain tiles, much of the soil at the site shows only remnant hydric indicators.

### 5.1.4   Environmental information

#### 5.1.4.1   Vegetation

The site supports areas of fallow agricultural fields, remnant tree farms, palustrine wetlands, and upland grasslands and forests. Vegetation in the palustrine emergent wetlands is dominated primarily by common velvetgrass, reed canarygrass, and blue grass (*Poa* sp.). Wetlands with wetter hydrologic regimes include small areas with narrow leaf cattail (*Typha angustifolia*), Pacific silverweed (*Potentilla anserina* spp. *pacifica*), hardstem bulrush (*Schoenoplectus acutus*), and soft rush (*Juncus effusus*). Wetland areas that are ponded for a majority of the early growing season support a high percent of water foxtail (*Alopecurus geniculatus*) with lamb's quarters (*Chenopodium album*) establishing as the soils dry out. Palustrine emergent/scrub-shrub saturated farmed wetlands consist mainly of ruderal vegetation.

Palustrine forested broad-leaf deciduous habitat is comprised primarily of remnant tree farming areas. Trees in these areas are all ornamental species that can tolerate wetter soil conditions and include weeping birch (*Betula* sp.), cherry (*Prunus* sp.), and London plane (*Plantanus* sp.). Upland remnant tree farming areas support Douglas fir (*Pseudotsuga menziesii*) and a variety of broad-leaved deciduous trees including maples (*Acer* sp.), fruit trees, etc. Himalayan blackberry (*Rubus armeniacus*) and other upland understory and ground cover species also occur in these upland forests.

Dikes and dredge spoils support shrub, forest, and grassland habitats. Dominant species observed on dikes include reed canarygrass, Himalayan blackberry, salmonberry (*Rubus spectabilis*), Nootka rose (*Rosa nootkana*), red elderberry (*Sambucus racemosa*), and red alder (*Alnus rubra*).

Upland areas of fallow agricultural fields are dominated by ryegrass, Canada thistle, and other ruderal vegetation. Other common, but not dominant, plant species observed throughout the Project site include evergreen blackberry (*Rubus laciniatus*), Douglas spirea (*Spiraea douglasii*), cutleaf geranium (*Geranium dissectum*), vetch (*Vicia* sp.), and black twinberry (*Lonicera involucrata*).

### 5.1.4.2    Wildlife

The Snohomish River basin supports wild runs of coho (*Oncorhynchus kisutch*), Chinook, pink (*Oncorhynchus gorbuscha*), chum (*Oncorhynchus keta*), and steelhead (*Oncorhynchus mykiss*) (King County 1995a, Ecology 1995a, in Snohomish River Basin Salmonid Recovery Technical Committee 2002). The Snohomish River basin has the most returning coho spawners between the Columbia River and the Canadian border, and produces 25 percent to 50 percent of all coho in Puget Sound (Puget Sound Partnership 2009). Adult Chinook move through the estuary from mid-July to mid-December, while juvenile Chinook outmigration occurs from mid-April to July. The Whidbey Basin region is also a major producer of forage fish such as Pacific herring (*Clupea pallasii*), sand lance (*Ammodytes hexapterus*), and surf smelt (*Hypomesus pretiosus*). Other important fish species include coastal cutthroat trout (*Oncorhynchus clarki clarki*), bull trout, and rockfish (*Sebastes* sp.). Commercial and recreational fisheries occur for shrimp and Dungeness crab (*Cancer magister*) throughout the basin. It is also an important migratory area for marine mammals. The deltas and flood plain support overwintering populations of tens of thousands of snow geese (*Chen caerulescens*) and ducks, thousands of swans, and many raptors and passerines. Upper reaches of the Snohomish system support numerous resident and overwintering populations of eagles and other raptors (Puget Sound Partnership, 2009).

Numerous wildlife species were observed using the site during field inventories (e.g., Brewster 2007). Observed bird species included 24 species of passerines, four species of raptors (including red tail hawk [*Buteo jamaicensis*] and rough legged hawk [*Buteo lagopus*]), three species of waterfowl, one species of shorebird (American killdeer, *Charadrius vociferus*), one species of wading bird (great blue heron, *Ardea herodias*), and bald eagle and osprey were observed hunting over Steamboat Slough. Mammals observed on site include coyote, cottontail rabbit, and Columbian black-tailed deer. One amphibian species, Pacific chorus frog, was observed.

## 5.1.5  Cultural resource information

A cultural resources report for the Project site was completed in 2007 by Equinox Research and Consulting International Inc. No archaeological sites were identified during this investigation (ERCI, 2007). An historic property inventory report for a farmhouse at the Project site and an archaeological site inventory form for the agricultural dikes were submitted to the USACE at their request. After consulting with the State Historic Preservation Officer (SHPO), the USACE approved the project and issued Nationwide Permit 27 for construction because USACE and the SHPO agreed that the project would not affect any known cultural resources. The approval included a special condition for the unanticipated discovery of cultural resources. The 2007 inadvertent discovery procedures shall be modified to include the following conditions:

◆ Procedures stipulated in RCWs 68.50.645, 27.44.055, and 68.60.055 for the inadvertent discovery of human remains on non-federal and non-tribal land in the State of Washington shall be followed.

◆ Wildlands/Port will work in coordination with SHPO and the federal lead, as appropriate, to notify all affected tribes in the event of an inadvertent discovery of human remains, and not be restricted to the tribes identified in the 2007 archaeological report.

◆ If human remains are inadvertently discovered and non-forensic are determined to be Indian, there shall be no destructive or non-destructive analysis of the remains.

## 5.2   HABITAT RESTORATION DESIGN GOALS AND OBJECTIVES

The main goal of the Project is to restore an estuarine habitat complex to an approximately 353-acre site that was cut off from tidal and riverine influence in the early 1900s. Specifically, the primary project goals are to:

Goal 1: Restore ecological processes (hydrologic, geomorphic, physiochemical, and biological) that will improve ecological functions within the Snohomish River watershed, Whidbey Basin, and Puget Sound.

Goal 2: Provide off-channel fish rearing and refuge habitat in the Snohomish River Estuary.

Goal 3: Permanently protect and manage the restored and enhanced habitats at the site in perpetuity.

Goals 1 and 2 will be accomplished by implementing the following objectives:

◆ **Objective 1**: Reconfigure the site topography to recreate off-channel rearing habitat and refugia for juvenile salmonids and other aquatic species, to restore a mosaic of habitats across the site (channel, mudflat, vegetated tidal marsh, upland buffer), and to encourage geomorphic stability.

◆ **Objective 2**: Restore river flows and tidal exchange by breaching existing dikes in several locations to improve habitat and connectivity.

◆ **Objective 3**: Enhance native woody vegetation on the remaining dikes to contribute to the food web (e.g., leaf litter and insects), to provide habitat components (e.g., large woody debris and shade) to the aquatic environment, and to provide habitat for terrestrial wildlife.

◆ **Objective 4**: Control invasive plant species throughout the site to encourage biological diversity in the plant, benthic, and wildlife communities.

Goal 3 will be accomplished by implementing the following objectives:

◆ **Objective 5**: Place a conservation easement over the entire site to protect the habitat in perpetuity.

◆ **Objective 6**: Provide funding through an escrow agreement to fund the long-term maintenance and monitoring activities.

◆ **Objective 7**: Monitor, Maintain and Manage the Project as described in Section 7, below.

# 6      Construction and Habitat Creation

Information regarding the timing, phasing, and implementation of construction activities is provided in the following subsections. Construction management and corrective action procedures are also described.

## 6.1    CONSTRUCTION TIMING AND PHASING

The construction of the Project will take place in three phases, although phase one and two can be constructed concurrently. Phase one will involve building the new dike that separates the Project property from I-5.

Phase two will involve constructing interior habitat elements and enhancing the existing shoreline habitat. Phase three will involve breaching the existing dike system and removing the tide gate to connect the site's interior habitats to Steamboat and Union sloughs. All construction activities set forth in the Final Design and Construction Plan are anticipated to be complete within four years of the Effective Date of the Decree.

Phase 1 Actions:

- Construct cross dike adjacent to I-5.

Phase 2 Actions (listed in no particular order):

- Construct a channel network
- Construct a low intertidal channel network
- Install large woody debris in interior channels
- Grade interior areas for prescribed marsh-mudflat configuration
- Create higher-elevation marsh areas along the new channel network
- Control weedy and non-native invasive vegetation on remnant dikes
- Plant remnant perimeter dikes with native woody and herbaceous vegetation

Phase 3 Actions (listed in no particular order):

- Breach the dike in four locations
- Remove tide gate

During construction of the Project, all areas with exposed soils will be managed and protected with Best Management Practices (BMPs) to minimize surface water runoff, erosion, and sedimentation per Washington State Department of Ecology (Ecology) and the Snohomish County grading permit and grading regulations. A stormwater pollution prevention plan (SWPPP) has been prepared for the project and will be updated as necessary.

## 6.2   IMPLEMENTATION OF PROPOSED RESTORATION ACTIONS

### 6.2.1   Phase 1

Phase 1 consists of construction of a new cross dike between the Project property and the I-5 right-of-way to protect the highway from water that will enter the property after the existing perimeter dike is breached to restore tidal flows. The new dike will be allowed to compact and harden for at least 200 days before the site is flooded.

### 6.2.2   Phase 2

Since the property was cut off from its natural hydrological processes long ago, the general restoration design involves constructing an interior slough network that will traverse the entire site, re-sculpting site topography to create an array of tidal habitats, and removing sections of the existing dike system, as well as the tide gate. Before reestablishing tidal flow to the interior, 'pilot channels' would be constructed to help initiate a dendritic channel network throughout the site. The pilot channels will be constructed to connect low-lying areas within the Project site to the main slough that will connect to dike breaches made in Phase 3. Excavated substrates will be used to raise elevations in some areas to maximize high-value habitat types such as marsh. Substrates excavated from the new channels will be used to create vegetated areas around the primary channels to maximize their value for fish and other aquatic species. LWD will be installed in the new interior channels. The large tree trunks with root wads embedded in the interior channels for fish refuge habitat will provide habitat complexity and serve as collectors for natural woody debris.

Grading activities will be accomplished with a variety of equipment, including crawler-tractors, excavators, earthmovers, backhoes, graders and dump trucks. The use of such equipment will be restricted to specific work areas and precluded from sensitive areas outside the limits of grading. All of the interior earthwork will be completed before the existing dikes are breached (in Phase 3).

Native vegetation will be reestablished through natural recolonization in the intertidal marsh, and planting and/or seeding native vegetation in the scrub-shrub and upland areas including on the remaining dikes. Following the interior earthwork, but prior to breaching, the disturbed area (approximately 95 acres) that will be inundated following the breaches will be stabilized by seeding with an erosion control seed mix which will include species such as redtop (*Agrostis alba*), red fescue (*Festuca rubra*), perennial ryegrass (*Lolium perenne*), and white clover (*Trifolium repens*).

Approximately 6.5 acres of upland forest and 2.5 acres of scrub-shrub will be planted with native woody plantings including red alder (*Alnus rubra*), red osier dogwood (*Cornus sericea*), black twinberry (*Lonicera involucrate*), Sitka spruce (*Picea sitchensis*), shore pine (*Pinus contorta* var. *contorta*), black cottonwood (*Populus balsamifera*), Douglas fir (*Pseudotsuga menzesii*), and Hooker's willow (*Salix hookeriana*). These plantings will consist of either bare root, container plants, or cuttings. The restored upland forest and scrub shrub habitat will be seeded with a seed mix which will include redtop, creeping

bentgrass (*Agrostis stolonifera*), meadow foxtail (*Alopecurus geniculatus*), tufted hairgrass (*Deschampsia caespitosa*), and meadow barley (*Hordeum brachyantherum*).

## 6.2.3   Phase 3

Phase 3 actions will be performed approximately one year (or at least 200 days) after completion of the interior habitat construction and the new dike in order to allow habitats to stabilize and vegetation to establish before the dike is breached. The third and final phase involves breaching the existing dike in four places and removing the tide gate.

Once breaching occurs, the species seeded for erosion control are not expected to survive in the marsh and mudflat areas due to the salinity of the water inundating the site; however, the intertidal marsh habitat is expected to revegetate naturally by volunteer recruitment from contributions from the seedbank within the Snohomish River Estuary. This will assist in restoring native emergent plant communities that were present on the Project site prior to agricultural conversion, as has occurred on the Port's adjacent Union Slough Restoration Site (Pentec 2006). Native species expected to colonize tidal marsh areas on the Project site include, but are not limited to western grasswort (*Lilaeopsis occidentalis*), spikerush (*Eleocharis* spp.), Lyngby's sedge (*Carex lynbyei),* three-square bulrush (*Schoenoplectus pungens* var. *badius*), seacoast bulrush (*Scirpus maritimus*) and softstem bulrush (City of Everett and Pentec 2001) (Cereghino 2007). The Port' staff has observed the species occurring adjacent to the Blue Heron Slough site and/or on the Union Slough site.

It is expected that there will be some initial changes to the pilot channels as the system adjusts to reestablishment of daily tides. Also, it is expected that there will be seasonal and cyclical changes over time due to tidal exchanges and river flooding regimes.

Upon project completion, it is anticipated that the 353.1-acre Project will include the following habitats:

- 6.5 acres of upland forest
- 2.5 acres of scrub shrub (high intertidal)
- 63.4 acres of upper marsh (high intertidal)
- 121.3 acres of lower marsh (high intertidal)
- 101 acres of mudflat (high intertidal)
- 26.2 acres of low intertidal areas above MLLW
- 9.2 acres of low intertidal areas below MLLW
- 2.0 acres of shallow subtidal channels
- 6.5 acres of preserved/enhanced existing habitats adjacent to the shoreline
- 14.5 acres of buffer area including the dike along I-5 (not included for NRD restoration credit)

### 6.3   CONSTRUCTION MANAGEMENT AND CORRECTIVE ACTIONS DURING CONSTRUCTION

The construction of the project will be overseen by representatives from the Port who will be onsite frequently during construction. The certified erosion and sediment control lead (CESCL) will document compliance with the Project's SWPPP and members of Wildlands' Design/Build group will frequently be onsite to ensure the construction is completed as set forth in the Final Design and Construction Plan.

During construction, a number of unanticipated situations may arise. In the event that a potential cultural resource is discovered during construction activities, the provisions from the inadvertent discovery plan, included as part of the cultural resources report, will be followed. If potential hazardous materials are discovered, the contractor will stop work immediately and notify the Port's contact. Hazardous materials shall be removed and disposed of in a manner that complies with all applicable laws including state cleanup regulations.

In the event that conditions are encountered which would prevent the Project from being constructed as designed, the Port will consult with the Trustees to determine what, if any, design modifications should be made.

# 7 Performance Standards and Monitoring

## 7.1 MONITORING METRICS AND PERFORMANCE STANDARDS

Performance Standards associated with the following components will be used to measure the success of the ecological enhancement and restoration efforts at the Project site during the Initial Maintenance and Monitoring period (the first 10 years after project construction):

◆ Native vegetation (native woody vegetation and intertidal marsh vegetation)

◆ Hydraulic/Hydrologic connections

◆ Intertidal aerial coverage

◆ Invasive plant species management

◆ Large woody debris

◆ Permanent protection

Estuarine and riparian ecosystems are dynamic, both in terms of their plant communities and the animal populations they support. The Project will be subject to periodic natural disturbances that will affect habitat, and habitat use and value; however, these natural disturbances are an important and necessary part of sustaining ecological succession and function. The maintenance and monitoring activities will evaluate progress towards the project goals.  As problems arise, it may be necessary to consider options for adaptive management of the site to continue progress towards goals. If the annual monitoring report identifies Performance Standards which are not being met, the Port will coordinate, within 4 months of submitting the monitoring report, with the Trustees regarding whether, and what type of, adaptive management actions are warranted.

Substantial beneficial change is expected in plant communities and physical habitats based on the Project's location and anticipated changes in hydrology, intertidal influence, and geomorphology following active restoration. The Project is also expected to have flood control benefits. Restoration of an intertidal marsh system will provide increases in the quality and extent of essential habitat for Chinook salmon, steelhead, bull trout, waterfowl, and shorebirds. While performance standards are not prescribed for the presence or diversity of fish and birds using these habitats, their use will be monitored throughout the establishment phase (Initial Maintenance and Monitoring) to inform the progress of habitat restoration conditions.

### 7.1.1 Native Vegetation

Establishment of native vegetation at the site is anticipated to result from both active planting and volunteer recruitment. Performance Standards for plantings will vary with

the specific vegetation designs for intertidal marsh, scrub-shrub, and upland forest habitats, and are described below by each habitat type.

### Scrub-Shrub and Upland Forest Native Woody Vegetation

Planting of native woody vegetation on the remnant dikes and interior tidal channel berms will require active management to ensure that native plant species density and performance criteria are met. The following Performance Standards, based on a planting density of 900 native woody plants per acre, will be used to assess successful native woody vegetation establishment:

- Year 1: 720 native woody plants per acre (including recruits)

- Year 2: 630 native woody plants per acre (including recruits). Show evidence of volunteer recruitment of native riparian and wetland plant species

- Year 3 and 4: 585 native woody plants per acre (including recruits). Show evidence of volunteer recruitment of native riparian and wetland plant species

- Year 5: 540 native woody plants per acre (including recruits). Show evidence of volunteer recruitment of native riparian and wetland plant species

- Year 7 and 10: 450 native woody plants per acre (including recruits). Show evidence of volunteer recruitment of native riparian and wetland plant species

Volunteer recruitment of native trees and shrubs in the upland forest and scrub-shrub planting areas may be credited towards the density/percent cover performance standard.

Contingency Measures:  If performance standards are not being met with installed and recruited native woody species combined, the Trustees will be consulted to determine if replanting efforts are necessary.

### Intertidal marsh

It is anticipated that the intertidal marsh habitat will revegetate naturally by volunteer recruitment from species within the estuary; therefore, the area will not be planted. The following Performance Standards will be used to assess the successful establishment of intertidal marsh vegetation:

- Year 2: at least 15 acres of the intertidal zone will be occupied by native salt or brackish marsh vegetation; "occupied" will be defined as areas with more than 25 percent cover of native marsh plants

- Year 3: at least 30 acres of the intertidal zone will be occupied by native salt or brackish marsh vegetation

- Year 5: at least 50 acres of the intertidal zone will be occupied by native salt or brackish marsh vegetation

- Year 10: at least 62 acres of the intertidal zone will be occupied by native salt or brackish marsh vegetation.

Contingency Measures:  If cover standards of marsh vegetation are not being met, data collected for elevation and sediment dynamics monitoring will be evaluated to determine if significant changes have occurred in the marsh area. If the project is not progressing toward or meeting the 10-year performance measure, the Trustees will be consulted to determine whether adaptive management actions are warranted.

### 7.1.2   Hydraulic/Hydrologic Connection

Hydrologic connections to the Snohomish River will be created by breaching the dike in four places and removing the tide gate. Tidal exchange between the Snohomish River and the Project site will be unrestricted. The following Performance Standards will be used to demonstrate the success of newly created hydrologic connections:

- Constructed interior sloughs will flood (i.e., filling and partially or completely draining) in response to fluctuations in the daily tidal regime and seasonal river stages in Steamboat and Union sloughs.

- The low-intertidal, forked, open slough that bisects the property will retain water at low tide levels and remain connected to exterior tidal sloughs, as designed.

Contingency Measures:  If the topographic condition of the constructed dendritic channels or graded main slough change so that they threaten the function of the restored habitat, then the Trustees will be consulted to determine if maintenance procedures or changes in design are necessary to maintain the channels and slough.

### 7.1.3  Intertidal Areal Coverage

Much of the restored habitat on the site is expected to be intertidal which is defined as the acreage inundated by extreme low tide (channels) subtracted from the area inundated by extreme high tide, including all intertidal habitats. The following performance standard will be used to assess the successful establishment of intertidal areas on the site:

- Intertidal areal coverage shall be a minimum of 260 acres.

Contingency Measures:  In the unlikely event that the intertidal aerial coverage is not meeting the performance standard to the extent that the functionality of the Project is compromised, the Trustees will be consulted to determine if site modifications should be considered.

25

### 7.1.4  Invasive Plant Species Management

*Marsh Habitat*

- Years 2, 3, 4, 5, and 7:  less than or equal to 20% areal cover of invasive species in marsh habitats. Invasive cover will be calculated as a percentage of the area covered by marsh plants during the year of observation.

- Year 10:  ≤ (less than or equal to) 10% areal cover of invasive species in marsh habitats.

- Every occurrence of invasive knotweed (e.g., Bohemian, giant, Himalayan, and Japanese) species and hybrids (*Polygonum bohemicum, P. sachalinense, P. polystachyum,* and *P. cuspiddatum*) will be treated in the year it is discovered.

- The site will be assessed annually for perennial pepperweed occurrences.  Management for perennial pepperweed will follow, where appropriate, published guidelines for pepperweed treatment, and will occur in the next season appropriate for the specific management actions to be implemented following the discovery of the occurrence(s), but in any event no later than 13 months following discovery of the occurrence(s).

- All other noxious weeds will be controlled as required by Snohomish county or the State of Washington.

*Upland Forest and Scrub-Shrub Habitat*

- 30% or less areal cover of invasive species at the end of 10 years for the upland forest and scrub-shrub habitats.

- Since the amount of invasive cover is 20% greater than the Trustees accepted standard of 10%, the value of the areas with upland and scrub-shrub habitat were reduced by 20% in the HEA.  These areas were originally assigned a value of 0.65 in the 2014 HEA and were reduced to a value of 0.52.  This reduction changed the overall NRD DSAYs for the project by 46, and revised the corresponding acreage to 34.79 acres out of the project's 338 acres available for restoration credit.

Contingency Measures:  In Years 2-5, and 7, if Performance Standards are not being met, adaptive management actions will be taken. In Year 10, if the project is not progressing towards or meeting Performance Standards, the Trustees will be consulted to consider whether adaptive management actions are warranted.

### 7.1.5  Large woody debris

LWD is defined as any portion of a tree that is at least 12 feet long, has a root wad diameter of at least 4 feet, and was at least 10 inches diameter at breast height (DBH). Performance of LWD will be based on the installation of 160 pieces of LWD and success will be measured by retention of installed pieces and/or natural recruitment. The following standards will be used:

- Year 2: the amount of LWD on site, including naturally recruited material, will be at least 70 percent of the amount of LWD installed in Year 1

- Year 3: the amount of LWD on site, including naturally recruited material, will be at least 60 percent of the amount of LWD installed in Year 1

- Year 5: the amount of LWD on site, including naturally recruited material, will be at least 50 percent of the amount of LWD installed in Year 1

Contingency Measures:  If LWD are not being retained or accumulating in sufficient numbers to meet the Performance Standards, the site will be assessed to determine if additional LWD can feasibly be installed, and if those measures are necessary for the function of the site. If it is determined to be necessary, additional LWD will be installed, as long as required permits can be obtained.

### 7.1.6  Permanent Protection

The Project's habitats and associated ecological functions will be permanently protected under an approved conservation easement.  In addition, an escrow account will be established to cover the maintenance, monitoring, and management activities conducted during the Long-term Maintenance and Monitoring phase of the Project (these activities are described in Section 8 of this plan).  Permanent Stewardship of this Project is a required component of the Conservation Bank Agreement, "*Puget Sound Salmon, Steelhead, and Bull Trout Umbrella Conservation Bank Agreement* and *Addendum #1, Blue Heron Slough Conservation Bank Agreement*" approved by NOAA's National Marine Fisheries Service on June 18, 2008 as provided in Paragraph 18 of the Consent Decree.


### 7.2   MONITORING METHODS AND SCHEDULE

There are two types of monitoring during the Initial Maintenance and Management Period:  monitoring events associated with Performance Standards and monitoring events without associated Performance Standards (see Table 3). The monitoring associated with Performance Standards was designed to assess the achievement of Performance Standards during the Initial Maintenance and Monitoring Period. Monitoring will provide data to assess the attainment of Performance Standards and guide adaptive management of the Project's habitats.

Monitoring not associated with Performance Standards is conducted for informational purposes; the results will increase the general understanding of the linkages between the physical habitat and fish and bird populations and will contribute to regional monitoring efforts.

The monitoring schedule is presented in Table 3 and described in detail below. Monitoring during the Initial Maintenance and Monitoring period is directed at closely evaluating the performance of initial site restoration treatments (Years 1-10) and is designed to closely evaluate the site's trend towards meeting the project's stated

objectives and Performance Standards.  Long-term monitoring (Years 11 through 30) is discussed in Section 8.

### 7.2.1  Monitoring During the Initial Maintenance and Monitoring Period

#### 7.2.1.1    Monitoring Associated with Performance Standards

*Native woody vegetation*

Monitoring of the live native woody plants will occur once per year in late summer or early fall in Years 1-5, 7, and 10. Monitoring will occur through the use of sample plots, with each plot measuring 10 meters by 10 meters. A total of 15 sample plots will be used and representative photos will be taken of each plot.  Both installed and volunteer native species will be counted towards the density standard. Density is based on planting 900 native woody plants per acre. Density will be calculated by counting each native woody plant within the designated monitoring area (both installed and recruited) to meet the performance standard. For example, in Year 1, an average of 720 native woody plants per acre (or greater) would be necessary to meet the Year 1 performance standard (as described in Section 7.1.1). This standard will apply to a minimum of 6.5 acres of upland forest habitat and 2.5 acres of scrub shrub habitat as depicted in the project design.

*Intertidal marsh vegetation*

Once per year during Years 2, 3, 5, and 10, recruited marsh vegetation will be monitored in late summer/early fall during low tide using 1.0-m2 quadrats randomly established along a minimum of ten 100-meter transects with a frequency of four sample plots per transect (sampling will be done on foot). Saltmarsh vegetation will be documented as a percent cover by species within each quadrat.  The rest of the intertidal marsh can be assessed by aerial photo with intermittent ground-truthing to document areas with greater than 25% ground cover. The polygons will be overlaid on the overall aerial photographs and all intertidal marsh areas with a like visual signature will be identified and drawn as an overlay on the aerial photograph. The intertidal marsh area consists of approximately 185 acres.

*Hydraulic/Hydrologic Connection*

The hydraulic/hydrologic connection will be monitored to ensure that the site is continuing to function as designed. For purposes of this monitoring, the channel areas consist of approximately 35 acres of intertidal channels (including 26 acres above MLLW and 9 acres below MLLW) and 2 acres of shallow subtidal. The mudflat area consist of approximately 101 acres. Hydraulic/hydrologic connections will be monitored in Years 0, 1 – 5, 7 and 10.

- Year 1:  Quarterly observations of breaches, timed with other monitoring actions, to ensure that breaches are functioning and that the channels remain open to flow. If it is observed that breaches are not functioning, then

topographic information will be collected and adaptive management actions may be initiated.

- Years 0-5, 7, 10:  Aerial photographs, timed with other aerial photo monitoring requirements, will be taken to observe channel connections. At least one aerial photograph will be taken during Years 1-5, 7, and 10 at low tide.
- Once per year in Years 1-5, 7, and 10, observed changes in channel configuration will be mapped.
- Once per year in Years 1-5, 7, and 10, the mudflat habitat will be visually assessed (by reviewing aerial photos) to determine if the area is flooding and draining as prescribed in the Project design.

### Invasive Vegetation

Invasive species cover and species will be documented during the marsh, upland forest, and scrub-shrub vegetation monitoring.

*Marsh Habitat*

Invasive vegetation will be monitored during the marsh habitat vegetation surveys. Monitoring will occur in late summer/early fall during low tide using the 1.0-m2 quadrats established for the marsh vegetation monitoring.

*Upland Forest and Scrub-Shrub Habitat*

Invasive vegetation will be monitored during the upland forest and scrub-shrub vegetation surveys. Monitoring will be done using the 10 meters by 10 meters sample plots established for the upland forest and scrub-shrub vegetation monitoring.

### Large Woody Debris

The number of LWD expected to be installed is a minimum of 1 LWD for every 300 feet of interior sloughs for a total of approximately 160. The location of each installed LWD will be documented using a handheld GPS unit. In Years 2, 3, and 5, following winter-spring floods, visual inspections of installed LWD will be done (e.g., by foot, boat, or drone) to determine the retention rate. Recruited LWD would be generally assessed during this monitoring; however, recruited LWD would only be counted if the installed LWD is not meeting Performance Standards for that year.

### 7.2.1.2    Monitoring without Performance Standards

### Site photos

*Aerial Photography*:  Extreme low-tide summer georeferenced aerial images of the entire site will be taken once annually in Years 0-5, 7, and 10. Aerial photographs will also be taken during high tides in Years 0, 2, 5, 7, and 10.

*Photopoints:* Still photographs will be taken a minimum of twice yearly in Years 1-5, 7, and 10 from 10 fixed pre-determined points. Photos will be taken from all four cardinal directions (i.e., north, south, east, and west) as long as the view depicts the project site.

### Hydraulic and Hydrologic Monitoring

In Year 0, as-built topography (or bathymetry) at breaches will be collected immediately after construction. Bathymetry of adjacent channels collected by other regional monitoring efforts will be reviewed. The combination will determine the baseline conditions.

In Years 1 and 2, bathymetric surveys of the breach locations will be performed (or contributions will be made to regional efforts), and interactions between the breach locations and nearby channels will be assessed to determine potential scouring or deposition impacts to channels adjacent to the restoration site.

Four CTD Diver units will either be obtained from NOAA or purchased. The units would be installed by the Port (or access would be allowed for others to install them) on the site. In Years 1 – 10, data will be collected by the Port. The data will then be summarized by the Port and included in the annual monitoring report. Installation locations will be coordinated with the Trustees and the Snohomish Basin Salmon Recovery Group.

### Elevation and sediment dynamics (mudflat habitat)

Due to large floating debris, sediment stakes that extend above ground would likely be damaged. As such, ten monitoring rods will be installed on the site. A long metal rod will be driven into the substrate so that the top of the rod is flush with the ground surface. The location of the rod would be documented using GPS and a magnetic locator. Sediment measurements will be taken during intertidal marsh vegetation monitoring (in Years 2, 3, 5, and 10). A marker horizon would be placed around the rod. The location could also be marked on the ground with a flexible rod and flag, although this might encourage trespass and tampering which could alter the data. Data will be summarized and included in the annual monitoring report. The mudflat area consists of approximately 101 acres.

### Fish monitoring

Fish monitoring will occur in the newly created channels in Years 1, 2, 3, 5, 7, and 10. Two beach seines will be conducted at a minimum of five onsite locations and one reference site once per month from February through September. A standard Puget Sound beach seine will be used. Species, numbers, and sizes (up to 10 individuals of each native species will be measured to fork length or total length when no fork is present) of fish will be recorded during surveys. Macroinvertebrates captured will also be identified and enumerated (or estimated if appropriate). Photos will be taken of all sampling locations and notes on habitat conditions recorded including shade, cover, depth, substrate, water temperature, salinity, dissolved oxygen, and turbidity. Fishery surveys will also note occurrence of aquatic plants by species, location, and relative

abundance. Data will be presented in the annual monitoring report, and the data will also be shared with the Snohomish Salmon Recovery Team.

### Bird assemblage monitoring

Bird surveys will be conducted by point count monitoring in Years 1, 3, 5, and 10. All bird species detected will be recorded once a month in April, June, and August. Bird surveys will be conducted from fixed point count locations which will be determined prior to breaching the dikes. Point count locations will be along the new dike and the remnant dike to ensure both audio and visual access and to cover the entire site without a high potential for overlap. Each sampling event will consist of a five-minute survey at each fixed point count station beginning 30 minutes prior to sunrise and up to three hours after sunrise. All detected bird species will be recorded to assess species occurrences, proportionate abundance, species richness and information such as percent native/non-native and presence of sensitive species.

# 8      Long-term Maintenance and Monitoring

Long-term Maintenance and Monitoring is the phase following the Initial Maintenance and Monitoring period and will be conducted for 20 years after completion of the Initial Maintenance and Monitoring period.

## 8.1 LONG-TERM MONITORING

Long-term monitoring will occur every tenth year following the Initial Maintenance and Monitoring period (see Table 4). The following elements will be monitored during long-term monitoring events:

- General site monitoring including aerial photograph and photos from permanent photo points.

- Channel connections: visual monitoring at low tide.

- Upland forest, scrub-shrub, and intertidal marsh vegetation monitoring: visual monitoring using aerial photographs taken in the summer.

- Invasive plant species monitoring: invasive plant species will be assessed and mapped. Control methods will be implemented, as needed.

- Juvenile salmonid and bird use: juvenile salmonid and bird use will be assessed at the site using the monitoring methods described for the establishment period monitoring.

## 8.2 LONG-TERM MAINTENANCE ACTIVITIES

Maintenance activities are those actions implemented on a recurring basis to ensure that the habitat value on the Project is maintained. Some maintenance activities will occur periodically throughout the life of the Project and thus continue as part of the long-term management plan. The following maintenance activities will occur during both the Initial Maintenance and Monitoring period and throughout the Long-term Maintenance and Monitoring period.

- Invasive species management

- Hydrologic connection maintenance

- Trash removal

- Maintenance of gates

- Prevention of trespass and public access

- Maintenance of fencing and signage

- Dike maintenance

### 8.2.1   Non-native invasive plant species management

During annual site inspections, the site will be assessed for the presence of non-native invasive plant species. If the establishment of non-native invasive species threatens the establishment of native habitats, invasive species control will be implemented. Potential methods of removing or controlling invasive species are:

- Hand/Mechanical Removal: Hand removal, use of small hand powered or handheld equipment (such as a Weed Wrench or a chainsaw), and mechanical methods (use of larger equipment with motors such as a small tractor with a mower or harrow) will be the preferred methods for the removal.

- Use of Herbicides: In some instances (i.e., extensive, severe, or persistent infestations) it may be necessary to use herbicides to control non-native invasive plant species. All herbicides will be applied according to label instructions and would typically be applied using a low pressure spray. As required, approval for herbicide application in or near water will be obtained from the Washington State Department of Ecology. If it is determined that the use of herbicides in certain areas may negatively impact established native vegetation, herbicide use will be avoided in those areas. A summary of management actions taken on the site, including herbicide applications, will be included within the annual monitoring reports.

### 8.2.2   Hydrologic connections

Hydrologic connections between the Project and the Snohomish River's Steamboat and Union sloughs have been designed to be self-maintaining; however, there may be times when sediment and debris may block the site's channels, such as during or after major flood events. If the connections become non-functional and habitat values, such as off-channel rearing for fish, are degraded by extensive deposits of sediment or woody material, the Trustees will be consulted to see if maintenance should be considered. The Port shall obtain prior approval from the Trustees in writing of proposed maintenance actions.

### 8.2.3   Trash removal

The site will be assessed at least once per year to determine the need to remove accumulations of trash and other unwanted debris including trash/debris that floated into the site. For these purposes, trash and unwanted debris are defined as non-biodegradable, non-organic material including, but not limited to, household trash, derelict vessels, plastic containers, etc.

### 8.2.4   Gates

The authorized gate access into the site will be kept locked and will be maintained to prevent unauthorized motor vehicle access. The authorized gate will be used to provide access to the Project site primarily for maintenance or monitoring work or other supervised activities.

### 8.2.5   Trespass and public access

Since the intent is to maintain the habitats of the Project in perpetuity to benefit natural resources, access to the site by the general public will be limited. Supervised access for educational or habitat restoration activities may be allowed, on a case-by-case basis. Land access will be controlled by locked gates maintained by the Port or any other landowners.

### 8.2.6   Fencing and signage

Fencing is not practical because the site is within an active floodplain. The presence of fences would result in accumulation of flood debris potentially altering site hydrology and flood flows would also result in frequent damage to fences requiring replacement. There is only one access road into the site and that access will be controlled through gates. If "No trespassing" signs are posted, they will be inspected annually and replaced as needed.

### 8.2.7   Dike Maintenance

During the annual site visit, the dike will be assessed for maintenance needs. The dike will be mowed and maintained to ensure it continues to function as designed.

# 9 Plans and Documentation

## 9.1 DESIGN DOCUMENTATION

The majority of the design work for the Blue Heron Slough project was completed in 2009, while minor design revisions were made in 2014. Construction permits have been obtained for the Project as described in Section 4 so the Project is "shovel ready." The Trustees approve the Final Design and Construction Plans for the Project including the engineering drawings and the habitat map, with all requirements as described in this SOW.

## 9.2 CONSTRUCTION COMPLETION REPORT (AS-BUILT SUBMITTAL)

After all phases of construction have been completed, the Port will produce a Notice of Final Completion report that will include as-built drawings completed by a licensed surveyor or licensed engineer and other documentation confirming that the Project has been implemented as designed. The as-built drawings and other post-construction documentation will also establish baseline conditions (i.e., conditions at the Project site immediately after construction) to be used during future Project monitoring. The Notice of Final Completion report will be submitted to the Trustees for review and approval within 90 days of completion of construction.

At a minimum, the following components should be included in the Notice of Final Completion report:

- Name and contact information for the parties responsible for the Project construction site including the Project Owner, engineers, and other individuals conducting construction compliance inspections during construction

- Ecology, Corps, and Local permit numbers

- Dates when activities began and ended such as grading, removal of invasive plants, installing plants, and installing habitat features

- Photographs of the site at as-built conditions taken from photo stations. Photographs from photo stations will consist of either panoramic photos or one photo in each cardinal direction (N, S, E, W), unless the photo location borders the Project boundary, in which case photos will be taken from all directions that show the Project.

- Description of any problems encountered and solutions implemented (with reasons for changes) during construction of the Project

- List of any follow-up actions needed with a schedule

- Results of Year 0 monitoring requirements in this agreement.

- 11x17 maps of the Project site showing:

- Topography points collected over the area in which earthwork was done, stamped by a licensed engineer or surveyor. Include relevant elevations of breach locations. If needed for clarity, an overview map and multiple individual maps will be provided in order to adequately show the Project details. Include a description of how elevations were determined. Elevation data may be acquired by a variety of methods including, but not limited to:
    - Ground-based RTK (real-time kinematic) or total station surveys
    - Ground-based cross-sections via transit or laser level
    - Ground-based LiDAR or point cloud scanning
    - Boat-based bathymetric surveys
    - LiDAR via airplane or drone
    - Photogrammetric survey via airplane or drone
- Installed planting scheme – quantities, densities, sizes, approximate locations, and the sources of plant material
- Locations of dataloggers that remain after construction
- Locations of large woody debris
- Locations of permanent photo stations
- Date when the maps were produced and, if applicable, when information was collected

### 9.3   MONITORING AND MAINTENANCE REPORTS

Within 6 months after construction completion, the Port will submit a draft monitoring plan to the Trustees for review and approval for the Initial Maintenance and Monitoring period that will be conducted consistent with the monitoring program described in this document and provide additional details as appropriate. The monitoring program for the Blue Heron Slough Project will follow the program set forth in Section 7 above, and includes monitoring for hydrologic connections, native vegetation (estuarine and native woody vegetation), mudflat habitat, large woody debris, invasive plant species, and fish and bird use. Annual reports documenting the methods followed and results for each of the monitoring elements will be prepared in each year in the establishment (Initial Maintenance and Monitoring) period and submitted to the Trustees within 90 days of the calendar year in which monitoring occurred. The monitoring reports will evaluate each monitoring element with respect to its associated Performance Standards to ensure that the Project is developing as planned. Monitoring reports will detail the general site conditions, and will include photographs of restored habitats and connecting channels, notes on management activities for the monitoring period, and a current credit ledger.

In the last year of the establishment (Initial Maintenance and Monitoring) period, the Port will submit a Long Term Maintenance and Monitoring Plan to the Trustees for

review and approval.  The Long-Term Maintenance and Monitoring Plan will follow the guidelines set out in this agreement and include additional details about the long-term monitoring activities described in Section 8.2 such as proposed maintenance approach and activities, maps with sampling locations, monitoring protocols, schedule, personnel, data handling and reporting.

During the Long-term Maintenance and Monitoring period, which begins after the establishment (Initial Maintenance and Monitoring) period, monitoring reports will be prepared for each year that long-term habitat monitoring and maintenance is required (in ten year intervals following the end of the Initial Maintenance and Monitoring period). Monitoring reports will be submitted to the Trustees within 90 days of the calendar year in which monitoring occurred.

During the long-term Maintenance and Monitoring period, in years without long-term monitoring, an annual site inspection will be conducted on the Project site to generally evaluate site conditions including invasive species, gate and sign conditions, evidence of trespass, trash/debris accumulation, etc. A brief report (i.e., annual report) will be prepared and submitted to the Trustees. The report will include a summary of maintenance activities conducted in that year. Annual reports will be submitted within 90 days of the end of that calendar year.

# 10    Schedule and Trustee Milestones

Project milestones and deadlines for the Blue Heron Slough Project are listed in Section 10.1. Project milestones, deadlines, and other requirements subject to stipulated penalties are described in Section 10.2.

Terms used in this section, and consistent with the definitions found in Exhibit A of the Performance Bond, shall have the following meaning.

1. **"Mobilization"** shall consist of preparatory work; operations; establishment of access roads; institution of traffic controls; and placement of equipment and personnel on site, including but not limited to, those necessary for movement of personnel, equipment, and supplies to the project site to complete the work, and those necessary for all setup and operations that must be performed prior to the beginning of the work on the various items on the project site, or costs incurred. "Mobilization" shall also include incidentals required to perform the Guaranteed Work, such as obtaining permit(s) necessary for mobilization that have not already been obtained by the Port, job administration, coordination, overhead, and insurance. The costs for mobilization activities required for the Completion of I-5 Dike are included in that project element.

2. **"Completion of I-5 Dike"** shall consist of all work associated with the completion of the I-5 Dike, as shown in the approved plans and specifications (including contract changes and/or additional regulatory agency requirements and any official amendments), and shall include all earthwork, soil placement, soil compaction, soil stabilization, dike-related plantings, drainage infrastructure construction, access road construction, security construction, and any other action that is required to reach the final completion of the I-5 Dike construction.

3. **"Substantial Completion (Including Dike Breaching) and Demobilization"** shall consist of all work necessary to substantially complete construction of the Guaranteed Work (including contract changes and/or additional regulatory agency requirements and any official amendments), including work to create tidal connections (i.e., breaches) within the existing dike at the four designated locations, remove the tide gate for the purpose of flooding the site, and connect the constructed habitat channels to the adjacent sloughs in accordance with the project design, as well as demobilize all equipment and unused materials from the site.

4. **"Final Completion"** shall consist of any work necessary following Substantial Completion to attain completion of all project elements described in Sections 6.1 and 6.2.

## 10.1   PROJECT MILESTONES AND DEADLINES

Project Milestones and deadlines for the Blue Heron Slough Project include:

- Milestone 1 – Recordation of the environmental covenant within 30 days of the Effective Date of the Consent Decree.

- Milestone 2 – Construction milestones and deadlines are as follows:

  o Mobilization shall be complete no more than 365 calendar days from the Effective Date of the Agreement.

  o Completion of I-5 Dike shall occur no more than 895 calendar days from the Effective Date of the Agreement.

  o Substantial Completion (Including Dike Breaching) and Demobilization shall be complete no more than 1,095 calendar days from the Effective Date of the Agreement.

  o Final Completion shall be complete no more than 1,277 calendar days from the Effective Date of the Agreement.

  o Port will further provide notice of completion of each construction milestones to the Trustees within 90 days of completion of each construction milestone.

- Milestone 3 – Construction Completion Report (As-Built Submittal). The Port will submit a Notice of Final Completion Report (as described in Section 9.2) to the Trustees for review within 90 days of completing construction activities.

- Milestone 4 – Monitoring Plan. The Port will submit to the Trustees an Initial Monitoring and Maintenance Plan (as described in Section 9.3) for Trustee review and approval within 6 months after construction completion, and prior to the Year 1 monitoring event.

- Milestone 5 – Maintenance and Monitoring Reports. Maintenance and Monitoring Reports will be prepared and submitted annually during the Initial Maintenance and Monitoring Period (Years 1 through 10). An updated credit ledger (register) will be provided with each annual Maintenance and Monitoring Report. Reports will be submitted within 90 days of the calendar year in which monitoring occurred.

- Milestone 6 – Notice of Completion of Initial Maintenance and Monitoring Obligations. The Port will submit to the Trustees a Notice of Completion of

Initial Maintenance and Monitoring Obligations upon completion of the 10-year Initial Maintenance and Monitoring Period (10 years from Final Completion). The Trustees will confirm completion of Milestone 6 by providing a written Approval of Completion of Initial Maintenance and Monitoring Obligations.

- Milestone 7 - Long-Term Maintenance and Monitoring Annual Reports. The Port will submit annual maintenance reports each year during the 20-year Long-Term Maintenance and Monitoring Period. These reports will include monitoring results in the years that Long-Term Monitoring is required. Reports will be submitted within 90 days of the calendar year in which monitoring occurred.

## 10.2  PROJECT REQUIREMENTS SUBJECT TO STIPULATED PENALTIES

Paragraph 48 of the Consent Decree identifies project requirements that are subject to stipulated penalties – specifically, the obligations described in Paragraphs 11, 22-24, 28, and 29 of the Consent Decree. In addition to these requirements, Milestones 1, 3, 4, 5, 6, and 7 and associated deadlines as described in Section 10.1 are also subject to stipulated penalties pursuant to Paragraph 48 of the Consent Decree.

## 11     References

Cereghino, Paul. NOAA Restoration Center. 2007. *Wetland Assessment for Restoration at Qwuloolt Marsh, Marysville, Washington*.

City of Everett, Washington State Department of Ecology, U.S. Environmental Protection Agency, and Puget Sound Water Quality Authority. 1997. *Snohomish Estuary Wetland Integration Plan (SEWIP)*. Everett, Washington.

City of Everett and Pentec Environmental. 2001. *Salmon Overlay to the Snohomish Estuary Wetland Integration Plan*. Everett, Washington.

Equinox Research and Consulting International, Inc. (ERCI), 2007. *Archaeological Investigation Report – Blue Heron Slough Conservation Bank, Marysville, Washington*.

Haas, A., and B. Collins. 2001. *Salmon Habitat Loss and Restoration Potential along the Snohomish River*. Report prepared by The Tulalip Tribes and Snohomish County, Department of Public Works, Surface Water Management. Everett, Washington.

Hruby, T. 2004. (Revised August 2006). *Washington State Wetland Rating System for Western Washington – Revised. Publication No. 04-06-025*. Washington State Department of Ecology. Olympia, WA.

Natural Resources Conservation Service. 2006. *Web Soil survey for Snohomish County* (http://websoilsurvey.nrcs.usda.gov/app/). Accessed on October 23, 2006.

Port Gardner Natural Resource Trustees. 2016. *Port Gardner Bay Final Damage Assessment Restoration Plan and Environmental Assessment.* Prepared by the Port Gardner Natural Resource Trustee Council.

Snohomish Basin Salmon Recovery Forum. 2005. *Snohomish River Basin Salmon Conservation Plan*. Snohomish County Public Works, Surface Water Management Division. Everett, Washington.

Snohomish River Basin Salmonid Recovery Technical Committee. 2002. (September). *Snohomish River Basin Salmonid Habitat Conditions Review*. Snohomish County Department of Public Works, Surface Water Management Division. Everett, WA.

Washington Department of Fish and Wildlife. 2008. (August). *Washington Department of Fish and Wildlife Priority Habitats and Species List*. Olympia, Washington. Accessed via http://wdfw.wa.gov/publications/00165/wdfw00165.pdf on May 2, 2014.

Wildlands. 2014. *2014 Revision of Addendum No. 1 to the Puget Sound Umbrella Conservation Bank Agreement, Blue Heron Slough Conservation Bank Agreement.* Snohomish County, Washington.

Wildlands and the Port of Everett. 2017. Blue Heron Slough Conservation and Mitigation Bank Prospectus, Snohomish County, Washington.

Wildlands of Washington. 2007. *Puget Sound Salmon, Steelhead, and Bull Trout Umbrella Conservation Bank Agreement and Addendum #1 Blue Heron Slough Conservation Bank Agreement.* Snohomish County, Washington.

| Table 3.  Monitoring and Performance Standards for the Blue Heron Slough NRDA | | | | | |
|---|---|---|---|---|---|
| **Initial Maintenance and Monitoring Period and Reporting Period** | | 10 Years starting from completion of construction (Years 1-10). Year 1 will be the first full year after construction completion. | | | |
| | | **Monitoring Elements _with_ Performance Standards** | | | |
| **Monitoring Element** | **Years** | **Performance Standards** | **Frequency** | **Monitoring Description and Methods** | **Contingency Measures** |
| **Scrub Shrub and Upland Forest Native Woody Vegetation** | 1-5, 7, 10 | • Year 1: 720 native woody plants per acre including recruits<br>• Year 2: 630 native woody plants per acre (including recruits). Show evidence of volunteer recruitment of native riparian and wetland plant species<br>• Year 3 and 4: 585 native woody plants per acre (including recruits). Show evidence of volunteer recruitment of native riparian and wetland plant species<br>• Year 5: 540 native woody plants per acre (including recruits). Show evidence of volunteer recruitment of native riparian and wetland plant species<br>• Year 7 and 10: 450 native woody plants per acre (including recruits). Show evidence of volunteer recruitment of native riparian and wetland plant species | Once per year, in late summer or early fall | Monitor the live native woody plants in late summer or early fall. Monitoring will occur through the use of sample plots, with each plot measuring 10 meters by 10 meters. A total of 15 sample plots will be used and representative photos will be taken of each plot.  Both installed and volunteer native species will be counted towards the density standard. Note:  Density is based on planting 900 native woody plants per acre. Density will be calculated by counting each native woody plant within the designated monitoring area (both installed and recruited) to meet the performance standard. For example, in Year 1, an average of 720 native woody plants per acre (or greater) would be necessary to meet the Year 1 performance standard. This standard applies to a minimum of 6.5 acres of upland forest and 2.5 acres of scrub shrub habitat as depicted in the project design. | If performance standards are not being met with installed and recruited native woody species combined, the Trustees will be consulted to determine if replanting efforts are necessary. |
| **Intertidal Marsh Vegetation** | 2, 3, 5, 10 | • Year 2: at least 15 acres of the intertidal zone will be occupied by native salt or brackish marsh vegetation; "occupied" will be defined as areas with more than 25 percent cover of native marsh plants.<br>• Year 3: at least 30 acres of the intertidal zone will be occupied by native salt or brackish marsh vegetation.<br>• Year 5: at least 50 acres of the intertidal zone will be occupied by native salt or brackish marsh vegetation.<br>• Year 10: at least 62 acres of the intertidal zone will be occupied by native salt or brackish marsh vegetation. | Once per year, in late summer or early fall | Recruited marsh vegetation will be monitored in late summer/early fall during low tide using 1.0-m2 quadrats randomly established along a minimum of ten 100-meter transects with a frequency of four sample plots per transect (sampling will be done on foot). Saltmarsh vegetation will be documented as a percent cover by species within each quadrat. The rest of the intertidal marsh can be assessed by aerial photo with intermittent ground-truthing to document areas with greater than 25% ground cover. The polygons will be overlaid on the overall aerial photographs and all intertidal marsh areas with a like visual signature will be identified and drawn as an overlay on the aerial photograph. The intertidal marsh area consists of approximately 185 acres. | If cover standards of marsh vegetation are not being met, data collected for elevation and sediment dynamics monitoring will be evaluated to determine if significant changes have occurred in the marsh area. If the project is not progressing toward or meeting the 10-year performance measure, the Trustees will be consulted to determine whether adaptive management actions are warranted. |
| **Hydraulic/Hydrologic Connection** | 0, 1-5, 7, 10 | • Constructed interior sloughs will flood (i.e., filling and partially or completely draining) in response to fluctuations in the daily tidal regime and seasonal river stages in Steamboat and Union sloughs.<br><br>• The low-intertidal, forked, open slough that bisects the property will retain water at low tide levels and remain connected to exterior tidal sloughs, as designed. | Quarterly (four times per year)<br><br><br><br><br>Once per year | Year 1:  Quarterly observations of breaches, timed with other monitoring actions, to ensure that breaches are functioning and that the channels remain open to flow. If it is observed that breaches are not functioning, then topographic information will be collected and adaptive management actions may be initiated.<br><br>Years 0-5, 7, 10:  Aerial photographs, timed with other aerial photo monitoring requirements, will be taken to observe channel connections. At least one aerial photograph during Years 1-5, 7, and 10 will be taken at low tide. | If the topographic condition of the constructed dendritic channels or graded main slough change so that they threaten the function of the restored habitat, then the Trustees will be consulted to determine if maintenance procedures or changes in design are necessary to maintain the channels and slough. |

| Table 3.  Monitoring and Performance Standards for the Blue Heron Slough NRDA | | | | | |
|---|---|---|---|---|---|
| **Initial Maintenance and Monitoring Period and Reporting Period** | 10 Years starting from completion of construction (Years 1-10). Year 1 will be the first full year after construction completion. | | | | |
| | | **Monitoring Elements _with_ Performance Standards** | | | |
| **Monitoring Element** | **Years** | **Performance Standards** | **Frequency** | **Monitoring Description and Methods** | **Contingency Measures** |
| | | | Once per year | Years 1-5, 7, 10:  Observed changes in channel configuration will be mapped.<br><br>Years 1-5, 7, 10:  The mudflat habitat will be visually assessed (by reviewing aerial photos) to determine if the area is flooding and draining as prescribed in the Project design.<br><br>The channel areas consist of approximately 35 acres of intertidal channels and 2 acres of shallow subtidal channels. | |
| | | | Once per year | | |
| **Intertidal Areal Coverage** | 0, 2, 5, 7, 10 | • Intertidal areal coverage shall be a minimum of 260 acres | | Intertidal areal coverage will be evaluated as the acreage inundated by extreme low tide (channels) and subtracted from the area inundated by extreme high tide, and will include all intertidal habitats.  Methods may be based on either georeferenced aerial photos of extreme tide events or predicted from elevation maps and on-site hydrologic data.  At Years 0, 5 and 10, provide maps with inundation frequency. | In the unlikely event that the intertidal areal coverage is not meeting the performance standard to the extent that the functionality of the Project is compromised, the Trustees will be consulted to determine if site modifications should be considered. |
| **Invasive Vegetation[1]** | 2 - 5, 7, 10 | _Marsh Habitat_<br>• Years 2, 3, 4, 5, and 7:  less than or equal to 20% areal cover of invasive species in marsh habitats. Invasive cover will be calculated as a percentage of the area covered by marsh plants during the year of observation.<br>• Year 10:  ≤ (less than or equal to) 10% areal cover of invasive species in marsh habitats.<br>• Every occurrence of invasive knotweed (e.g., Bohemian, giant, Himalayan, and Japanese) species and hybrids (_Polygonum bohemicum, P. sachalinense, P. polystachyum,_ and _P. cuspiddatum_) will be treated in the year it is discovered.<br>• The site will be assessed annually for perennial pepperweed occurrences.  Management for perennial pepperweed will follow, where appropriate, published guidelines for pepperweed treatment, and will occur in the next season appropriate for the specific management actions to be implemented following the discovery of the occurrence(s), but in any event no later than 13 months following discovery of the occurrence(s).<br>• All other noxious weeds will be controlled as required by Snohomish County or the State of Washington. | Once per year, in August | _Marsh Habitat_<br><br>Invasive vegetation will be monitored during the marsh habitat vegetation surveys. Monitoring will occur in late summer/early fall during low tide using the 1.0-m2 quadrats established for the marsh vegetation monitoring. | In Years 2-5, and 7, if Performance Standards are not being met, adaptive management actions will be taken. In Year 10, if the project is not progressing towards or meeting Performance Standards, the Trustees will be consulted to consider whether adaptive management actions are warranted. |

| Table 3.  Monitoring and Performance Standards for the Blue Heron Slough NRDA | | | | | |
|---|---|---|---|---|---|
| **Initial Maintenance and Monitoring Period and Reporting Period** | | 10 Years starting from completion of construction (Years 1-10). Year 1 will be the first full year after construction completion. | | | |
| | | **Monitoring Elements _with_ Performance Standards** | | | |
| **Monitoring Element** | **Years** | **Performance Standards** | **Frequency** | **Monitoring Description and Methods** | **Contingency Measures** |
| | | _Upland Forest and Scrub Shrub Habitat_<br><br>• 30% or less areal cover of invasive species at the end of 10 years for the upland forest and scrub shrub habitats.  Invasive cover will be calculated as a percentage of the total upland forest and scrub shrub habitats.<br>• Since the amount of invasive cover is 20% greater than the Trustees accepted standard of 10%, the value of the areas with upland and scrub shrub habitat were reduced by 20% in the HEA.  These areas were originally assigned a value of 0.65 in the 2014 HEA and were reduced to a value of 0.52.  This reduction changed the overall NRD DSAYs for the project by 46, and revised the corresponding acreage to 34.79 acres out of the project's 338 acres available for restoration credit. | Once per year, in August | _Upland Forest and Scrub Shrub Habitat_<br><br>Invasive vegetation will be monitored during the upland forest and scrub shrub vegetation surveys. Monitoring will be done using the 10 meters by 10 meters sample plots established for the upland forest and scrub shrub vegetation monitoring. | |
| **Mudflat** | | See "Elevation and sediment dynamics" | | | |
| **Large Woody Debris[2]** | 2, 3, 5 | • Year 2: the amount of LWD on site, including naturally recruited material, will be at least 70 percent of the amount of LWD installed in Year 1<br>• Year 3: the amount of LWD on site, including naturally recruited material, will be at least 60 percent of the amount of LWD installed in Year 1<br>• Year 5: the amount of LWD on site, including naturally recruited material, will be at least 50 percent of the amount of LWD installed in Year 1 | Once per year, following winter-spring floods. | The number of LWD expected to be installed is a minimum of 1 LWD for every 300 feet of interior sloughs for a total of approximately 160. The location of each installed LWD will be documented using a handheld GPS unit. Following winter-spring floods, visual inspections of installed LWD will be done (e.g., by foot, boat, or drone) to determine the retention rate. Recruited LWD would be generally assessed during this monitoring; however, recruited LWD would only be counted if the installed LWD is not meeting performance standards for that year. | If LWD are not being retained or accumulating in sufficient numbers to meet the Performance Standards, the site will be assessed to determine if additional LWD can feasibly be installed, and if those measures are necessary for the function of the site. If it is determined to be necessary, additional LWD will be installed, as long as required permits can be obtained. |
| | | | | | |
| NOTES:<br>[1] Invasive plant species are defined as plants that are not native (i.e., not native to the Puget Sound Trough), and are invasive (i.e., displacing) native vegetation or native habitats. These species have been identified because they can become highly destructive and difficult to control or eliminate once establish and may displace native species or communities. The Snohomish County Noxious Weed List will be used. Plants listed in Class A, Class B, Class B Undesignated, and Class C can be referred to for assistance in determining if a plant is an exotic pest plant species of concern. The updated list will be referred to prior to site visits.<br><br>[2] Large woody debris is defined as any portion of a tree that is at least 12 feet long, has a root wad diameter of at least 4 feet, and was at least 10 inches in diameter at breast height. | | | | | |

## Table 3.  Monitoring and Performance Standards for the Blue Heron Slough NRDA

| | | Monitoring Elements *without* Performance Standards | Frequency |
|---|---|---|---|
| Monitoring Element | Years | Monitoring Description and Methods | Frequency |
| Site Photos | 0-5, 7, 10 | *Aerial Photography:*  Extreme low-tide summer georeferenced aerial images of entire site once annually in Years 0-5, 7, and 10. Aerial photographs will also be taken during high tides in Years 0, 2, 5, 7, and 10. | Once per year |
| | 1-5, 7, 10 | *Photopoints:*  Still photographs taken a minimum of twice yearly from 10 fixed pre-determined points. Photos will be taken from all four cardinal directions (i.e., north, south, east, and west) as long as the view depicts the project site. | Twice per year |
| Hydraulic/Hydrologic Monitoring | Year 0 | As-built topography (or bathymetry) at breaches will be collected immediately after construction. Bathymetry of adjacent channels collected by other regional monitoring efforts will be reviewed. The combination will determine the baseline conditions. | Once, post-construction |
| | Years 1, 2 | Perform bathymetry surveys of the breach locations (or contribute to regional efforts) and interactions between the breach locations and nearby channels will be assessed to determine potential scouring or deposition impacts to channels adjacent to the restoration site. | Once per year |
| | Years 1 - 10 | Four CTD Diver units will either be obtained from NOAA or purchased. The Port would install 4 CTD Diver units (or allow access for others to install them) on the site. Data will be collected and summarized by the Port and included in the annual monitoring report. Installation locations will be coordinated with the Trustees and the Snohomish Basin Salmon Recovery Group. | |
| Elevation and Sediment Dynamics | 2, 3, 5, 10 | Due to large floating debris, sediment stakes that extend above ground would likely be damaged. As such, ten monitoring rods will be installed on the site. A long metal rod will be driven into the substrate so that the top of the rod is flush with the ground surface. The location of the rod would be documented using GPS and a magnetic locator. Sediment measurements will be taken during intertidal marsh vegetation monitoring (Years 2, 3, 5, and 10). A marker horizon would be placed around the rod. The location could also be marked on the ground with a flexible rod and flag, although this might encourage trespass and tampering which could alter the data. Data will be summarized and included in the annual monitoring report. The mudflat area consists of approximately 101 acres. | |
| Fish Monitoring | 1, 2, 3, 5, 7, 10 | Fish monitoring will occur in the newly created channels in Years 1, 2, 3, 5, 7, and 10. Two beach seines will be conducted at a minimum of five onsite locations and one reference site once per month from February through September.  A standard Puget Sound beach seine will be used. Species, numbers, and sizes (up to 10 individuals of each native species will be measured to fork length or total length when no fork is present) of fish will be recorded during surveys. Macroinvertebrates captured will also be identified and enumerated (or estimated if appropriate). Photos will be taken of all sampling locations and notes on habitat conditions recorded including shade, cover, depth, substrate, water temperature, salinity, dissolved oxygen, and turbidity.  Fishery surveys will also note occurrence of aquatic plants by species, location, and relative abundance. Data will be presented in the annual monitoring report, and the data will also be shared with the Snohomish Salmon Recovery Team. | Once per month, Feb - Sept |
| Bird Assemblage Monitoring | 1, 3, 5, 10 | Bird surveys will be conducted by point count monitoring in Years 1, 3, 5, and 10. All bird species detected will be recorded once a month in April, June, and August. Bird surveys will be conducted from fixed point count locations which will be determined prior to breaching the dikes. Point count locations will be along the new dike and the remnant dike to ensure both audio and visual access and to cover the entire site without a high potential for overlap. Each sampling event will consist of a five-minute survey at each fixed point count station beginning 30 minutes prior to sunrise and up to three hours after sunrise. All detected bird species will be recorded to assess species occurrences, proportionate abundance, species richness and information such as percent native/non-native and presence of sensitive species. | Once per month, April, June, Aug |
| Reporting | 1-5, 7, 10 | Establishment Period: Annual monitoring report in Years 1-5, 7, and 10 will include all of the monitoring elements required in that year. Monitoring reports shall also include maps with polygons of subtidal, mudflat, marsh, and upland habitat and a summary of acreage of each type of habitat, documenting changes since the previous monitoring event. | Once per year |

| Table 4.  Long-term Maintenance and Monitoring for the Blue Heron Slough NRDA | |
|---|---|
| **LONG-TERM MONITORING (20 years following the end of the Initial Monitoring and Maintenance Period)** | |
| **Long-term Monitoring**<br><br>(10 year intervals following the end of the Initial Monitoring and Maintenance Period.) | • General site monitoring (aerial photos and photo points).<br><br>• Channel connections: visual monitoring at low tide.<br><br>• Upland forest, scrub shrub, and intertidal marsh vegetation monitoring: visual monitoring using aerial photos taken in the summer.<br><br>• Invasive plant species monitoring: invasive plant species will be assessed and mapped. Control methods implemented, as needed.<br><br>• Juvenile salmonid and bird use: same method as in the establishment period.<br><br>The frequency of long-term monitoring will be every 10 years following the 10-year establishment period. Monitoring reports shall include maps with polygons of subtidal, mudflat, marsh, and upland habitat and a summary of acreage of each type of habitat, documenting any changes since the previous monitoring event. |
| **Opportunities for Future Research (from the CBA, Management Plan)** | While research on restored habitat development and function, beyond the monitoring described above, is not proposed to be conducted as part of this project, other organizations interested in conducting research on the Project site would be encouraged and proposals for such work would be considered on a case-by-case basis. |

# Appendix D

**RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:**

Wildlands of Washington, LLC
Attn: General Counsel
3301 Industrial Ave.
Rocklin, CA  95765

## Conservation Easement
### (Blue Heron Slough Conservation Bank)

THIS CONSERVATION EASEMENT DEED ("Conservation Easement") is made this ___ day of _____, 2019, by the Port of Everett (the "Port") and Wildlands of Washington, LLC, ("Wildlands") (collectively, the "Grantor"), in favor of the Tulalip Tribes ("Grantee").  The Port, Wildlands and Grantee are referred to individually as a "Party" and collectively as the "Parties."

## RECITALS:

A.      Grantor is the sole owner in fee simple of certain real property containing approximately ___ acres in the County of Snohomish, State of Washington more particularly described in Exhibit A attached hereto and incorporated herein (the "Overall Property").  Grantor desires to grant the Conservation Easement over a ___ acre portion of the Overall Property (the "Property").  The Property is more particularly described in Exhibit B, which is attached hereto and incorporated herein.

B.      The Property possesses wildlife and habitat values of great importance to Grantor, Grantee, and the people of the State of Washington and the United States.

C.      This Conservation Easement is being executed and delivered pursuant to the Puget Sound Salmon, Steelhead, and Bull Trout Umbrella Conservation Bank Instrument and in particular Addendum 1 thereto for the Blue Heron Slough Conservation Bank (collectively, the "Conservation Instrument"). A specific habitat development plan and management and operations plan for the Property has been developed in accordance with applicable requirements of the Conservation Instrument, entitled "Blue Heron Slough Habitat Development Plan" (the "Development Plan") and the "Blue Heron Slough Management Plan" (the "Management Plan"). Grantor and Grantee each have a copy of the Management Plan and the Development Plan, both incorporated herein by reference.  A Statement of Work ("Statement of Work") was also developed for the Property in cooperation with the Port Gardner Natural Resource Trustee Council ("Trustee Council"). The Conservation Instrument, Development Plan, Management Plan, and Statement of Work are collectively referred to as the "Conservation Documents".

D.     The Property provides or is capable of providing significant ecological and habitat values that benefit endangered, threatened, and other species (collectively, "Conservation Values").  The Conservation Values of the Blue Heron Slough project include restoring a mosaic of intertidal estuarine and upland habitats, reconnecting these habitats to the Snohomish River watershed and Puget Sound, and preserving open space. The restored habitats will provide benefits to a multitude of native fish and wildlife species, as well as other natural resources.  Conservation Values also include "Essential Fish Habitat" for Pacific salmon and all life stages and associated habitat, for, among other things, the threatened Puget Sound Chinook salmon (*Oncorhyncus tshawytscha*), Puget Sound steelhead (*O. mykiss),* and Bull trout  (*Salvelinus confluentus).*  The Conservation Values of the Property are more fully set forth in the Conservation Documents.

E.     The National Marine Fisheries Service ("NMFS"), an agency within the United States Department of Commerce, exercises jurisdiction with respect to the conservation, protection, restoration, enhancement, and management of anadromous and marine fish species and habitat pursuant to various federal laws including the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"), the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661-666c, and the Fish and Wildlife Act of 1956, 16 U.S.C. §742(f) et seq.

F.     The United States Fish and Wildlife Service ("USFWS"), an agency within the United States Department of the Interior, has jurisdiction over the conservation, protection, restoration and management of fish, wildlife, native plants, and the habitat necessary for biologically sustainable populations of these species within the United States pursuant to the Endangered Species Act, 16 U.S.C. § 1531, et seq., the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661-666(c), the Fish and Wildlife Act of 1956, 16 U.S.C. § 742(f), et seq., and other provisions of federal law.

G.     The Trustee Council consists of the following members: the Tulalip Tribes, the Suquamish Tribe, Washington State as represented by the Department of Ecology, the National Oceanic and Atmospheric Administration ("NOAA") on behalf of the United States Department of Commerce, and the United States Fish and Wildlife Service ("USFWS") on behalf of the United States Department of the Interior. As referenced to in this Conservation Easement, "Trustee Council" means all of the above listed Trustee Council members. The Trustee Council has conducted a damage assessment for the Port Gardner Bay Area, and is bringing claims for injuries to natural resources under the Model Toxics Control Act, RCW 70.105D, the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.* ("CERCLA"), the Oil Pollution Act of 1990, 33 U.S.C. §§ 9601, *et seq.* and other applicable federal and state law.

H.     Grantor intends to convey to Grantee the right to preserve, protect, sustain, and enhance and/or restore the Conservation Values of the Property in perpetuity.

## COVENANTS, TERMS, CONDITIONS AND RESTRICTIONS

NOW, THEREFORE, in consideration of the above recitals and the mutual covenants, terms, conditions, and restrictions contained herein, and pursuant to the laws of the United States and the State of Washington, Grantor hereby voluntarily grants and conveys to Grantee the Conservation Easement in perpetuity over the Property of the nature and character consistent with the Conservation Documents to the extent hereinafter set forth.

1.     Purpose.  The purpose of this Conservation Easement is to ensure that the Property will be retained forever in a condition contemplated by the Conservation Documents and to prevent any use of the Property that will significantly impair or interfere with the Conservation Values of the Property.  Grantor intends that this Conservation Easement will confine the use of the Property to such activities including, without limitation, those involving the preservation and enhancement of native species and their habitats in a manner consistent with the conservation purposes of this Conservation Easement and the Conservation Documents.

2.     Baseline Documentation. Grantee shall document specifically the Conservation Values in an inventory of relevant features of the Property, which Grantee shall maintain on file at its offices and which shall be incorporated into this Conservation Easement by this reference ("Baseline Documentation").  The Baseline Documentation shall consist of reports, maps, photographs, and other documentation that provide, collectively, an accurate representation of the Property.  The Baseline Documentation is intended to serve as an objective, although nonexclusive, information baseline for monitoring compliance with the terms and conditions of this Conservation Easement.  Grantee shall timely provide Grantor with a copy of the Baseline Documentation. Through the process of establishing the Conservation Values for baseline there may be from time to time such annual reports, "as-built" plans, and other documentation of the condition of the Property ("Mitigation Plans & Reports") sufficient to constitute the Baseline Documentation prepared by the Grantor. Grantor agrees to provide Grantee with a copy of each such document constituting a Mitigation Plan or Report.  The Grantee may, but shall have no obligation to independently obtain any other information for the purpose of establishing or updating the Baseline Documentation.

3.     Rights of Grantee.  To accomplish the purposes of this Conservation Easement, Grantor hereby grants and conveys the following rights to Grantee, consistent with the Conservation Documents:

A.     To preserve, protect, sustain, and enhance and/or restore the Conservation Values of the Property.

B.     To enter upon the Property at reasonable times, subject to giving Grantor 24 hours notice, except in cases where Grantee determines that immediate entry is required to prevent, terminate, or mitigate a violation of the Conservation Easement, to monitor Grantor's compliance with and to otherwise enforce the terms of this Conservation Easement, or for the exercise of Grantee's rights that may be unrelated to maintaining conditions contemplated by the Conservation Documents, such as but not limited to, the exercise of tribal treaty rights; provided that Grantee shall not unreasonably interfere with Grantor's authorized use and quiet enjoyment of the Property.

C.    To prevent any activity on or use of the Property that is inconsistent with the Conservation Values of the Property, including the habitat conservation purposes of this Conservation Easement, and to require the restoration of such areas or features of the Property that may be damaged by any act, failure to act, or any use or activity that is inconsistent with the purposes of this Conservation Easement.  The lawful exercise of tribal treaty rights is consistent with the purposes of this Conservation Easement.

D.    All mineral, air and water rights necessary to preserve, protect and sustain the biological resources and Conservation Values of the Property, unless specifically excluded from this Conservation Easement, including Grantor's right, title and interest in and to any waters consisting of: (a) any riparian water rights appurtenant to the Property; (b) any appropriative water rights held by Grantor to the extent those rights are appurtenant to the Property; (c) any waters, the rights to which are secured under contract between the Grantor and any irrigation or water district, to the extent such waters are customarily applied to the Property; and (d) any water from wells that are in existence or may be constructed in the future on the Property or on those lands described as excepted from the Property in the legal description and that were historically used by the Grantor to maintain the Property in a flooded condition (collectively, "Easement Waters").  The Easement Waters, mineral, air and water rights are limited to the amount of Grantor's waters reasonably required to maintain the Conservation Values of the Property.

E.    All present and future development rights appurtenant to, allocated, implied, reserved or inherent in the Bank Property; such rights are hereby terminated and extinguished and may not be used on or transferred to any portion of the Bank Property, nor any other property adjacent or otherwise.

4.    Prohibited Uses.  Any activity on or use of the Property inconsistent with the Conservation Values of the property, the purposes of this Conservation Easement and the Conservation Documents is prohibited.  Without limiting the generality of the foregoing, Grantor, its personal representatives, heirs, successors, assigns, employees, agents, lessees, licensees, invitees, and Grantee are expressly prohibited from doing or permitting any of the following on the Property unless specifically authorized by the Conservation Documents:

A.    The legal or "de facto" division or subdivision of the Property, which shall include, but not be limited to, any subdivision, short subdivision, platting, binding site plan, testamentary division, or other process by which the Property is divided into lots. This prohibition shall not be interpreted to preclude any lot line adjustment that does not create a number of lots that is greater than the number of lots in existence on the effective date of the Conservation Easement.

B.    Construction, reconstruction or placement of any building, billboard, sign, structure, or other improvement including, but not limited to, roads, railroads, utilities, cellular phone towers, septic systems, wells, recreational facilities, docks/piers, and parking lots.

C.    Unseasonable watering; use of fertilizers, biocides, or other agricultural chemicals; incompatible fire protection activities; and any and all other uses which may adversely affect the conservation purposes of this Conservation Easement.

D.      Grazing, the keeping of domesticated animals, and agricultural activity of any kind.

E.      Commercial or industrial uses.

F.      Depositing or accumulating soil, trash, ashes, refuse, waste, bio-solids or any other material.

G.      Filling, dumping, excavating, draining, dredging, mining, drilling, removing, exploring for or extracting minerals, loam, gravel, soil, rock, sand or other material on or to a depth of 100 ft below the surface of the Property, or granting or authorizing surface entry for any of these purposes of the Property, or granting or authorizing surface entry for any of these purposes.

H.      Altering the surface or general topography of the Property, including building roads, paving or otherwise covering the Property with concrete, asphalt, or any other impervious material. Shoreline armoring is prohibited on the Property, except in the case of a breach of the agricultural dike system prior to Final Completion.  Any and all temporary shoreline armoring that is allowed in the event of a breach of the agricultural dike system shall be removed at Final Completion.

I.      Removing, destroying, or cutting trees, shrubs or other vegetation, except as required for:  (i) fire breaks; (ii) maintenance of existing foot trails or roads; (iii) prevention or treatment of disease; or (iv) utility line clearance.

J.      Use of motorized vehicles, including off-road vehicles, except on existing roadways, inasmuch as they are harmful or adverse to the conservation purposes of the Conservation Easement, otherwise they shall be allowed for the purposes of land management and monitoring.

K.      Transferring any water right necessary to maintain or restore the biological resources of the Property.

L.      Planting, introduction or dispersal of non-native or exotic plant or animal species.

M.      Manipulating, impounding or altering any natural watercourse, body of water or water circulation on the Property and any activities or uses detrimental to water quality, including but not limited to degradation or pollution of any surface or sub-surface waters.

N.      Recreational activities shall be allowed so long as they are not adverse or harmful to the Conservation Values of the Property and the conservation purposes of the Conservation Easement. Grantor shall not construct improvements in furtherance of the foregoing recreational uses and activities.

O.      Permitting a general right of access to the Property.

5.      Grantor's Duties.  Grantor shall undertake all reasonable actions to prevent the unlawful entry and trespass by persons whose activities may degrade or harm the Conservation Values of the Property and are inconsistent with the Conservation Documents.  In addition,

Grantor shall undertake all necessary actions to perfect Grantee's rights under this Conservation Easement, including, but not limited to, Grantee's water rights.

6.      <u>Grantor's Reserved Rights</u>.  To ensure that the purposes of this Conservation Easement as described in Section 1 are being accomplished, Grantee and its successors and assigns shall:

- Perform, at a minimum on an annual basis, compliance monitoring inspections of the Property as compared to baseline; and

- Prepare reports on the results of the compliance monitoring inspections, and provide these reports to NMFS or their designee and the Trustee Council or their designee on an annual basis.

All rights accruing from Grantor's ownership of the Property, including the right to manage and maintain the Property consistent with the Conservation Documents, establish a mitigation bank, and engage in or permit or invite others to engage in all uses of the Property that are not prohibited herein and are not inconsistent with the purposes of this Conservation Easement, are reserved to Grantor and Grantor's personal representatives, heirs, successors, and assigns.

7.      <u>Grantor's Obligations</u>. Grantor shall comply with all state and local requirements for controlling noxious weeds within the Property.  All pesticide and herbicide application must be performed by a licensed applicator.

8.      <u>Remedies for Violation and Corrective Action</u>.  If Grantee, Grantor, or NMFS determine there is a violation of the terms of this Conservation Easement or that a violation is threatened, written notice of such violation and a demand for corrective action sufficient to cure the violation shall be given to Grantor or Grantee.  Within ten (10) days of the receipt of written notice of such violation, the notice recipient shall provide a written response to each of the parties to this Conservation Easement pursuant to section 14 of this Conservation Easement. In any instance, measures to cure the violation shall be reviewed and approved by NMFS, and Grantee if Grantee is the Party providing notice.  If a violation is not cured within 30 days after receipt of written notice and demand, or if the cure reasonably requires more than 30 days to complete and there is failure to begin the cure within the 30-day period or failure to continue diligently to complete the cure, the Parties shall first engage in the following dispute resolution process to resolve any disputes arising related to the violation and cure.  The Grantee, Grantor, or NMFS shall issue a written Notice of Deficiencies to all Parties, detailing the claimed deficiencies concerning the violation and cure. The Notice of Deficiencies shall identify a higher-level administrative officer within the issuing Party's organization who shall represent the Party in the dispute resolution process ("Dispute Resolution Representative"). The Notice of Deficiencies shall include the Dispute Resolution Representative's contact information. Within fourteen (14) days of the receipt of the Notice of Deficiencies, the remaining Parties shall identify corresponding Dispute Resolution Representatives within their respective organizations and communicate to schedule a joint conference to be held at the earliest opportunity. The Dispute Resolution Representatives shall engage in a reasonable, good-faith effort to review the dispute and decide upon a mutually agreeable cure, which shall be diligently implemented. If, after a reasonable period of time, the Dispute Resolution Representatives are unable to reach

agreement, the Grantor, Grantee, or NMFS may bring an action at law or in equity in a court of competent jurisdiction to enforce compliance with the terms of this Conservation Easement, to recover any damages to which Grantee, Grantor, or NMFS may be entitled for violation of the terms of this Conservation Easement or for any injury to the Conservation Values of the Property, or for other equitable relief, including, but not limited to, the restoration of the Property to the condition in which it existed prior to any violation or injury. Without limiting violator's liability therefore, any damages recovered may be applied to the cost of undertaking any corrective action on the Property.

8.1     Injunctive Relief.  If Grantee, Grantor, or NMFS, in its sole discretion, determines that circumstances require immediate action to prevent or mitigate significant damage to the Conservation Values of the Property, Grantee, Grantor, or NMFS may pursue its remedies under this Section without prior notice or without waiting for the period provided for cure to expire to enjoin the violation, *ex parte* as necessary, by temporary or permanent injunction without the necessity of proving either actual damages or the inadequacy of otherwise available legal remedies, and to require the restoration of the Property to the condition that existed prior to any such injury.  The remedies described in this Section shall be cumulative and shall be in addition to all remedies now or hereafter existing at law or in equity.  The failure of Grantee, Grantor, or NMFS to discover a violation or to take immediate legal action shall not bar taking such action at a later time.

8.2     Standing.  If at any time Grantee, Grantor, or any successor in interest or subsequent transferee uses or threatens to use the Property for purposes not in conformance with the stated conservation purposes contained herein, or releases or threatens to abandon this Conservation Easement in whole or in part, then, the Washington Attorney General and Third Party Beneficiaries have standing as interested parties in any proceeding affecting this Conservation Easement.

8.3     Costs of Enforcement.  The prevailing Party shall be entitled to recover damages for the violation of the terms of this Easement or injury to any Conservation Values protected by this Easement. Without limiting Grantor's liability in any way, Grantee shall first apply any damages recovered to the cost of undertaking corrective or restoration action on the Property.

8.4     Enforcement Discretion.  Enforcement of the terms of this Conservation Easement shall be at the discretion of Grantee or Third party Beneficiaries (as hereinafter defined) and any forbearance to exercise rights of enforcement under this Conservation Easement in the event of any breach of any term of this Conservation Easement shall not be deemed or construed to be a waiver of such term or of any subsequent breach of the same or any other term of this Conservation Easement or of any rights under this Conservation Easement.  No delay or omission in the exercise of any right or remedy upon any breach shall impair such right or remedy or be construed as a waiver. Notwithstanding the foregoing, nothing in this Conservation Easement shall be interpreted to waive or toll any applicable statutes of limitation.

8.5     Acts Beyond Grantee's or Grantor's Control.  Nothing contained in this Conservation Easement shall be construed to entitle Grantee, Grantor, or NMFS to bring any action for any injury to or change in the Property resulting from causes beyond Grantee or Grantor's control, including, without limitation, fire not caused by Grantee or Grantor, flood,

storm, and earth movement, or from any prudent action taken by Grantee or Grantor under emergency conditions to prevent, abate, or mitigate significant injury to the Property resulting from such causes, or from any action taken by Grantee or Grantor to protect human health or safety.

      8.6    Third Party Beneficiary Right of Enforcement.  All rights and remedies conveyed under this Conservation Easement shall extend to and are enforceable by NMFS and the Trustee Council (collectively, NMFS and the Trustee Council are referred to herein as the "Third Party Beneficiaries"). These rights of enforcement are in addition to, and do not limit, the rights of enforcement under the Conservation Documents. If Grantor exercises its right to establish a mitigation bank on the Property, this Conservation Easement may be amended to extend rights of enforcement to other approving agencies.

      9.    Costs and Liabilities.  Grantor retains all responsibilities and shall bear all costs and liabilities of any kind related to the ownership, operation, upkeep, and maintenance of the Property, including transfer costs, costs of title and documentation review, and maintenance of adequate liability insurance coverage.  Grantor remains solely responsible for obtaining any applicable permits and approvals required for any activity or use permitted on the Property by this Conservation Easement, and any such activity or use shall be undertaken in accordance with all applicable federal, state, local and administrative agency laws, statutes, ordinances, rules, regulations, orders and requirements.

      9.1    Taxes; No Liens.  Grantor shall pay before delinquency all taxes, assessments, fees, and charges of whatever description levied on or assessed against the Property by competent authority (collectively, "taxes"), including any taxes imposed upon, or incurred as a result of, this Conservation Easement, and shall furnish Grantee with satisfactory evidence of payment upon request.  Grantor shall keep Grantee's interest in the Property free from any liens, including those arising out of any obligations incurred by Grantor for any labor or materials furnished or alleged to have been furnished at or for use on the Property.

      9.2    Hold Harmless.

      9.2.1  By Grantor.  Grantor shall hold harmless, indemnify, and defend Grantee and its members, directors, officers, employees, agents, and contractors and the heirs, personal representatives, successors, and assigns of each of them (collectively, "Grantee Indemnified Parties"), from and against any and all liabilities, penalties, costs, losses, damages, expenses, causes of action, claims, demands, orders, liens, or judgments, including, without limitation, reasonable attorneys' fees (collectively, "Losses"), arising from or in any way connected with:  (a) injury to or the death of any person, or physical damage to any property, resulting from any act, omission, condition, or other matter related to or occurring on or about the Property caused by Grantor and/or Grantor's agents, representatives, officers, partners, members, shareholders, employees, contractors and/or subcontractors, unless due to the negligence of any of the Grantee Indemnified Parties; (b) Grantor's  failure to perform its obligations under this Conservation Easement; and (c) Grantor's breach of its obligations, covenants, representations, and warranties of this Conservation Easement relating to Costs and Liabilities of this Section 9.

9.2.2  By Grantee.  Grantee shall hold harmless, indemnify, and defend Grantor and its members, commissioners, officers, employees, agents, and contractors and the heirs, personal representatives, successors, and assigns of each of them (collectively, "Grantor Indemnified Parties"), from and against any and all Losses arising from or in any way connected with:  (a) injury to or the death of any person, or physical damage to any property, resulting from any act, omission, condition, or other matter related to or occurring on or about the Property caused by Grantee  and/or Grantee's, agents, representatives, employees, contractors and/or subcontractors in carrying out activities as Grantee under this conservation easement, unless due to the negligence of any of the Grantor Indemnified Parties; (b) Grantee's  failure to perform its obligations under this Conservation Easement; and (c) Grantee's breach of its obligations, covenants, representations, and warranties of this Conservation Easement relating to Costs and Liabilities of this Section 9.

9.3     No Hazardous Materials Liability.  Grantor represents and warrants that it has no knowledge of any release or threatened release of hazardous materials in, on, under, about, or affecting the Property, except as stated in Exhibit H-1 of the Conservation Instrument. Without limiting the obligations of Grantor as otherwise provided in this instrument, Grantor agrees to indemnify, protect, and hold harmless the Indemnified Parties against any and all Claims arising from or connected with any hazardous materials present, released in, on, from, or about the Property, at any time, of any substance now or hereafter defined, listed, or otherwise classified pursuant to any federal state, or local law, regulation, or requirement as hazardous, toxic, polluting, or otherwise contaminating to the air, water, or soil, or in any way harmful or threatening to human health or the environment, unless caused solely by any of the Indemnified Parties.

10.     Best and Most Necessary Use.  The habitat conservation purposes of the Conservation Easement are presumed to be the best and most necessary public use.

11.     Conservation Easement Assignment or Transfer.  This Conservation Easement may be assigned or transferred by Grantee or any successor in interest upon written approval of Grantor, and NMFS, which approval shall not be unreasonably withheld, but Grantee shall give Grantor and Third Party Beneficiaries at least thirty (30) days prior written notice of the transfer. Approval of any assignment or transfer may be withheld whenever it will result in a merger of the Conservation Easement and the Property in a single Property owner (thereby extinguishing the Conservation Easement) if no method or mechanism deemed adequate to preserve, protect, and sustain the Property in perpetuity has been established.  Grantee or any successor in interest may assign or transfer its rights and obligations under this Conservation Easement only to an entity or organization that is authorized to acquire and hold easements under applicable law (RCW 64.04.130) and is approved by NMFS.  As a condition of such assignment or transfer, Grantee shall require that the conservation purposes of this Conservation Easement and the Conservation Documents are carried out and notice of such restrictions, including the Conservation Documents, shall be recorded in the County where the Property is located.  The failure of Grantee to perform any act required by this paragraph shall not impair the validity of this Conservation Easement or its enforcement in any way.

12.     Subsequent Property Transfer.  Grantor agrees to incorporate the terms of this Conservation Easement in any deed or other legal instrument by which Grantor divests itself of

any interest in all or a portion of the Property, including, without limitation, a leasehold interest. Grantor further agrees to give Grantee and Third Party Beneficiaries written notice of the intent to transfer any interest at least 30 days prior to the date of such transfer. Such notice shall include the name, address, and telephone number of the transferee or the transferee's representative. Grantee or NMFS shall have the right to prevent subsequent transfers in which prospective subsequent claimants or transferees are not given notice of the terms, covenants, conditions and restrictions of this Conservation Easement or whenever a subsequent Property transfer will result in a merger of the Conservation Easement and the Property in a single Property owner (thereby extinguishing the Conservation Easement) if no method or mechanism deemed adequate to preserve, protect, and sustain the Property in perpetuity has been established.  The failure of Grantor to perform any act required by this section shall not impair the validity of this Conservation Easement or limit its enforcement in any way.

13.     Estoppel Certificates.  Grantee shall, within 30 business days after receiving Grantor's request therefore, execute and deliver to Grantor a document certifying, to the best knowledge of the person executing the document, that Grantor is in compliance with any obligation of Grantor contained in this Conservation Easement, or otherwise evidencing the status of such obligation to the extent of Grantee's knowledge thereof, as may be reasonably requested by Grantor.

14.     Notices.  Any notice, demand, request, consent, approval, or other communication that Grantor, Grantee, or Third Party Beneficiaries desires or is required to give to the others with the exception of Section 3 (D) shall be in writing and either served personally or sent by first-class mail, postage prepaid or by recognized overnight courier that guarantees next-day delivery addressed as follows:

| | |
|---|---|
| To Grantor: | Wildlands of Washington, LLC |
| | Attn:  General Counsel |
| | 3301 Industrial Ave. |
| | Rocklin, CA  95765 |
| | Phone:  (916) 435-3555 |
| | Fax:  (916) 435-3556 |
| | |
| | Port of Everett |
| | Chief of Legal Affairs |
| | PO Box 538 |
| | Everett, Washington 98206 |
| | Phone: (425) 388-0702 |
| | |
| To Grantee: | Timothy Brewer |
| | Tulalip Tribes Offices of the Reservation Attorney |
| | 6406 Marine Drive |
| | Tulalip, WA 98271 |
| | |
| To NMFS: | National Oceanic and Atmospheric Administration |
| | National Marine Fisheries Service |
| | Attn: Regional Administrator |

- 10 -

Northwest Region - F/NW
7600 Sand Point Way NE
BIN C15700, Bldg. 1
Seattle, WA 98115-0070
Phone: 206-526-6150
Fax: 206-526-6426

To Trustee Council:

**United States Fish and Wildlife Service:**

Office of the Regional Solicitor
U.S. Department of the Interior
805 SW Broadway, Suite 600
Portland, OR 97205
Phone: (503) 231-2145
Fax: (503) 231-2166

Fish and Wildlife Biologist/NRDA Specialist
U.S. Fish and Wildlife Service
Washington Fish and Wildlife Office
510 Desmond Drive, SE, Suite 102
Lacey, Washington 98503-1263
Phone: (360) 753-6053

**National Oceanic and Atmospheric Administration**:

National Oceanic and Atmospheric Administration
Office of General Counsel, Natural Resources Section
U.S. Department of Commerce
501 W. Ocean Blvd, Suite 4470
Long Beach, CA 90802

National Oceanic and Atmospheric Administration
NMFS Restoration Center
U.S. Department of Commerce
7600 Sand Point Way NE
Seattle, WA 98115

**Washington State:**

Toxics Cleanup Program
State of Washington
P.O. Box 47600
Olympia, WA 98504-7600

Attorney General's Office
P.O. Box 40117
Olympia, WA 98504-0117

**Suquamish Tribe:**

Melody Allen
Office of Tribal Attorney
P.O. Box 498
18690 Suquamish Way
Suquamish, WA 98392

**Tulalip Tribes:**

Kurt Nelson
Environmental Manager
Tulalip Tribes
6406 Marine Drive
Tulalip, WA 98271

Timothy Brewer
Tulalip Tribes Offices of the Reservation Attorney
6406 Marine Drive
Tulalip, WA 98271

or to such other address as a party shall designate by written notice to the others.  Notice shall be deemed effective upon delivery in the case of personal delivery or delivery by overnight courier or, in the case of delivery by first class mail, five (5) days after deposit into the United States mail.

15.   Recordation.  Grantor shall submit an original, signed and notarized Conservation Easement to Grantee and Grantee shall promptly record this instrument in the official records of the County in which the Property is located, and shall thereafter promptly provide a conformed copy of the recorded Conservation Easement to the Grantor and to Third Party Beneficiaries.  Grantee may re-record at any time as may be required to preserve its rights in this Conservation Easement.

16.   Amendment.  This Conservation Easement may be amended by Grantor and Grantee only by mutual written agreement and written approval of NMFS.  Any such amendment shall be consistent with the purposes of this Conservation Easement and shall not affect its perpetual duration, and Grantee shall promptly record this amended instrument in the official records of the County in which the Property is located, and shall thereafter promptly provide a conformed copy of the recorded amended Conservation Easement to the Grantor and to Third Party Beneficiaries.

17.   Limited Waivers of Sovereign Immunity and Venue Stipulation.   Both the Grantor and Grantee recognize and respect the sovereignty and legal status of the other Party.

Each Party further recognizes that the other Party has and reserves all rights, powers and remedies now or hereafter existing at law, in equity or by statute, treaty or otherwise.  Except for the limited waiver set forth herein, this Conservation Easement is not intended nor shall it be construed to diminish, increase or otherwise alter the rights and entitlements of any Party.  Each Party hereby expressly provides a limited waiver of sovereign immunity from suit, and hereby consents to be subject to the jurisdiction and venue of the Snohomish County Superior Court for disputes arising between themselves regarding the interpretation or enforcement of the terms and conditions of this Conservation Easement, but not as to any other matter, person or entity..  Neither Party shall revoke, by any means, that Party's limited waiver of sovereign immunity during the term of this Conservation Easement.  The limited waivers of sovereign immunity provided by each Party shall be effective as of the date of this Conservation Easement and shall continue for the applicable statute of limitations following termination or cancellation of this Conservation Easement, except that such limited waivers of sovereign immunity shall remain effective for any legal proceeding pending at the end of the applicable statute of limitations until the conclusion of any such legal proceeding and enforcement thereof.  The limited waiver of sovereign immunity shall survive termination of this Conservation Easement for the duration of any applicable statute of limitations. Except for the limited waiver of sovereign immunity expressly set forth in this Section 17, nothing in this Conservation Easement is or shall be deemed to be a waiver of any Party's sovereign immunity from suit.

18.    <u>Warranty</u>.  Grantor represents and warrants that, except for the authorized encumbrances set forth in Exhibit C, which is attached hereto and incorporated herein, there is no outstanding mortgage, lien, encumbrance, or other interest in the Property which has not been expressly subordinated to this Conservation Easement, and that, except for another conservation easement established in accordance with the Conservation Documents and which is not adverse to the Conservation Easement established herein, the Property is not subject to any other easement or interest that is adverse to or is not subordinate to this Conservation Easement.

19.    <u>Additional Interests</u>.  Except for another conservation easement established in accordance with the Conservation Documents and which is not adverse to the Conservation Easement established herein, Grantor shall not grant any additional interest in the Property, nor shall Grantor grant, transfer, abandon, or relinquish any water or water right associated with the Property, including without limitation any Easement Waters, without the prior written authorization of Grantee and NMFS.  Such consent may be withheld if the proposed interest or transfer is inconsistent with the purposes of this Conservation Easement and the Conservation Documents or will impair or interfere with the Conservation Values of the Property.  This Section shall not prohibit the transfer of a fee title or leasehold interest in the Property that is otherwise subject to and complies with the terms of this Conservation Easement.

20.    <u>Third-Party Beneficiaries and Access.</u>  Grantor and Grantee acknowledge that where NMFS and the Trustee Council are neither Grantor nor Grantee, Third Party Beneficiaries have the right of access to the Property for monitoring or conservation activities contemplated by this Conservation Easement or the Conservation Documents, except in cases where Third Party Beneficiaries determine that immediate entry is required to prevent, terminate, or mitigate a violation of the Agreement, such access is subject to providing the Grantor with 48 hours notice, and with rights to enforce all of the provisions of this Conservation Easement.

21.    General Provisions.

21.1    Controlling Law.  The interpretation and performance of this Conservation Easement shall be governed by the laws of the State of Washington and applicable Federal law including the ESA.

21.2    Involuntary Succession. If at any time the Grantor and NMFS shall reasonably determine the Grantee is unable to carry out its responsibilities under this Conservation Easement, the Grantor and NMFS shall have the right to notify the Grantee in writing of this determination and the reasons therefore.  The Grantee shall have 30 days to cure the disability or if the disability cannot be cured within this period, the Grantee shall take reasonable steps toward curing the disability within this time period.  However, if the Grantee is unwilling or unable to establish its capacity to carry out the Conservation Easement responsibilities, the Conservation Easement shall be assigned by the Grantee, by a legal representative of the Grantee, or by court order, to a qualified successor approved by the Grantor and NMFS.

21.3    Liberal Construction.  Any general rule of construction to the contrary notwithstanding, this Conservation Easement shall be liberally construed in favor of the deed to affect the purposes of this Conservation Easement.  If any provision in this instrument is found to be ambiguous, an interpretation consistent with the purposes of this Conservation Easement that would render the provision valid shall be favored over any interpretation that would render it invalid.

21.4    Severability.  If any provision of this Conservation Easement or the application thereof is found to be invalid the remaining provisions of this Conservation Easement or the application of such provisions other than that found to be invalid shall not be affected thereby.

21.5    Entire Agreement.  This Conservation Easement and the Conservation Documents incorporated by reference herein, including all of the exhibits thereto, together set forth the entire agreement of the parties and supersede all prior discussions, negotiations, understandings, or agreements relating to the Conservation Easement, all of which are merged herein.  No alteration or variation of this instrument shall be valid or binding unless contained in an amendment in accordance with the provisions herein.

21.6    No Forfeiture.  Nothing contained herein will result in a forfeiture or reversion of Grantor's title in any respect.

21.7    Successors.  The covenants, terms, conditions, and restrictions of this Conservation Easement shall be binding upon, and inure to the benefit of, the parties hereto and their respective personal representatives, heirs, successors, and assigns and shall constitute a servitude running in perpetuity with the Property.

21.8    Termination of Rights and Obligations.  A party's rights and obligations under this Conservation Easement terminate upon transfer of the party's interest in the Conservation Easement or Property, except that liability for acts, omissions or breaches occurring prior to transfer shall survive transfer.

21.9   <u>Captions</u>.  The captions in this instrument have been inserted solely for convenience of reference and are not a part of this instrument and shall have no effect upon its construction or interpretation.

21.10   <u>Effective Date</u>. The effective date of this Conservation Easement is the date of the recording of this easement.

21.11   <u>Counterparts</u>.  The parties may execute this instrument in two or more counterparts, which shall, in the aggregate, be signed by both parties; each counterpart shall be deemed an original instrument as against any party who has signed it.  In the event of any disparity between the counterparts produced, the recorded counterpart shall be controlling.

IN WITNESS WHEREOF, Grantor has executed and delivered this Conservation Easement Deed as of the day and year first above written.

GRANTOR (PROPERTY OWNER):

By: _____

Title: _____

Date: _____


GRANTEE:

By: _____

Title: _____

Date: _____

**Exhibit A**

**Overall Property**

To be provided

**Exhibit B**

**Property [legal description of easement area]**

To be provided

**Exhibit C**

**Authorized Encumbrances**

To be provided

# Appendix E

PROJECT ESCROW AGREEMENT

This Project Escrow Agreement ("Agreement") is made and entered into this ___th day of _____, 2018, by the Port of Everett ("Port") and Zions Bancorporation, National Association ("Escrow Agent") (each a "Party" and collectively "the Parties").

**WHEREAS**, the Port and the Port Gardner Bay Trustee Council ("Trustee Council") – comprised of the National Oceanic and Atmospheric Administration ("NOAA") on behalf of the Department of Commerce, the United States Department of the Interior, the Washington Department of Ecology on behalf of the State of Washington, the Tulalip Tribes, and the Suquamish Tribe – propose to enter into a Consent Decree, hereinafter called the "Decree," to be filed in the United States District Court for the Western District of Washington ("Court"). Pursuant to Paragraph 22 of the proposed Decree, the Port must establish an escrow account ("Project Escrow Account") for the purpose of funding construction of the Blue Heron Slough Restoration Project ("Project"). The Project Escrow Account shall have two subaccounts: the Direct Subaccount and the Transfer Subaccount, to be funded as described below.

**WHEREAS**, pursuant to a [DATE] escrow agreement between the Port and the Tulalip Tribes ("Tulalip-Port Escrow Agreement"), Escrow Agent is currently maintaining an escrow account with funds that will be used for the Project and will be deposited in the Transfer Subaccount established by this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties hereto agree as follows:

**SECTION 1. Appointment of Escrow Agent.**
The Port hereby appoints Zions Bancorporation, National Association to serve as Escrow Agent under the Agreement on the terms and conditions set forth herein.

**SECTION 2. The Escrow Fund, Release of Funds and Termination.**

(a) Within 5 business days of the date on which the Court enters the Decree (the "Entry Date"), the Port shall notify the Escrow Agent, in writing, that the Decree has been entered.  Within 5 days after the date on which the Escrow Agent receives notice that the Decree has been entered:

    i.   The Escrow Agent shall establish a separate escrow account maintained by the Escrow Agent for purposes of this Agreement and containing two subaccounts, the Direct Subaccount and the Transfer Subaccount; and

    ii.   Pursuant to the terms of the Tulalip-Port Escrow Agreement, the Escrow Agent shall tender $3,946,633.00 from the Tulalip-Port Escrow Account for deposit in the Transfer Subaccount.

(b) Within 30 days of the Entry Date, the Port shall tender $5,000.00 to the Escrow Agent for deposit in the Direct Subaccount pursuant to written direction by the Port.  Any subsequent deposits by the Port shall also be deposited in the Direct Subaccount pursuant to written direction by the Port unless otherwise specified.

(c) Pursuant to Paragraph 24 and Appendix F of the Decree, the Port and the Trustee Council are the beneficiaries of a construction performance bond for the Project issued by the Hartford Fire Insurance Company [or other surety] ("Surety").  If, at a later date, the Surety pursuant to written notification to Escrow Agent tenders funds to the Escrow Agent, such funds shall be deposited in the Transfer Subaccount.  Any other deposits by parties other than the Port shall also be deposited in the Transfer Subaccount unless otherwise specified.

(d) All funds received by the Escrow Agent pursuant to the terms of this Agreement shall be held and disbursed in accordance with the terms and conditions of this Agreement.  The Escrow Agent shall invest the funds in the Project Escrow Account in an interest bearing account(s) at an FDIC-insured financial institution to be selected by the Port.  In the event the Escrow Agent does not receive written direction regarding investments, the deposits will remain uninvested until written direction is received.

(e) All interest earned on such funds shall be available for purposes of this Agreement.  In the event the funds in the Project Escrow Account exceed the amounts needed for construction of the Project as described in Appendix C to the Decree, at the end of the

2

term of this Agreement any balance in the Direct Subaccount shall be released to the Port, and any balance in the Transfer Subaccount shall be released to subaccount #0613 of the U.S. Department of the Interior's Natural Resource Damage Assessment and Restoration Fund ("NRDAR Fund") pursuant to written instructions provided to Escrow Agent.

(f) The Escrow Agent shall disburse funds on the following conditions:

    i.    On a periodic basis the Port's authorized officer will direct in writing in the form attached as Exhibit B that the Escrow Agent shall disburse funds to Wildlands of Washington, LLC ("Wildlands") and/or other entities performing construction services for the Project. These disbursements shall be made pursuant to instructions provided by the Port in the form attached as Exhibit B.  The funds held in the Transfer Subaccount shall be fully disbursed before the disbursement of any funds from the Direct Subaccount.

    ii.    Pursuant to Paragraph 26(d) of the Decree, the Trustee Council may provide the Escrow Agent with a Notice of Exercise of Performance Guarantee.  Such notice shall be provided by the Trustee Council to Escrow Agent in writing. Unless otherwise directed by the Court, upon the Escrow Agent's receipt of a written Notice of Exercise of Performance Guarantee, the Escrow Agent shall disburse funds from the Transfer Subaccount pursuant to instructions provided by the Trustee Council.  No Notice of Exercise of Performance Guarantee shall be transmitted by the Trustee Council to the Escrow Agent except in conformity with the procedures described in Paragraph 26 of the Decree.

(g) <u>Escrow Agent Performance</u>. The Escrow Agent shall only perform such duties as are expressly set forth in this Agreement and no implied duties or conditions shall be read into this Agreement. The Escrow Agent may resign from its duties or obligations hereunder by giving written notice 30 days in advance of such resignation to the Port. Advance written notice shall specify a date when such resignation shall take effect, but no such resignation shall be effective until at least 30 days following the date on which the Escrow Agent provided notice. In the event that the Port has not appointed a new escrow agent under this Agreement and provision has not been made to transfer the Project Escrow Account to such new escrow agent prior to the effective date of

the resignation of the Escrow Agent, then the Escrow Agent may apply to any court of competent jurisdiction to appoint a successor Escrow Agent which shall be a commercial bank organized under the laws of the United States or the State of Washington and having a combined capital and surplus of at least $50 million.

(h) <u>Effective Date</u>. This Agreement shall take effect on the date of the signing of the Agreement by the last party to sign.

(i) <u>Notices.</u> Any written notices required in this Escrow Agreement shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by email to the addresses noted below:

John Carter
CFO
Port of Everett
1205 Craftsman Way, Suite 200
Everett, WA  98201
Email: johnc@portofeverett.com

Bob Marion
Controller
Port of Everett
1205 Craftsman Way, Suite 200
Everett, WA  98201
Email: robertm@portofeverett.com

Zions Bancorporation, National Association
Michael A. Jones, Vice President
601 Union Street, Suite 3600
Seattle, WA 98101
Email: Michael.a.jones@zionsbank.com

The Port and/or Escrow Agent may change the contact to which notices or other written communications to them are to be given by giving notice as required under this section.

(j) <u>Jurisdiction</u>. Any action, lawsuit or proceeding that may arise pursuant to this Agreement, unless otherwise specified in this Agreement, must be instituted in the United States District Court for the Western District of Washington.

(k) <u>Modifications to Project Construction</u>.  The Port recognizes that the requirements for construction of the Project as described in Appendix C to the Decree may be modified, revised or amended and such changes will not affect the terms and conditions of this Agreement.

(l) <u>Term</u>. The term of this Escrow Agreement is from the Effective Date for ten years or one year from the date the Trustee Council issues its Notice of Approval of Final Completion under Paragraph 12 of the Decree, whichever is first. The term may be extended upon the written agreement of the Port and the Escrow Agent.

(m) <u>Compensation</u>. The Port shall pay Escrow Agent initial acceptance and administrative fees totaling $2,000.00, pursuant to the Escrow Agent fee schedule attached as Exhibit A, at the time of execution of this Escrow Agreement.  All subsequent fees and expenses of Escrow Agent for its services hereunder shall be paid from interest accrued to the Escrow Account.  If such accrued interest is insufficient to pay such fees when due, the Port shall pay the fees and expenses of Escrow Agent. The provisions of this Section (m) shall survive any termination of this Escrow Agreement and removal or resignation of Escrow Agent.

(n) <u>Governing Law</u>.  This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Washington.

(o) <u>Entire Agreement</u>.  This Escrow Agreement and the Decree sets forth the entire agreement and understanding of the Parties.

(p) <u>Amendment</u>.  This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by the Parties.

(q) <u>Waivers</u>.  The failure of any Party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any Party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

5

(r)  <u>Business Day</u>.  For purposes of this Escrow Agreement, the term **"Business Day"** shall mean any day of the year other than a Saturday, Sunday or a day on which national banking institutions in the State of Washington are not open to the public for conducting business.

(s)  <u>Headings</u>.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

(t)  <u>Counterparts</u>.  This Escrow Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any signature page delivered by facsimile or electronic image transmission shall be binding to the same extent as an original signature page. Any Party hereto that delivers a signature page by facsimile or electronic image transmission shall deliver an original counterpart to any other Party that requests such original counterpart.

(u)  <u>Effective date</u>.  This Agreement shall take effect on the date of the signing of the Agreement by the last Party to sign.

[Remainder of page is intentionally left blank.]

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

**PORT OF EVERETT:**

By:_____
    Les Reardanz, CEO

Date:_____

**ESCROW AGENT:**

**ZIONS BANCORPORATION, NATIONAL ASSOCIATION**

By:_____
    Michael A. Jones, Vice President, Zions Bank Division

# EXHIBIT A
## SERVICES AND COMPENSATION PROPOSAL
### Zions Bancorporation, National Association dba Zions Bank
#### Escrow Agreement with Port of Everett

**Acceptance Fee:**                                                                    $500.00

> This one-time charge includes review and acceptance of the account in accordance with the Escrow Agreement.

**\*One-time Administration Fee:**                                                     $1,500.00

> This fee compensates Zions Bank for duties assigned specific to the Escrow Agreement; maintenance of account; maintenance of administrative records; furnishing information to Port of Everett and responding to correspondence and telephone inquiries; on-line statement access; receipt of wires and distribution as provided in Escrow Agreement.

**Out-of-Pocket Expenses (postage, overnight mail, etc.)**                             Billed at Cost

> Extraordinary and travel expenses, such as those incurred to attend meetings, if required, will be billed at actual cost.

**Extraordinary Services**                                                             By Appraisal

> Extraordinary services or services not specifically contemplated with the fee proposal may be subject to special charges. Extraordinary services will be charged based on an assessment of services to be performed.

*This quote is pending final review of the governing documents and transactions contemplated thereby and may be subject to change.*

'To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each party who opens an account.  When you open an account with us, we will ask for appropriate information that will allow us to identify you.'

Exibit B

Disbursement Requisition


TO: Zions Bancorporation, National Association
Corporate Trust Department
601 Union Street, Suite 3600
Seattle WA, 98101
Phone: (206) 438-1263
Fax: (855) 214-2352
Email: michael.a.jones@zionsbank.com

Requisition No:  _____

Disbursement from A/C:_____

Disbursement Amount:_____

Disbursement Date: _____

Purpose:_____

_____


Wire Transfer Instructions to Payee:

Bank Name:_____
ABA#_____
Bank Address:_____
Bank Recipient A/C#_____
Attn:_____
Phone Number:_____


FROM:  PORT OF EVERETT:


By:_____
        Authorized Officer
Dated: _____

# Appendix F

# PERFORMANCE BOND

Bond No. _____

KNOW ALL BY THESE PRESENTS:

That we, Wildlands of Washington, LLC as Principal, hereinafter called **"Principal"**, and Hartford Fire Insurance Company, a Connecticut corporation, as Surety, hereinafter called **"Surety"**, are held and firmly bound unto the Port of Everett, known as the **"Port Obligee,"** and the Port Gardner Bay Trustee Council, known as "**Trustee Obligees**" in the amount of **$5,076,748.21 ("Penal Sum")** for the payment of which sum, well and truly to be made, and the said Principal and Surety bind themselves, and their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents. The Trustee Obligees consist of the National Oceanic and Atmospheric Administration (NOAA) on behalf of the United States Department of Commerce, the United States Department of the Interior, the Washington Department of Ecology on behalf of the State of Washington, the Tulalip Tribes, and the Suquamish Tribe. The Port and the Trustees are referred to collectively as the "**Obligees.**"

WHEREAS, Obligees have developed a document entitled CONSENT DECREE BETWEEN THE PORT GARDNER NATURAL RESOURCE TRUSTEES AND THE PORT OF EVERETT hereinafter called the **"Agreement"**.  Under the guidelines set forth in the Agreement, the Principal must provide financial assurance to guarantee the construction of a natural resource restoration project in accordance with the Agreement.

The habitat restoration project to be guaranteed through the issuance of this Performance Bond shall hereinafter be called the **"Guaranteed Work,"** as defined in Exhibit A hereto.

NOW, THEREFORE, THE CONDITION OF THE ABOVE OBLIGATION IS SUCH, That if Principal shall promptly, faithfully, fully and finally complete the Guaranteed Work, the Surety's obligation shall be null and void, otherwise to remain in full force and effect.

PROVIDED, HOWEVER, That:

1.    The Surety shall become liable on the obligation evidenced hereby only upon receipt of a written notice from an Obligee that the Obligee has determined that the Principal has failed to perform the Guaranteed Work. Such notice shall consist of either:

a.  Written notice from the Port Obligee that the Principal has failed to perform

1

the Guaranteed Work and is in Default (as defined in Exhibit A attached hereto); or

b.  Written notice from the Trustee Obligees that the Trustee Obligees have determined (1) the Principal has failed to perform the Guaranteed Work and is in Default (as defined in Exhibit A attached hereto), and (2) the Port Obligee has failed to ensure the continued construction of the project.

Obligees will provide written notice only in conformity with the terms of the Agreement. Such notice shall include a description of the Principal's failure to perform and shall be forwarded to the Principal, with a copy to the Surety. The notice to the Surety shall be delivered by registered mail to Surety at its Home Office located at One Hartford Plaza, Hartford, Connecticut 06155. In the event of Default, the Surety will have the right and opportunity, at its discretion, to: a) cure the Principal's Default; b) assume the remainder of the Principal's obligations under this Performance Bond and to perform or sublet same; or c) to tender to the Obligee providing the notice funds sufficient (as determined by that Obligee) to pay the cost, or remaining cost, of the Guaranteed Work, up to an amount not to exceed the Penal Sum. Funds tendered to Port Obligee will be funded to the Transfer Subaccount, as defined in the Agreement. Funds tendered to the Trustee Obligees will be funded to a segregated sub-account within the U.S. Department of Interior Natural Resource Damage Assessment and Restoration Fund at the time the Trustee Obligees provide notice to Surety pursuant to Paragraph 1(b). In no event shall the Surety be liable for fines, penalties, or forfeitures assessed against the Principal.

2.  Any action, lawsuit or proceeding that may arise pursuant to this Performance Bond must be instituted in the US District Court for the Western District of Washington. No action, lawsuit or proceeding under the Performance Bond shall be had or maintained against the Surety unless the same be filed and properly served upon the Surety within one year from the effective date of the cancellation of the Performance Bond.

3.  That no right of action shall accrue under this Performance Bond to or for the use of a person or entity other than the Obligees, and their successors and assigns.

4.  The aggregate liability of the surety is limited to the Penal Sum stated herein regardless of the number or amount of claims brought against this Performance Bond and regardless of the number of years this Performance Bond remains in force. The liability of the Surety shall not be discharged by any payment or succession of payments hereunder, unless and until such payment or payments shall amount in the aggregate to the Penal Sum. The Surety's aggregate liability hereunder shall in no event exceed the Penal Sum.

2

5.   Any modification, revision, or amendment which may be made in the terms of the Guaranteed Work or in the work to be done thereunder, or any extension of the Guaranteed Work, or other forbearance on the part of either the Principal or Obligees to the other, shall not in any way release the Principal and the Surety, or either of them, or their heirs, executors, administrators, successors or assigns from liability hereunder. The Surety hereby expressly waives notice of any change, revision, or amendment to the Guaranteed Work or to any related obligations between the Principal and Obligees.

6.   The Surety hereby agrees that the obligations of the Surety under this Performance Bond shall be in no way impaired or affected by any winding up, insolvency, bankruptcy or reorganization of the Principal or by any other arrangement or rearrangement of the Principal for the benefit of creditors.

7.   The Surety will notify the Obligees in writing of any of the following events: (a) the filing by the Surety of a petition seeking to take advantage of any laws relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts; (b) the Surety's consent to (or failure to contest in a timely manner) any petition filed against it in an involuntary case under such bankruptcy or other laws; (c) the Surety's application for (or consent to or failure to contest in a timely manner) the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator, or the like of itself or of all or a substantial part of its assets; (d) the Surety's making a general assignment for the benefit of creditors; or (e) the Surety's taking any corporate action for the purpose of effecting any of the foregoing. Such notice shall be provided within thirty (30) days to the Obligees so as to provide the Obligees time to respond to any of the noted events.

8.   All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, to the addresses shown below. Notice to Obligees shall not be effective unless notice is sent to:

As to the Port of Everett:

Paul Brachvogel
Chief of Legal Affairs
Port of Everett
1205 Craftsman Way, Suite 200
Everett, WA  98201

As to the Trustees:

        Jeff Krausmann
        Fish and Wildlife Biologist/NRDA Specialist
        U.S. Fish and Wildlife Service
        Washington Fish and Wildlife Office
        510 Desmond Drive, SE, Suite 102
        Lacey, Washington  98503-1263

All notices, elections, requests and demands under this Performance Bond shall be effective and deemed received upon the earliest of (a) the actual receipt of the same by personal delivery or otherwise, (b) one business day after being deposited with a nationally recognized overnight courier service as required above, or (c) three business days after being deposited in the United States mail as required above. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, election, request, or demand sent.

9.     Any provision in this Performance Bond that conflicts with any applicable statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or legal requirement shall be deemed incorporated herein.

10.    The Principal may terminate this Performance Bond only by sending written notice of termination to the Surety and to the Obligees; provided, however, that no such termination shall become effective unless and until the Surety receives written authorization for termination of this Performance Bond by the Obligees.

11.    Notwithstanding the provisions of the Agreement, the term of this Performance Bond shall apply from _____[DATE OF BOND]_____, until one year after completion of the Guaranteed Work (as defined in Exhibit A), and may be extended by the Surety by Continuation Certificate.  However, neither nonrenewal by the Surety, nor the failure or inability of the Principal to file a replacement bond in the event of nonrenewal, shall itself constitute a loss to the Obligees recoverable under this Performance Bond or any renewal or continuation thereof.  The liability of the Surety under this Performance Bond or any continuation certificates issued in connection therewith shall not be cumulative and shall in no event exceed the amount as set forth in this Performance Bond or in any additions, riders, or endorsements properly issued by the Surety as supplements thereto.

IN WITNESS WHEREOF, The said Principal and Surety have signed and sealed this instrument on this _____ day of _____, 2019.

SURETY:                                                  PRINCIPAL:

_____        WILDLANDS OF WASHINGTON, INC.,
Hartford Fire Insurance Company              a Washington corporation

                                                                By: _____

_____        Its: _____
Attorney-in-Fact                                       _____ Date:_____
                                                                _____

---

**BOND RELEASE – Bond _____**

Effective the date shown below, the Obligees confirm that the required work has been completed and accepted.  We hereby fully release and exonerate this bond.

For the Port Obligee:

_____
Date

_____
Signature

_____
Name/Title

For the Trustee Obligee:

_____
Date

_____
Signature

_____
Name/Title

# EXHIBIT A

This attachment describes the construction deadlines Principal shall meet for the Guaranteed Work. Subject to the provisions in Section B below, the failure to meet any of the deadlines described in Section A below shall constitute a default by Principal.

A.    Definitions: The terms used in Section B shall have the following meaning.

1.    **"Mobilization"** shall consist of preparatory work; operations; establishment of access roads; institution of traffic controls; and placement of equipment and personnel on site, including but not limited to, those necessary for movement of personnel, equipment, and supplies to the project site to complete the work, and those necessary for all setup and operations that must be performed prior to the beginning of the work on the various items on the project site, or costs incurred. "Mobilization" shall also include incidentals required to perform the Guaranteed Work, such as obtaining permit(s) necessary for mobilization  that have not already been obtained by Principal, job administration, coordination, overhead, and insurance. The costs for mobilization activities required for the Completion of I-5 Dike are included in that project element.

2.    **"Completion of I-5 Dike"** shall consist of all work associated with the completion of the I-5 Dike, as shown in the approved plans and specifications (including contract changes and/or additional regulatory agency requirements and any official amendments), and shall include all earthwork, soil placement, soil compaction, soil stabilization, dike-related plantings, drainage infrastructure construction, access road construction, security construction, and any other action that is required to reach the final completion of the I-5 Dike construction.

3.    **"Substantial Completion (Including Dike Breaching) and Demobilization"** shall consist of all work necessary to substantially complete construction of the Guaranteed Work (including contract changes and/or additional regulatory agency requirements and any official amendments), including work to create tidal connections (i.e., breaches) within the existing dike at the four designated locations, remove the tide gate for the purpose of flooding the site, and connect the constructed habitat channels to the adjacent sloughs in accordance with the project design, as well as demobilize all equipment and unused materials from the site.

4.    **"Effective Date"** means the date upon which the approval of the Agreement is recorded on the Court's docket.

5.    **"Final Completion"** shall consist of any work necessary following Substantial Completion to attain completion of all project elements described in Section 6.1 and 6.2

6

of the Statement of Work attached to the Agreement and all required closeout documentation.

6.      **"Guaranteed Work"** shall consist of the habitat restoration project to be guaranteed through the issuance of this Performance Bond, the approved plans and specifications for which are described in the Final Design and Construction Plan as modified by the Statement of Work attached to the Agreement.

B.      Default: Failure to meet any of the following deadlines shall constitute a default (**"Default"**) by Principal; provided, however, in the event that any of the dates by which the Guaranteed Work must be completed are extended or tolled pursuant to the provisions of the Agreement (e.g., Force Majeure Event (as defined in the Agreement), mutual agreement to extend, et cetera), then the following deadlines shall automatically be extended for an additional period of time equal in length to the duration of such extension or tolling period under the Agreement.

1)      Mobilization shall be complete no more than 365 calendar days from the Effective Date of the Agreement.

2)      Completion of I-5 Dike shall occur no more than 895 calendar days from the Effective Date of the Agreement.

3)      Substantial Completion (Including Dike Breaching) and Demobilization shall be complete no more than 1,095 calendar days from the Effective Date of the Agreement.

4)      Final Completion shall be complete no more than 1,277 calendar days from the Effective Date of the Agreement.

C.      Successful completion of the Guaranteed Work outlined in Section B plus a one-year warranty period shall result in the Obligee's release of the Performance Bond posted to ensure completion of the Guaranteed Work. No claim shall be filed against the Performance Bond after one year of successful completion of the Guaranteed Work.

# Appendix G

MAINTENANCE & MONITORING ESCROW AGREEMENT

This Maintenance & Monitoring Escrow Agreement ("Agreement") is made and entered into this __th day of _____, 2018, by the Port of Everett ("Port") and  Zions Bancorporation, National Association ("Escrow Agent") (each a "Party" and collectively "the Parties").

**WHEREAS**, the Port and the Port Gardner Bay Trustee Council ("Trustee Council") – comprised of the National Oceanic and Atmospheric Administration ("NOAA") on behalf of the Department of Commerce, the United States Department of the Interior, the Washington Department of Ecology on behalf of the State of Washington, the Tulalip Tribes, and the Suquamish Tribe –propose to enter into a Consent Decree, hereinafter called the "Decree," to be filed in the United States District Court for the Western District of Washington ("Court"). Pursuant to Paragraph 23 of the proposed Decree, the Port must establish an escrow account ("Maintenance & Monitoring Escrow Account") for the purpose of funding maintenance and monitoring of the Blue Heron Slough Restoration Project ("Project"), to be funded as described below.

**WHEREAS**, pursuant to a separate escrow agreement to be executed between the Parties, Escrow Agent will be maintaining a separate escrow account ("Project Escrow Account") with a subaccount known as the "Transfer Subaccount."

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties hereto agree as follows:

**SECTION 1. Appointment of Escrow Agent.**
The Port hereby appoints Zions Bancorporation, National Association to serve as Escrow Agent under the Agreement on the terms and conditions set forth herein.

1

**SECTION 2. The Escrow Fund, Release of Funds and Termination.**

(a) Within 60 days of the date on which the Court enters the Decree (the "Entry Date"), the Port shall provide written instructions to the Escrow Agent to transfer $625,836 from the Transfer Subaccount of the Project Escrow Account for deposit in the Maintenance & Monitoring Escrow Account, a separate escrow account maintained by the Escrow Agent for purposes of this Agreement.

(b) All funds received by the Escrow Agent pursuant to the terms of this Agreement shall be held and disbursed in accordance with the terms and conditions of this Agreement. The Escrow Agent shall invest the funds in the Maintenance & Monitoring Escrow Account in an interest bearing account(s) at an FDIC-insured financial institution to be selected by the Port.  In the event the Escrow Agent does not receive written direction regarding investments, the Escrow Agent will hold the moneys received hereunder uninvested.

(c) All interest earned on such funds shall be available for purposes of this Agreement. In the event the funds in the Maintenance & Monitoring Escrow Account exceed the amounts needed for maintenance and monitoring of the Project as described in Appendix C to the Decree, at the end of the term of this Agreement any balance shall upon written instructions from the Port to Escrow Agent (including wire instructions for the destination of the funds) be released to the Port to be applied towards Stewardship of the Project in accordance with Paragraphs 4(y) and 23 of the Decree.

(d) The Escrow Agent shall disburse funds on the following conditions:

    i. On a periodic basis the Port will direct in writing that the Escrow Agent shall disburse funds to Wildlands of Washington, LLC ("Wildlands") and/or other entities performing maintenance and monitoring services for the Project. These disbursements shall be made pursuant to instructions provided by the Port in the form attached as Exhibit B.

    ii. Pursuant to Paragraph 26(d) of the Decree, the Trustee Council may provide the Escrow Agent with a Notice of Exercise of Performance Guarantee.  Such notice shall be provided by the Trustee Council to Escrow Agent in writing. Unless otherwise directed by the Court, upon the Escrow Agent's receipt of a written Notice of Exercise of Performance Guarantee, the Escrow Agent shall

disburse funds from Maintenance & Monitoring Escrow Account pursuant to instructions provided by the Trustee Council.  No Notice of Exercise of Performance Guarantee shall be transmitted by the Trustee Council to the Escrow Agent except in conformity with the procedures described in Paragraph 26 of the Decree.

(e) <u>Escrow Agent Performance</u>. The Escrow Agent shall only perform such duties as are expressly set forth in this in this Agreement and no implied duties or conditions shall be read into this Agreement. The Escrow Agent may resign from its duties or obligations hereunder by giving written notice 30 days in advance of such resignation to Port. Advance written notice shall specify a date when such resignation shall take effect, but no such resignation shall be effective until at least 30 days following the date on which Escrow Agent provided notice. In the event that the Port has not appointed a new escrow agent under this Agreement and provision has not been made to transfer the Maintenance & Monitoring Escrow Account to such new escrow agent prior to the effective date of the resignation of the Escrow Agent, then the Escrow Agent may apply to any court of competent jurisdiction to appoint a successor escrow agent appoint a second escrow agent which shall be a commercial bank organized under the laws of the United States or the State of Washington and having a combined capital and surplus of at least $50 million.

(f) <u>Effective Date</u>. This Agreement shall take effect on the date of the signing of the Agreement by the last Party to sign.

(g) <u>Notices.</u> Any written notices required in this Escrow Agreement shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, to the addresses noted below:

John Carter
CFO
Port of Everett
1205 Craftsman Way, Suite 200
Everett, WA  98201
Email: johnc@portofeverett.com

Bob Marion
Controller
Port of Everett
1205 Craftsman Way, Suite 200
Everett, WA  98201
Email: robertm@portofeverett.com

Michael A. Jones, Vice President
Zions Bankcorporation, National Association
601 Union Street, Suite 3600
Seattle, WA  98101
Email: Michael.a.jones@zionsbank.com

The Port and/or Escrow Agent may change the contact to which notices or other written communications to them are to be given by giving notice as required under this section.

(h) Jurisdiction. Any action, lawsuit or proceeding that may arise pursuant to this Agreement, unless otherwise specified in this Agreement, must be instituted in the United States District Court for the Western District of Washington.

(i) Modifications to Project Construction.  The Port recognizes that the requirements for maintenance and monitoring of the Project as described in Appendix C to the Decree may be modified, revised or amended and such changes will not affect the terms and conditions of this Agreement.

(j) Term. The term of this Escrow Agreement is from the Effective Date until thirty one years from the date the Trustee Council issues its Notice of Approval of Final Completion under Paragraph 12 of the Decree. The term may be extended upon the written agreement of the Port and the Escrow Agent.

(k) Compensation.  The Port shall pay Escrow Agent initial acceptance and administrative fees totaling $2,000.00, pursuant to the Escrow Agent fee schedule attached as Exhibit A, at the time of execution of this Escrow Agreement.  All subsequent fees and expenses of Escrow Agent for its services hereunder shall be paid from interest accrued to the Escrow Account.  If such accrued interest is insufficient to pay such fees when due, the Port shall pay the fees and expenses of Escrow Agent. The provisions of this Section (k) shall survive any termination of this Escrow Agreement and removal or resignation of Escrow Agent.

(l) <u>Governing Law</u>.  This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Washington.

(m) <u>Entire Agreement</u>.  This Escrow Agreement and the Decree sets forth the entire agreement and understanding of the Parties.

(n) <u>Amendment</u>.  This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by the Parties.

(o) <u>Waivers</u>.  The failure of any Party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any Party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

(p) <u>Business Day</u>.  For purposes of this Escrow Agreement, the term **"Business Day"** shall mean any day of the year other than a Saturday, Sunday or a day on which national banking institutions in the State of Washington are not open to the public for conducting business.

(q) <u>Headings</u>.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

(r) <u>Counterparts</u>.  This Escrow Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any signature page delivered by facsimile or electronic image transmission shall be binding to the same extent as an original signature page.  Any Party hereto that delivers a signature page by facsimile or electronic image transmission shall deliver an original counterpart to any other Party that requests such original counterpart.

(s) <u>Effective date</u>.  This Agreement shall take effect on the date of the signing of the Agreement by the last Party to sign.

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

**PORT OF EVERETT:**

By:_____
    Les Reardanz CEO

Date:_____

**ESCROW AGENT:**

**ZIONS BANCORPORATION, NATIONAL ASSOCIATION**

By:_____
    Michael A. Jones, Vice President, Zions Bank Division

# EXHIBIT A
## SERVICES AND COMPENSATION PROPOSAL
### Zions Bancorporation, National Association dba Zions Bank
#### Escrow Agreement with Port of Everett

**Acceptance Fee:**                                                                    $500.00

   This one-time charge includes review and acceptance of the account in accordance with the Escrow Agreement.

**\*One-time Administration Fee:**                                             $1,500.00

   This fee compensates Zions Bank for duties assigned specific to the Escrow Agreement; maintenance of account; maintenance of administrative records; furnishing information to Port of Everett and responding to correspondence and telephone inquiries; on-line statement access; receipt of wires and distribution as provided in Escrow Agreement.

**Out-of-Pocket Expenses (postage, overnight mail, etc.)**                 Billed at Cost

   Extraordinary and travel expenses, such as those incurred to attend meetings, if required, will be billed at actual cost.

**Extraordinary Services**                                                       By Appraisal

   Extraordinary services or services not specifically contemplated with the fee proposal may be subject to special charges. Extraordinary services will be charged based on an assessment of services to be performed.

*This quote is pending final review of the governing documents and transactions contemplated thereby and may be subject to change.*

'To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each party who opens an account. When you open an account with us, we will ask for appropriate information that will allow us to identify you.'

Exibit B

Disbursement Requisition

TO: Zions Bancorporation, National Association
Corporate Trust Department
601 Union Street, Suite 3600
Seattle WA, 98101
Phone: (206) 438-1263
Fax: (855) 214-2352
Email: michael.a.jones@zionsbank.com

Requisition No: _____

Disbursement from A/C:_____

Disbursement Amount:_____

Disbursement Date: _____

Purpose:_____

_____

Wire Transfer Instructions to Payee:

Bank Name:_____
ABA#_____
Bank Address:_____
Bank Recipient A/C#_____
Attn:_____
Phone Number:_____

FROM:  PORT OF EVERETT:

By:_____
       Authorized Officer
Dated: _____